# COMPOSITE EXHIBIT A

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

MENDEZ FUEL HOLDINGS, LLC,
a Florida limited liability company,
MENDEZ FUEL HOLDINGS 1, LLC,
a Florida limited liability company,
MENDEZ FUEL HOLDINGS 2, LLC,
s Florida limited liability company and
MENDEZ FUEL HOLDINGS 3, LLC,
a Florida limited liability company,

       Plaintiffs,

vs.

Case No. _2020-015060-CA-01_

7-ELEVEN, INC.,
a Texas corporation,
SEI FUEL SERVICES, INC.,
a Texas corporation and
KENDALL HEALTHCARE GROUP, LTD.,
a Florida limited partnership,

       Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, MENDEZ FUEL HOLDINGS, LLC, MENDEZ FUEL HOLDINGS 1, LLC,

MENDEZ FUEL HOLDINGS 2, LLC and MENDEZ FUEL HOLDINGS 3, LLC (collectively,

"Plaintiffs"), by and through undersigned counsel, hereby sue Defendants, 7-ELEVEN, INC.,

FUEL SERVICES, INC. and KENDALL HEALTHCARE GROUP, LTD., and in support thereof,

allege as follows:

### Parties, Jurisdiction and Venue

1.    This is an action for damages that exceeds the sum of Thirty Thousand Dollars

($30,000.00), exclusive of interest and costs.

2.      Plaintiff, MENDEZ FUEL HOLDINGS, LLC ("MFH"), is a Florida limited liability company having its principal place of business in Miami-Dade County, Florida.

3.      Plaintiff, MENDEZ FUEL HOLDINGS 1, LLC ("MFH1"), is a Florida limited liability company having its principal place of business in Miami-Dade County, Florida.

4.      Plaintiff, MENDEZ FUEL HOLDINGS 2, LLC ("MFH2"), is a Florida limited liability company having its principal place of business in Miami-Dade County, Florida.

5.      Plaintiff, MENDEZ FUEL HOLDINGS 3, LLC ("MFH3"), is a Florida limited liability company having its principal place of business in Miami-Dade County, Florida.

6.      Defendant, 7-ELEVEN, INC. ("7-Eleven"), is a Texas corporation having its principal place of business in the State of Texas.

7.      Defendant, SEI FUEL SERVICES, INC. ("SEIFS"), is a Texas corporation having its principal place of business in the State of Texas. 7-Eleven is the parent company of SEIFS.

8.      Defendant, KENDALL HEALTHCARE GROUP, LTD. ("KHG"), is a Florida limited partnership having its principal place of business in Miami-Dade County, Florida.

9.      Venue is proper in this Court as the causes of action alleged in this Complaint arose and accrued in Miami-Dade County, Florida.

### General Allegations

10.     On or about May 1, 2017, SEIFS and MFH3 entered into a Motor Fuel Supply & Security Agreement ("Motor Fuel Supply Agreement") pursuant to which SEIFS agreed to sell, and MFH 3 agreed to purchase exclusively from SEIFS, those types of MOBIL branded gasoline and diesel fuels at MFH 3's gasoline station located at 11870 SW 40th Street, Miami, Florida 33175 (the "Premises").

11.     Simultaneous with the execution of the Motor Fuel Supply Agreement, 7-Eleven

2

and MFH3 entered into a Dealer Fuel Lease Agreement pursuant to which 7-Eleven leased to MFH3, and MFH3 leased from 7-Eleven, the Premises for a period of three (3) years, or until April 30, 2020. Similarly, the Motor Fuel Supply Agreement was also for a term of three (3) years, commencing on May 1, 2017 and ending on April 30, 2020.

12.     From the inception of its relationship, MFH3, as well as the other Plaintiffs, enjoyed a fruitful relationship with 7-Eleven, as well as SEIFS, in connection with the operation of their four (4) gasoline stations.  It was a mutually beneficial relationship until 7-Eleven and SEIF decided to pull the rug from under MFH3 commencing Spring 2020.

13.     Unbeknownst to Plaintiffs' principal, Michael Mendez ("Mendez"), at the time, SEIFS commenced discussions with to KHG back in September 2019 to sell the Premises to KHG as KHG was interested in expanding its footprint. Coincidentally, the gasoline station located at the Premises also happened to be Mendez's most profitable gasoline station.

14.     During this time, in or about October 2019, Plaintiffs received a lucrative offer to sell all four (4) of its gasoline stations.  Plaintiffs ultimately entered into an Asset Purchase Agreement ("APA1") with BriBri, LLC ("BriBri") pursuant to which Plaintiffs agreed to sell, and BriBri agreed to purchase, all four (4) of Plaintiffs' gasoline stations for the sum of Five Million Two Hundred Fifty Thousand Dollars ($5,250,000.00).

15.     Around this time, SEIFS' representative, Rob Dowd ("Dowd"), came to visit Mendez and informed Mendez that 7-Eleven and/or SEIFS intended to sell the real estate to the hospital, i.e., KHG, for an unspecified sum of money. Dowd advised Mendez that 7-Eleven and/or SEIFS would shortly provide an executed sales contract to Mendez as 7-Eleven and/or SEIFS intended to close on the sale of the real estate by the end of 2019.

16.     On or about November 18, 2019, Plaintiffs submitted to 7-Eleven and SEIFS a copy

3

of APA1 for their review and approval.

17.     On December 30, 2019, 7-Eleven advised Plaintiffs that it had declined its right of first refusal to acquire Plaintiffs' four (4) gasoline stations. 7-Eleven, however, failed to inform Plaintiffs whether it would grant approval of the proposed transaction presumably because 7-Eleven and/or SEIFS intended to effectuate a transaction with KHG.  As a result of SEIFS' failure to timely respond and unreasonably delay, Plaintiffs ultimately lost the proposed buyer.

18.     A few months later, Plaintiffs received an offer to sell all four (4) of their locations, *albeit*, at a much lower price. On or about February 13, 2020, Plaintiffs entered into an Asset Purchase Agreement ("APA2") with Florida Fuel Holdings, LLC ("FFH"), pursuant to which Plaintiffs agreed to sell, and FFH agreed, to purchase, Plaintiffs' four (4) gasoline stations for the sum of Three Million Nine Hundred Thousand Dollars ($3,900,000.00).

19.     On or about February 18, 2020, Plaintiffs submitted to 7-Eleven and SEIFS a copy of APA2 for their review and approval. Following the submission of APA2, Mendez also discussed with SEIFS' representatives a renewal of the parties' relationship if the purchase and sale transaction did not materialize. Mendez was advised that pursuing both fronts were not necessary as it would result in unnecessary work for all parties if the sale was ultimately concluded.

20.     On March 10, 2020, and less than two (2) months prior to the expiration of the Motor Fuel Supply Agreement and Dealer Fuel Lease Agreement effective April 30, 2020, SEIFS advised MFH3 that it had elected to "non-renew the Supply Agreement because 7-Eleven, the parent company of SEIFS, has decided in good faith and in the normal course of business to sell the Facility to a bona fide third party" and that MFH3's rights to occupy the Premises and continue its relationship with 7-Eleven and SEIFS would now expire effective June 12, 2020 ("Notice").[1]

---

[1] A copy of the March 10, 2020 letter is annexed hereto as Exhibit "A."

21.     SEIFS agreed to provide to MFH3 a sales contract, along with a forty-five (45) day right of first refusal, in accordance with the Petroleum Marketing Practices Act ("PMPA"). Notwithstanding same, SEIFS failed to provide to MFH3 a copy of the sales contract nor did it disclose the identity of the purported bona fide third party.

22.     On or about March 16, 2020, and in response to SEIFS letter, MFH3, through counsel, sent a communication to SEIFS questioning its purported non-renewal notice pursuant to the PMPA.[2] MFH3 further inquired as to the status of 7-Eleven and SEIFS' approval of APA2 as it had been pending approval for a while. MFH3 urged 7-Eleven and SEIFS to approve the proposed purchase and sale transaction so that the parties could amicably go their separate ways.

23.     On March 25, 2020, 7-Eleven informed Plaintiffs that it had declined its right of first refusal to acquire Plaintiffs' four (4) gasoline stations.

24.     On March 26, 2020, 7-Eleven and SEIFS informed MFH3 that it disputed its position that the March 10, 2020 notice was not in compliance with the PMPA.[3] 7-Eleven and SEIFS stated that with respect to 7-Eleven's decision to sell the Premises, "a franchisor must make either a bona fide offer to sell, transfer or assign to the franchisee its interest in the premises or, if applicable, offer a franchisee a right of first refusal of at least 45 days' duration of any offer made by third parties to purchase the franchisor's interest."

25.     SEIFS continued to maintain that once it received a sales contract with its buyer, SEIFS would provide same to MFH3 so that MFH3 could determine within a period of forty-five (45) days whether to exercise its right of first refusal per the PMPA.  As of March 26, 2020, 7-Eleven and SEIFS had not made a bona fide offer to sell, transfer or assign its interest in the

---

[2] A copy of the March 16, 2020 letter is annexed hereto as Exhibit "B."

[3] A copy of the March 26, 2020 letter is annexed hereto as Exhibit "C."

ZARCO EINHORN SALKOWSKI & BRITO
ONE BISCAYNE TOWER, 2 S. BISCAYNE BLVD., 34TH FLOOR, MIAMI, FLORIDA 33131 (305) 374-5418 FAX (305) 374-5428

Premises to MFH3.

26.     On May 12, 2020, and still not having received any bona fide offer to acquire the Premises or an executed sales contract and the June 12, 2020 expiration date right around the corner, MFH3 inquired on the status of its proposed sale.[4] Among other things, MFH3 requested that SEIFS re-consider APA2 and approve same before FFH walked away from the proposed transaction.

27.     On May 15, 2020, and for the very first time, SEIFS blamed its failure to provide a sales contract on COVID-19.[5] Specifically, SEIFS confirmed that negotiations regarding the sale of the Premises had been delayed due to COVID-19 but were still ongoing. SEIFS agreed to provide MFH3 with a final, signed sales contract and honor the required forty-five (45) right of refusal period under the PMPA even after June 12, 2020. As of May 15, 2020, 7-Eleven and SEIFS, had not made any bona fide offer to sell, transfer or assign its interest in the Premises to MFH3.

28.     On or about June 11, 2020, and literally one (1) day prior to the expiration of the Motor Fuel Supply Agreement and Dealer Fuel Lease Agreement and ninety-three (93) days after tendering the notice of non-renewal, 7-Eleven decided to make an offer to sell the Premises to MFH3 for Eight Million Dollars ($8,000,000.0).[6] By failing to make a bona fide offer to sell, transfer or assign its interest in the Premises to MFH3 within ninety (90) days of tendering its notice of non-renewal of the Motor Fuel Supply Agreement, 7-Eleven and SEIFS violated § 2802(b)(3)(D) of the PMPA.

29.     7-Eleven had no choice but to make the offer for sale to MFH3 one (1) day prior to

---

[4] A copy of the May 12, 2020 letter is annexed hereto as Exhibit "D."

[5] A copy of the May 15, 2020 letter is annexed hereto as Exhibit "E."

[6] A copy of the June 11, 2020 letter is annexed hereto as Exhibit "F."

the expiration of the Motor Fuel Supply Agreement and Dealer Fuel Lease Agreement because ***"a sales contract has not been signed and negotiations have stalled due to the pandemic."*** 7-Eleven agreed to keep this offer open for thirty (30) days, i.e., July 13, 2020, provided that MFH3 agreed to the purchase price, without having an opportunity to negotiate the other terms and conditions. Specifically, 7-Eleven stated "we will not engage in such negotiations unless and until there is a firm, written commitment to the purchase price."

30.     On June 15, 2020, MFH3 called into question SEIFS' offer to sell the Premises for Eight Million Dollars ($8,000,000.00) as it certainly was not a bona fide offer in accordance with the express terms of the PMPA.[7] Indeed, this offer was made only because SEIFS was unable to provide to MFH3 a signed sales contract that MFH3 could choose to match within a period of forty-five (45) days in accordance with § 2802(b)(3)(D)(iii)(II) of the PMPA. And by refusing to respond to MFH3's request to approve APA2, MFH3's proposed buyer for all four (4) gasoline stations rescinded its offer to acquire same.

31.     The very next day, SEIFS, through counsel, claimed that its offer to sell the Premises to MFH3 was bona fide and that 7-Eleven was prepared to provide a copy of a non-binding Letter of Intent to MFH3 on the condition that it agreed to execute a Confidentiality and Non-Disclosure Agreement.[8] SEIFS' counsel's June 16, 2020 further provided, in relevant part, as follows:

> Simply stated, your assertion that SEIFS is required to provide your client "a contract to examine and determine whether to exercise its right of first refusal" is incorrect.  Rather, SEIFS may either: (1) make a bona fide offer to your client; or (2) offer to your client an offer made by another.  Accordingly, since SEIFS has made a bona fide offer to sell the property to your client within ninety days after its §2804 notification to your client was given.  SEIF has complied with 15 U.S.C.

---

[7] A copy of the June 15, 2020 letter is annexed hereto as Exhibit "G."

[8] A copy of the June 16, 2020 letter is annexed hereto as Exhibit "H."

§2802(b)(3)(D)(III).

*See* Exhibit "H."

32.     On July 14, 2020, 7-Eleven, through counsel, advised MFH3 that its Dealer Fuel Lease Agreement expired as of July 13, 2020 and that it was now a hold-over tenant.

33.     On or about July 17, 2020, and while the parties have been engaged in trying to resolve this matter, 7-Eleven and/or SEIFS resorted to self-help and shut off MFH3's fuel supply. In other words, 7-Eleven and/or SEIFS's actions resulted in a total destruction of MFH3's business.

34.     Plaintiffs submit that by refusing to renew the Motor Fuel Supply Agreement for an additional term of three (3) years (and extending the corresponding Dealer Fuel Lease Agreement), 7-Eleven and SEIFS violated §2802(b)(3)(D)(III) of the PMPA on several grounds.

35.     Upon information and belief, sometime between February – March 2020, KHG tortiously induced SEIFS to unreasonably delay its consent to APA2 under which Plaintiffs stood to make Three Million Nine Hundred Thousand Dollars ($3,900,000.00) through a sale of their four (4) gasoline stations to a third-party.  Upon information and belief, KHG was motivated by its desire to acquire the Premises for itself in order to expand its hospital operations at the Premises and offered a substantial sum of money to SEIFS.

36.     Enticed by a large sum of money by KHG, 7-Eleven decided to sell the Premises to a third-party, i.e., arguably KHG, and made the decision to not renew its Motor Fuel Supply Agreement with MFH3 as conceded by SEIFS in the March 10, 2020 letter.  In other words, SEIFS unreasonably delayed its consent to APA2 on its desire to close on its proposed transaction with KHG. This ultimately resulted in resulted in FFH withdrawing its offer to acquire Plaintiffs' gasoline stations.

ZARCO EINHORN SALKOWSKI & BRITO
ONE BISCAYNE TOWER, 2 S. BISCAYNE BLVD., 34TH FLOOR, MIAMI, FLORIDA 33131 (305) 374-5418 FAX (305) 374-5428

37.     Unfortunately for SEIFS and 7-Eleven, the purported deal with KHG never materialized.  SEIFS was unable to provide to MFH3 a copy of the executed sales contract to trigger MFH3's forty-five (45) day period to exercise its right of first refusal.  In order to legally justify its non-renewal of the Motor Fuel Supply Agreement, SEIFS made an offer to sell the Premises to MHF3 for a sum of Eight Million Dollars ($8,000,000.00). Not only was such an offer not bona fide per the terms of the PMPA, but SEIFS failed to make such offer within ninety (90) days of its March 10, 2020 non-renewal notice, or by no later than June 8, 2020.  By failing to make such an offer within ninety (90) days of its non-renewal letter, SEIFS further violated § 2802(b)(3)(D)(iii)(I) of the PMPA.

38.     All conditions precedent to bringing this action have been waived, excused, performed, or otherwise occurred.

39.     As a result of Defendants' wrongful conduct, as described herein, and Plaintiffs' need to protect and enforce their legal rights, Plaintiffs have retained the undersigned attorneys and are obligated to pay said firm attorneys' fees.  Pursuant to § 2805(e) of the PMPA, Plaintiffs seek to recover their attorneys' fees and costs from 7-Eleven and SEIFS.

## LEGAL CAUSES OF ACTION

### Count I – Tortious Interference with Contractual Relations
### (Plaintiffs Against KHG)

40.     Plaintiffs incorporate each and every allegation set forth in Paragraphs 1 through 39, *supra*, as if fully set forth herein.

41.     Plaintiffs were engaged in a contractual relationship with SEIFS, pursuant to which it was authorized to operate a gasoline station.

42.     Plaintiffs and FFH entered into APA2 pursuant to which Plaintiffs agreed to sell to FFH their gasoline stations for Three Million Nine Hundred Thousand Dollars ($3,900,000.00).

9

43.     Upon information and belief, KHG was directly and/or indirectly aware of the terms of APA2.

44.     KHG knowingly, intentionally and unjustifiably interfered with, and induced SEIFS to unreasonably delay providing its consent to APA2 in order to work out its own deal for the acquisition of the Premises.

45.     KHG's interference with the relationship between SEIFS and MFH3 resulted in SEIFS not renewing MFH3's Motor Fuel Supply Agreement and SEIFS also unreasonably delaying its consent to APA2. This, in turn, resulted in MFH3's prospective buyer withdrawing its offer to acquire Plaintiffs' four (4) gasoline stations.

46.     KHG's interference was improper in means and motive.

47.     As a direct, proximate and foreseeable result of KHG's tortious interference with the relationship between MFH3 and SEIFS, MFH3 has suffered substantial damages.

**WHEREFORE**, Plaintiffs, MENDEZ FUEL HOLDINGS, LLC, MENDEZ FUEL HOLDINGS 1, LLC, MENDEZ FUEL HOLDINGS 2, LLC and MENDEZ FUEL HOLDINGS 3, LLC, respectfully request that this Honorable Court enter a judgment in its favor and against Defendant, KENDALL HEALTHCARE GROUP, LTD., for: (i) actual and compensatory damages in an amount to be determined at trial; (ii) attorneys' fees, costs and pre- and post-judgment interest; and (iii) such other and further relief as this Honorable Court deems just and proper.

### Count II – Violation of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq*.
### (MFH3 Against 7-Eleven and SEIFS)

48.     MFH3 incorporates each and every allegation set forth in Paragraphs 1 through 39, *supra*, as if fully set forth herein.

49.     SEIFS is a "franchisor" under the PMPA, 15 U.S.C. § 2801 *et seq.*, because it is a

10

distributor that authorizes, under a franchise, a retailer to use a trademark in connection with the sale of motor fuel. 15 U.S.C. § 2801(3).

50.     7-Eleven, being the parent company of SEIFS, constitutes a "franchisor" under the PMPA, 15 U.S.C. § 2801 *et seq.*, because it is an affiliate of a "distributor that authorizes, under a franchise, a retailer to use a trademark in connection with the sale of motor fuel." 15 U.S.C. § 2801(3), (6). For purposes of this count, 7-Eleven and SEIFS are collectively referred to as "SEIFS."

51.     MFH3 is a "franchisee" under the PMPA because it is a retailer that is authorized, under a franchise, to use a trademark in connection with the sale of motor fuel. 15 U.S.C. § 2801(4).

52.     The relationship between MFH3 and SEIFS, is a "franchise" under the PMPA because it is an agreement under which a distributor authorizes a retailer to use, in connection with the sale of motor fuel, a trademark which is owned or controlled by a refiner which supplies motor fuel to the distributor which authorizes or permits such use. Additionally, it is an agreement pertaining to the supply of motor fuel which is to be sold under a trademark owned or controlled by a refiner. 15 U.S.C. §§ 2801(1)(A)(iv) and (1)(B)(ii).

53.     The supply relationship between MFH3 and SEIFS is a "franchise relationship" under the PMPA because it deals with the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise. 15 U.S.C. § 2801(2).

54.     The Premises constitutes a "leased marketing premises" under the PMPA because it is a "marketing premises owned, leased or in any way controlled by a franchisor and which the

ZARCO EINHORN SALKOWSKI & BRITO
ONE BISCAYNE TOWER, 2 S. BISCAYNE BLVD., 34TH FLOOR, MIAMI, FLORIDA 33131 (305) 374-5418 FAX (305) 374-5428

franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel." 15 U.S.C. § 2801(9).

55.     Under the PMPA, a notification of termination or nonrenewal of a franchise relationship is only valid if the requirements under 15 U.S.C. § 2804 are met. 15 U.S.C. § 2802(b)(1)(A).

56.     15 U.S.C. § 2804 requires that a notice of nonrenewal include a statement of the intention to not renew the franchise relationship, together with the reasons therefor; the date on which such termination or nonrenewal takes effect; and a summary statement summarizing a party's rights under the PMPA which is prepared by the Secretary of Energy and published in the Federal Register. 15 U.S.C. § 2804(c)(3)(A)-(C).

57.     On March 10, 2020, SEIFS sent its Notice of non-renewal, advising MFH3 that it had elected to "non-renew the Supply Agreement because 7-Eleven, the parent company of SEIFS, has decided in good faith and in the normal course of business to sell the Facility to a bona fide third party." 15 U.S.C. § 2802(b)(3)(D)(i)(III). The Notice provided that MFH3's rights to occupy the Premises and continue its relationship with 7-Eleven and SEIFS would expire, effective June 12, 2020. SEIFS further advised that upon receipt of a signed contract, SEIFS, through an authorized representative, would provide to MFH3 a sales contract, along with a 45-day right of first refusal.

58.     Pursuant to SEIFS' Notice provided under 15 U.S.C. § 2802(b)(3)(D), involving the sale of a "leased marketing premises," SEIFS was required, during the 90-day period after the Notice was given pursuant to Section 2804 of the PMPA, either: (i) make a bona fide offer of all of its interests in the premises on which each Plaintiff's station is located, which includes the equipment, improvements, including underground gasoline storage tanks, located on the property

and the real property itself, at fair market values or (ii) offer MFH3 a right of first refusal of at least 45-days duration of an offer, made by another, to purchase SEIFS' interest in such premises. 15 U.S.C. § 2802(b)(3)(D)(iii). SEIFS failed to do either.

59.     SEIFS attempted to satisfy 15 U.S.C. § 2802(b)(3)(D)(iii)(I) by presenting MHF3 with an offer to purchase the Premises for $8 million on June 11, 2020, ninety-three days after the Notice of Non-Renewal was sent, and three days after the 90-day window under 15 U.S.C. § 2802(b)(3)(D)(iii) had passed.

60.     Even if SEIFS had not blown the 90-day statutory deadline, SEIFS' $8 million offer does not constitute a "bona fide offer" under the PMPA, 15 U.S.C. § 2802(b)(3)(D)(iii), because it exceeds the fair market value of the Premises and because the offer did not include sale of all SEIFS' entire interest in the Premises (i.e. equipment and improvements, in addition to the real property itself).

61.     SEIFS' failure to provide a legitimate basis for non-renewal and/or termination of the franchise relationship between itself and MHF3 constitutes a violation the PMPA, which has caused MHF3 to sustain significant damages.

**WHEREFORE**, Plaintiff, MENDEZ FUEL HOLDINGS 3, LLC, respectfully requests that this Honorable Court enter a judgment in its favor and against Defendants, 7-ELEVEN, INC. and SEI FUEL SERVICES, INC. for: (i) actual damages in an amount to be determined at trial; (ii) exemplary damages in an amount to be determined at trial; (iii) attorneys' fees, costs and pre- and post-judgment interest; and (iv) such other and further relief that is available to it under Section 2805 of the PMPA and as this Honorable Court deems just and proper.

ZARCO EINHORN SALKOWSKI & BRITO
ONE BISCAYNE TOWER, 2 S. BISCAYNE BLVD., 34TH FLOOR, MIAMI, FLORIDA 33131 (305) 374-5418 FAX (305) 374-5428

## DEMAND FOR JURY TRIAL

Plaintiffs, MENDEZ FUEL HOLDINGS, LLC, MENDEZ FUEL HOLDINGS 1, LLC, MENDEZ FUEL HOLDINGS 2, LLC and MENDEZ FUEL HOLDINGS 3, LLC, respectfully demand a trial by jury of all issues so triable under the laws of the State of Florida.

Dated: July 17, 2020    Respectfully submitted,

         ZARCO EINHORN SALKOWSKI & BRITO, P.A.
         *Counsel for Plaintiffs*
         One Biscayne Tower
         2 S. Biscayne Blvd., Suite 3400
         Miami, Florida 33131
         Telephone: (305) 374-5418
         Telecopier: (305) 374-5428

         By: /s/ Alejandro Brito
           ALEJANDRO BRITO
           Florida Bar No. 098442
           E-mail: abrito@zarcolaw.com
           HIMANSHU M. PATEL
           Florida Bar No. 0167223
           E-mail: hpatel@zarcolaw.com
           BRENDA PHANG
           Florida Bar No. 1012334
           E-mail: bphang@zarcolaw.com



Kristen Cook
Associate General Counsel
Direct Dial: (972) 828-7242
Fax: (972) 828-5012
Kristen.Cook@7-11.com

March 10, 2020

*Certified Mail, Return Receipt Requested; and*
*Via Email (mrmendez30@icloud.com)*
Mr. Michael Mendez
Mendez Fuel Holdings 3 LLC
5250 SW 76th Street
Miami, FL 33143

Re:  **Dealer Fuel Lease Agreement ("Lease") between 7-Eleven, Inc. ("7-Eleven"), as Landlord and Mendez Fuel Holdings 3 LLC, as Tenant, effective May 1, 2017; and**

**Motor Fuel Supply and Security Agreement, as amended (the "Supply Agreement"), effective May 1, 2017, between SEI Fuel Services, Inc. ("SEIF"), and Mendez Fuel Holdings 3 LLC, as Dealer ("Dealer")**

**7-Eleven Store #37581 – located 11870 SW 40th Street, Miami, FL 33175 (the "Leased Premises"); SEIF Store #37581 (the "Facility")**

Dear Mr. Mendez:

SEIF and Dealer are parties to the Supply Agreement for the supply of motor fuels to the Facility.  Further, Dealer occupies the Facility pursuant to the Lease between Dealer, as Tenant, and 7-Eleven, as Landlord.  The Supply Agreement and Lease expire on April 30, 2020 and there are no options to extend the Supply Agreement or Lease.

Accordingly, this letter is to give formal written notice pursuant to the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §2801 *et seq.*, that SEIF will not renew the franchise with Dealer effective close of business on Friday, June 12, 2020 ("Effective Date").  The franchise is comprised of the Supply Agreement, under which Dealer purchases Mobil branded motor fuel from SEIF for the Facility.  The franchise also consists of any other agreement(s) that may have been expressly made a part of the foregoing Supply Agreement.

Pursuant to 15 U.S.C. §2802(b)(3)(D)(III), SEIF is electing to non-renew the Supply Agreement because 7-Eleven, the parent company of SEIF, has decided in good faith and in the normal course of business to sell the Facility to a bona fide third party.  As soon as the sales

**SEI Fuel Services, Inc.**
3200 Hackberry Road, Irving, TX 75063

**EXHIBIT A**

Mr. Michael Mendez
March 10, 2020
Page 2

contract is signed, a representative at 7-Eleven will forward to you the sales contract along with a 45-day right of first refusal option in accordance with the Petroleum Marketing Practices Act. Upon receipt of the sales contract, Dealer will have the right to determine, within forty-five (45) days, if it chooses to purchase the property upon the same terms and conditions as the third party.

For such reasons, you should also consider this as your notice that pursuant to Section 29 of the Lease, your right to occupy the Leased Premises will also terminate on June 12, 2020 and you must vacate the Facility not later than that date. Further, pursuant to Section 10 of the Lease, Dealer, as Tenant, "shall surrender the Leased Premises and the Equipment to 7-Eleven in good operating condition and in keeping with all of its current maintenance obligations through such expiration."

This non-renewal is without prejudice to SEIF's accrued rights.

A copy of the summary statement described in Section 104(d) [15 U.S.C. Section 2804 (d)] of the Petroleum Marketing Practices Act is enclosed herewith.

Regards,

Kristen Williams Cook
Associate General Counsel
7-Eleven, Inc. and SEI Fuel Services, Inc.

KWC/eg

cc:    Kenia Del Risco, SEI Fuel Services, Inc. (via e-mail)
       Rob Dowd, SEI Fuel Services, Inc. (via e-mail)
       Hollie Roane, 7-Eleven, Inc. (via e-mail)
       Robin Bryant, 7-Eleven, Inc. (via e-mail)

# Revised Summary of Title I of the Petroleum Marketing Practices Act

**AGENCY: Department of Energy**

ACTION: Notice

**SUMMARY:** This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or non renewal of a franchise is given.

**SUPPLEMENTARY INFORMATION:**
Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. §§2801-2807, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the Federal Register a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under the title. The Department published this summary in the Federal Register on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised Dealer by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

## Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 2007 (the Act), 15 U.S.C §§2801-2807. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination, or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure

to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark, which is owned or controlled by a refiner and it includes secondary agreements such as leases of real property and motor fuel Supply Agreement which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 2007 (15 U.S.C. §§2801-2807). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

## I. Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

### A. Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State, or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

### B. Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith

efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

**C.      Mutual Agreement to Terminate the Franchise**

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

**D.      Withdrawal From the Market Area**

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. § 2802(b)(E).

**E.      Other Events Permitting a Termination**

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate you franchise agreement:

(1)      Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2)      You declare bankruptcy or a court determines that you are insolvent.

(3)      You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4)      Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchiser's interest in any improvements or equipment located on the premises, or offered by the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5)      Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6)      Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7)      Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8)      Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9)      Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10)     Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11)     Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12)     Your conviction of any felony involving moral turpitude.

(13)     Any event that affects the franchise relationship and as a result of which termination is reasonable.

**II.      Reasons for Nonrenewal**

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

**A.      Failure to Agree on Changes or Additions To Franchise**

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

**B.      Customer Complaints**

If you supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

**C.      Unsafe or Unhealthful Operations**

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

**D.      Operation of Franchise is Uneconomical**

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

**III.      Notice Requirements for Termination or Nonrenewal**

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

**A.      How Much Notice Is Required**

In most cases, your supplier must give you notice of termination or nonrenewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier my repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

**B.      Manner and Contents of Notice**

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain: (1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action; (2) The date the termination or nonrenewal takes effect; and (3) A copy of this summary.

**IV.      Trial Franchises and Interim Franchises**

The following is a description of the special requirements that apply to trial and interim franchises.

**A.      Trial Franchises**

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

**B. Interim Franchises**

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately

after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

## V.       Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. §§2801-2807.

## VI.      Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

Further Discussion of Title I - Definitions and Legal Remedies

## I.       Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

## A.       Franchise
A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

## B.       Franchise Relationship
The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

## C.       Franchisee
A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

## D.       Franchisor
A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

**E.      Marketing Premises**

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

**F.      Leased Marketing Premises**

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

**G.      Fail to Renew and Nonrenewal**

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

**II.      Legal Remedies Available to Franchisee**

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

**A.      Franchisee's Right to Sue**

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

**B.      Equitable Relief**

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

**C.      Burden of Proof**

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

**D.      Damages**

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

**E.      Franchisor's Defense to Permanent Injunctive Relief**

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:

(1)      To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
(2)      To materially alter, add to, or replace such premises;
(3)      To sell such premises;
(4)      To withdraw from marketing activities in the geographic area in which such premises are located; or

(5)        That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.

Form BJC-(R)-PMPA (10-2001)

## 2007 PMPA AMENDMENT

## 15 U.S.C. § 2807. Prohibition on restriction of installation of renewable fuel pumps.

### (a)        Definition

In this section:

(1)        Renewable fuel
The term "renewable fuel" means any fuel—

(A)        at least 85 percent of the volume of which consists of ethanol; **or**

(B)        any mixture of biodiesel and diesel or renewable diesel (as defined in regulations adopted pursuant to section 7545(o) of Title 42 (40 CFR, part 80)), determined without regard to any use of kerosene and containing at least 20        percent biodiesel or renewable diesel.

(2)        Franchise-related document
The term "franchise-related document" means—

(A)        a franchise under this Chapter; **and**

(B)        any other contract or directive of a franchisor relating to terms or conditions of the sale of fuel by a franchisee.

### (b)        Prohibitions

(1)        In general

No franchise-related document entered into or renewed on or after December 19, 2007, shall contain any provision allowing a franchisor to restrict the franchisee or any affiliate of the franchisee from—

(A)        installing on the marketing premises of the franchisee a renewable fuel pump or tank, except that the franchisee's franchisor may restrict the installation of a tank on leased marketing premises of such franchisor;

(B)        converting an existing tank or pump on the marketing premises of the franchisee for renewable fuel use, so long as such tank or pump and the piping connecting them are either warranted by the manufacturer or certified by a recognized standards setting organization to be suitable for use with such renewable fuel;

(C)        advertising (including through the use of signage) the sale of any renewable fuel;

(D)        selling renewable fuel in any specified area on the marketing premises of the franchisee (including any area in which a name or logo of a franchisor or any other entity appears);

(E)        purchasing renewable fuel from sources other than the franchisor if the franchisor does not offer its own renewable fuel for sale by the franchisee;

(F)        listing renewable fuel availability or prices, including on service station signs, fuel dispensers, or light poles; **or**

      (G)      allowing for payment of renewable fuel with a credit card,

so long as such activities described in subparagraphs (A) through (G) do not constitute mislabeling, misbranding, willful adulteration, or other trademark violations by the franchisee.

(2)      Effect of provision

Nothing in this section shall be construed to preclude a franchisor from requiring the franchisee to obtain reasonable indemnification and insurance policies.

### (c) Exception to 3-grade requirement

No franchise-related document that requires that 3 grades of gasoline be sold by the applicable franchisee shall prevent the franchisee from selling a renewable fuel in lieu of 1, and only 1, grade of gasoline.

# ZARCO EINHORN SALKOWSKI BRITO

### ATTORNEYS AT LAW

ROBERT ZARCO
ROBERT M. EINHORN
ROBERT F. SALKOWSKI*
ALEJANDRO BRITO
HIMANSHU M. PATEL
KAARI-LYNN S. GAGNON
ALAINA B. KARSTEN
BESHOY RIZK
MELISSA L. BERNHEIM**
COLBY CONFORTI
MICHAEL D. BRAUNSTEIN
BRENDA PHANG

*ALSO ADMITTED TO PRACTICE IN NJ
**OF COUNSEL

2 S. BISCAYNE BOULEVARD
34TH FLOOR
MIAMI, FLORIDA 33131

MIAMI
TELEPHONE (305) 374-5418
TELEFAX (305) 374-5428

WEST PALM BEACH
TELEPHONE (561) 721-2861

WWW.ZARCOLAW.COM

March 16, 2020

Via email transmission Kristen.Cook@7-11.com and US Mail

Kristen Williams Cook, Esq.
Associate General Counsel
SEI Fuel Services, Inc.
3200 Hackberry Road
Irving, TX 75063

Re:   **Mendez Fuel Holdings 3, LLC**

Dear Ms. Cook:

This law firm represents the interests of Mendez Fuel Holdings 3, LLC ("Mendez Fuel"). We are in receipt of your letter dated March 10, 2020.

The March 10 letter purports to provide notice to Mendez Fuel that SEIF is electing not to renew the Supply Agreement, as is required under the PMPA. The March 10 letter, however, is defective and noncompliant with the PMPA. As noted in the March 10 letter, the Supply Agreement and the Lease Agreement state that those agreements are set to expire on April 30, 2020. As you know, the current Supply Agreement and Lease Agreement were renewal agreements from prior agreements with Mendez Fuel. At the time near the expiration of those initial agreements, the parties engaged in dialogue designed to effectuate renewal agreements. To that end, on or about May 1, 2017, the parties entered into these renewal agreements. In approximately September, 2019, Mendez Fuel initiated dialogue relating to renewing these agreements once again. At no point was Mendez Fuel advised that these agreements would not be renewed. To the contrary, the information supplied to Mendez Fuel by SEIF was that these agreements, consistent with the parties' course of conduct and course of dealing, would be renewed. Mendez Fuel reached out to SEIF several times in the end of 2019 and into 2020 seeking follow up information as to when the renewal agreements would be executed.

**EXHIBIT**

**B**

Kristen Williams Cook, Esq.
March 16, 2020
P a g e | **2**

     In early 2020, Mendez Fuel advised SEIF that it intended to sell the Facility. On February 18, 2020, Mendez Fuel submitted a written proposal to SEIF to sell the Facility. After doing so, Mendez Fuel discussed with SEIF the need to simultaneously proceed down concurrent paths (*i.e.,* renewal agreements and new agreements for the purchaser) in the event that the proposed sale did not occur. Mendez Fuel was advised that proceeding on both fronts was not necessary because it would simply result in the possibility of unnecessary work (relating to the renewal) in the event that the sale was completed.

     Mendez Fuel has repeatedly requested that SEIF approve the proposed transaction. Those efforts, however, have been unavailing as SEIF has become non-responsive. Now, just a few weeks before the Supply Agreement and the Lease state that those agreements are set to expire, SEIF has advised that it intends to sell the Facility to an unnamed party upon terms that are not even disclosed to Mendez Fuel given that the purported purchase and sale agreement between SEIF and this third party has not been executed. These facts do not support a finding that SEIF is selling the Facility "in good faith and in the normal course of business." Rather, it is evident that SEIF is simply seeking to avoid granting approval of the purchase and sale transaction proposed by Mendez Fuel. Such conduct would clearly constitute tortious interference by SEIF.

     SEIF's conduct in this regard is not compliant with the terms and the spirit of the PMPA and is actionable. Notwithstanding, we are hopeful that SEIF will properly consider and address the Mendez Fuel transaction so that the parties may amicably proceed with the sale of the Facility by Mendez Fuel to its proposed purchaser.

     We look forward to hearing from you.

                       Very Truly Yours,

                       ALEJANDRO BRITO

AB:ap

ZARCO EINHORN SALKOWSKI BRITO
ATTORNEYS AT LAW



Kristen Cook
Associate General Counsel
Direct Dial: (972) 828-7242
Fax: (972) 828-5012
Kristen.Cook@7-11.com

March 26, 2020

*Via Email (abrito@zarcolaw.com)*
Mr. Alejandro Brito, Esq.
Zarco Einhorn Salkowski Brito
2 S. Biscayne Boulevard
34th Floor
Miami, FL 33131

> Re:   **Dealer Fuel Lease Agreement ("Lease") between Mendez Fuel Holdings 3 LLC, as Tenant, and 7-Eleven, Inc. ("7-Eleven"), as Landlord, effective May 1, 2017; and**
>
> **Motor Fuel Supply and Security Agreement, as amended (the "Supply Agreement"), effective May 1, 2017, between SEI Fuel Services, Inc. ("SEIF"), and Mendez Fuel Holdings 3 LLC, as Dealer ("Dealer")**
>
> **7-Eleven Store #37581 – located 11870 SW 40th Street, Miami, FL 33175 (the "Leased Premises"); SEIF Store #37581 (the "Premises")**

Dear Mr. Brito:

I write as counsel for 7-Eleven and SEIF. I am in receipt of your letter dated March 16, 2020, wherein you allege that my correspondence, dated March 10, 2020, notifying Dealer and Tenant of non-renewal of the Lease and Supply Agreement, is defective and noncompliant with the Petroleum Marketing Practices Act, as representatives of SEIF purportedly made representations to Dealer about renewal of the agreements. Further, you state that a secondary written right of first refusal to sell the Premises dated February 18, 2020 was submitted to 7-Eleven by Dealer and 7-Eleven failed to respond. Please allow this letter to respond to your allegations.

First, you allege that representatives of SEIF made representations to Dealer that the agreements would be extended and that such representations bar SEIF and 7-Eleven from terminating the agreements. 7-Eleven and SEIF deny that any such representations were made. Further, even if discussions regarding a potential extension occurred, pursuant to Section 18 of the Supply Agreement, the parties agreed that no oral representations could modify the agreements. Specifically, Section 18 states, *"This Agreement and the Dealer Fuel Lease Agreement between Dealer and 7 Eleven, Inc. commencing May 1, 2017, including its exhibits as well as all documents*

**EXHIBIT C**

Mr. Alejandro Brito, Esq.
March 26, 2020
Page 2

*and materials referenced herein will constitute the entire agreement between SEIF and Dealer with regard to the Premises. Dealer acknowledges and agrees that there are no understandings or agreements between SEIF and Dealer with respect to the Premises except as set forth therein, and that Dealer has not relied on any oral statements or representations made by or on behalf of SEIF in connection with the Premises.*"

Further, Section 29 of the Supply Agreement provides, "*Nothing in this Agreement is to be construed as preventing SEIF, upon renewal of its relationship with Dealer, from offering Dealer in good faith and in the normal course of business terms and conditions that differ from or are in addition to those in this Agreement, including terms and conditions relating to other businesses that may be operated at the Premises.*"

Accordingly, the Supply Agreement provides that no oral discussions could amend the agreements and that SEIF had the contractual right to change the terms of the Supply Agreement at the time of renewal in the normal course of business. Contrary to your assertions, 7-Eleven's decision to sell was made in the ordinary course of business, the sales price is fair market value, and 7-Eleven and SEIF deny any misrepresentations to the Dealer. Your argument that 7-Eleven is legally prohibited from entering into an agreement to sell the premises to a third-party at the same time it was discussing the renewal of your client's franchise is unsupported by the PMPA or any case law interpreting that statute.

Indeed, "[t]he PMPA was enacted to protect gasoline franchisees from arbitrary or discriminatory termination or nonrenewal of their franchises, *Esso Standard Oil Co. v. Dept. of Consumer Affairs*, 793 F.2d 431, 432 (1st Cir. 1986), but that does not oblige franchisors to give franchisees special treatment. *See, e.g., Ballis v. Mobil Oil Corp.*, 622 F. Supp. 473, 475 (D.C. Ill. 1985). With respect to 7-Eleven's decision to sell the Premises, the case law is clear: a franchisor must make either a bona fide offer to sell, transfer or assign to the franchisee its interest in the premises or, if applicable, offer a franchisee a right of first refusal of at least 45 days duration of any offer made by third parties to purchase the franchisor's interest. 15 U.S.C. § 2802(b)(3)(D)(iii); *Art Diamond, Inc. v. Texaco, Inc.*, 1986 U.S. Dist. LEXIS 28949 (Fl. S.D.C. 1986).

Lastly, in response to your issue relating to the right of first refusal letter dated February 18, 2020 ("Second ROFR Letter"), a formal decline letter will be sent via separate correspondence, but in short, 7-Eleven will not exercise the right of first refusal for the multiple sites, including the Premises, referenced in the Second ROFR Letter. In researching this issue, I confirmed that the business person responsible for reviewing the Second ROFR Letter confused that letter with the first right of first refusal that Dealer sent for the same properties, including the Premises, in December 2019, and for which 7-Eleven previously declined to exercise the purchase option. As the Second ROFR Letter covered the same four properties as the first right of first refusal letter in December 2019, the business representative did not recognize that a new right of first refusal offer letter had been received.

For the reasons set forth above, any claims of alleged misrepresentations or oral modifications to extend the Supply Agreement are rejected. Your client has no contractual or legal

Mr. Alejandro Brito, Esq.
March 26, 2020
Page 2

right to stop the termination of the franchise relationship and 7-Eleven's sale of the property unless it exercises its right to purchase the Premises on the same terms and conditions as the third-party buyer. As previously stated, once a contract of sale is finalized with the third-party buyer, 7-Eleven will provide Dealer the opportunity to review the offer and purchase the property on the same terms and conditions as set forth therein. Please note that SEIF's notice of non-renewal remains in effect pursuant to the deadlines set forth therein.

      A copy of the summary statement described in Section 104(d) [15 U.S.C. Section 2804 (d)] of the Petroleum Marketing Practices Act is enclosed herewith.

                Regards,

                Kristen Cook
                Associate General Counsel
                7-Eleven, Inc. and SEI Fuel Services, Inc.

KWC/eg

cc:    Kenia Del Risco, SEI Fuel Services, Inc. (via e-mail)
       Rob Dowd, SEI Fuel Services, Inc. (via e-mail)
       Hollie Roane, 7-Eleven, Inc. (via e-mail)
       Robin Bryant, 7-Eleven, Inc. (via e-mail)
       Matt Sanders, 7-Eleven, Inc. (via e-mail)

# Revised Summary of Title I of the Petroleum Marketing Practices Act

**AGENCY: Department of Energy**

ACTION: Notice

**SUMMARY:** This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or non renewal of a franchise is given.

**SUPPLEMENTARY INFORMATION:**

Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. §§2801-2807, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the Federal Register a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under the title. The Department published this summary in the Federal Register on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised Dealer by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

**Summary of Legal Rights of Motor Fuel Franchisees**

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 2007 (the Act), 15 U.S.C §§2801-2807. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination, or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure

to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark, which is owned or controlled by a refiner and it includes secondary agreements such as leases of real property and motor fuel Supply Agreement which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 2007 (15 U.S.C. §§2801-2807). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

## I.       Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

### A.       Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State, or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

### B.       Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith

efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

**C.    Mutual Agreement to Terminate the Franchise**

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

**D.    Withdrawal From the Market Area**

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. § 2802(b)(E).

**E.    Other Events Permitting a Termination**

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate you franchise agreement:

(1)    Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2)    You declare bankruptcy or a court determines that you are insolvent.

(3)    You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4)    Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered by the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5)    Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6)    Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7)    Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8)    Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9)    Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10)    Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11)    Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12)    Your conviction of any felony involving moral turpitude.

(13)    Any event that affects the franchise relationship and as a result of which termination is reasonable.

**II.    Reasons for Nonrenewal**

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

**A.    Failure to Agree on Changes or Additions To Franchise**

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

**B.     Customer Complaints**

If you supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

**C.     Unsafe or Unhealthful Operations**

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

**D.     Operation of Franchise is Uneconomical**

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

**III.     Notice Requirements for Termination or Nonrenewal**

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

**A.     How Much Notice Is Required**

In most cases, your supplier must give you notice of termination or nonrenewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier my repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

**B.     Manner and Contents of Notice**

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain: (1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action; (2) The date the termination or nonrenewal takes effect; and (3) A copy of this summary.

**IV.     Trial Franchises and Interim Franchises**

The following is a description of the special requirements that apply to trial and interim franchises.

**A.     Trial Franchises**

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

**B. Interim Franchises**

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately

after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

## V.      Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. §§2801-2807.

## VI.     Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

Further Discussion of Title I - Definitions and Legal Remedies

## I.       Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

## A.      Franchise
A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

## B.      Franchise Relationship
The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

## C.      Franchisee
A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

## D.      Franchisor
A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

**E.     Marketing Premises**
"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

**F.     Leased Marketing Premises**
"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

**G.     Fail to Renew and Nonrenewal**
The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

**II.     Legal Remedies Available to Franchisee**

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

**A.     Franchisee's Right to Sue**
A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

**B.     Equitable Relief**
Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

**C.     Burden of Proof**
In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

**D.     Damages**
A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

**E.     Franchisor's Defense to Permanent Injunctive Relief**
Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:

    (1)    To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
    (2)    To materially alter, add to, or replace such premises;
    (3)    To sell such premises;
    (4)    To withdraw from marketing activities in the geographic area in which such premises are located; or

(5)      That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.

Form BJC-(R)-PMPA (10-2001)

**2007 PMPA AMENDMENT**

**15 U.S.C. § 2807. Prohibition on restriction of installation of renewable fuel pumps.**

**(a)       Definition**

In this section:

(1)      Renewable fuel
The term "renewable fuel" means any fuel—

(A)      at least 85 percent of the volume of which consists of ethanol; **or**

(B)      any mixture of biodiesel and diesel or renewable diesel (as defined in regulations adopted pursuant to section 7545(o) of Title 42 (40 CFR, part 80)), determined without regard to any use of kerosene and containing at least 20        percent biodiesel or renewable diesel.

(2)      Franchise-related document
The term "franchise-related document" means—

(A)      a franchise under this Chapter; **and**

(B)      any other contract or directive of a franchisor relating to terms or conditions of the sale of fuel by a franchisee.

**(b)       Prohibitions**

(1)      In general

No franchise-related document entered into or renewed on or after December 19, 2007, shall contain any provision allowing a franchisor to restrict the franchisee or any affiliate of the franchisee from—

(A)      installing on the marketing premises of the franchisee a renewable fuel pump or tank, except that the franchisee's franchisor may restrict the installation of a tank on leased marketing premises of such franchisor;

(B)      converting an existing tank or pump on the marketing premises of the franchisee for renewable fuel use, so long as such tank or pump and the piping connecting them are either warranted by the manufacturer or certified by a recognized standards setting organization to be suitable for use with such renewable fuel;

(C)      advertising (including through the use of signage) the sale of any renewable fuel;

(D)      selling renewable fuel in any specified area on the marketing premises of the franchisee (including any area in which a name or logo of a franchisor or any other entity appears);

(E)      purchasing renewable fuel from sources other than the franchisor if the franchisor does not offer its own renewable fuel for sale by the franchisee;

(F)      listing renewable fuel availability or prices, including on service station signs, fuel dispensers, or light poles; **or**

      (G)      allowing for payment of renewable fuel with a credit card,

so long as such activities described in subparagraphs (A) through (G) do not constitute mislabeling, misbranding, willful adulteration, or other trademark violations by the franchisee.

(2)      Effect of provision

Nothing in this section shall be construed to preclude a franchisor from requiring the franchisee to obtain reasonable indemnification and insurance policies.

### (c) Exception to 3-grade requirement

No franchise-related document that requires that 3 grades of gasoline be sold by the applicable franchisee shall prevent the franchisee from selling a renewable fuel in lieu of 1, and only 1, grade of gasoline.

# ZARCO EINHORN SALKOWSKI BRITO
### ATTORNEYS AT LAW

ROBERT ZARCO
ROBERT M. EINHORN
ROBERT F. SALKOWSKI*
ALEJANDRO BRITO
HIMANSHU M. PATEL
KAARI-LYNN S. GAGNON
BESHOY RIZK
MELISSA L. BERNHEIM**
COLBY CONFORTI
MICHAEL D. BRAUNSTEIN
BRENDA PHANG

*ALSO ADMITTED TO PRACTICE IN NJ
**OF COUNSEL

2 S. BISCAYNE BOULEVARD
34TH FLOOR
MIAMI, FLORIDA 33131

MIAMI
TELEPHONE (305) 374-5418
TELEFAX (305) 374-5428

WEST PALM BEACH
TELEPHONE (561) 721-2861

WWW.ZARCOLAW.COM

May 12, 2020

Via email transmission Kristen.Cook@7-11.com and US Mail

Kristen Williams Cook, Esq.
Associate General Counsel
SEI Fuel Services, Inc.
3200 Hackberry Road
Irving, TX 75063

Re:     **Mendez Fuel Holdings 3, LLC**

Dear Ms. Cook:

We are in receipt of your letter dated March 26, 2020. We were hopeful that by now Mendez Fuel would have received a copy of the purchase and sale agreement for the purported sale of the Premises, especially since SEIF's March 10, 2020 letter of non-renewal stated that on June 12, 2020 the franchise would no longer be renewed and the Lease would be terminated. Given that Mendez Fuel has not been afforded the opportunity to review any such agreement and exercise its rights under the PMPA within the allotted time, a termination and lease non-renewal as of June 12, 2020 is violative of the PMPA. Barring any communication from 7-11 to the contrary, we will presume that the June 12, 2020 date is no longer applicable.

Separately, with respect to your contention that Mendez Fuel had no right to rely on representations made to it by SEIF's representatives relating to the renewal of the franchise given the existence of the "no oral modification" clause in the agreement, it is well settled that such a clause may be waived through the course of conduct of the parties. *See e.g, Allapattah Services, Inc. v. Exxon Corporation*, 61 F.Supp.2d 1308, 1317 (S.D. Fla. 1999)("Modifications can be effectuated by subsequent oral agreement or course of dealing with one another despite the requirement of a writing in order to modify."), citing *Linear Corp. v. Standard Hardware Co.*, 423 So.2d 966, 968 (Fla. 1st DCA 1982); *Canada v. Allstate Insurance Company*, 411 F.2d 517, 519 (5th Cir. 1969)("Florida law, however, goes even further and allows an oral modification of a

EXHIBIT
D

Kristen Williams Cook, Esq.
May 12, 2020
P a g e | 2

written contract under circumstances of detrimental reliance even though the contract contains a provision prohibiting its alteration except in writing."). *Kiwanis Club of Little Havana, Inc. v. Kalafe*, 723 So.2d 838, 841 (Fla. 3rd DCA 1998); *Professional Ins. Corp. v. Cahill*, 90 So. 2d 916, 918 (Fla. 1956).

Given the passage of time, Mendez Fuel questions whether an actual offer to purchase the Premises exists and/or remains under consideration. As I noted in my prior letter, on February 18, 2020, Mendez Fuel submitted a written proposal to SEIF to sell the Facility. Mendez Fuel has repeatedly requested that SEIF approve the proposed transaction. To the extent that SEIF wishes to reconsider this proposal, Mendez Fuel is willing to discuss that with SEIF.

To be clear, despite the statement in your March 26, 2020 letter that "SEIF's notice of non-renewal remains in effect pursuant to the deadlines set forth therein," for the reasons set forth above, those deadlines no longer are in effect and have no enforceability given the mandates of the PMPA.

We look forward to hearing from you.

Very truly yours,

ALEJANDRO BRITO

AB:ap

ZARCO EINHORN SALKOWSKI BRITO
ATTORNEYS AT LAW



Kristen Cook
Associate General Counsel
Direct Dial: (972) 828-7242
Fax: (972) 828-5012
Kristen.Cook@7-11.com

May 15, 2020

*Via Email (abrito@zarcolaw.com)*
Mr. Alejandro Brito
Zarco Einhorn Salkowski Brito
2 S. Biscayne Boulevard
34th Floor
Miami, FL 33131

> **Re:** **Dealer Fuel Lease Agreement ("Lease") between Mendez Fuel Holdings 3
> LLC, as Landlord, and 7-Eleven, Inc. ("7-Eleven"), as Tenant, effective May
> 1, 2017; and**
>
> **Motor Fuel Supply and Security Agreement, as amended (the "Supply
> Agreement"), effective May 1, 2017, between SEI Fuel Services, Inc. ("SEIF"),
> and Mendez Fuel Holdings 3 LLC, as Dealer ("Dealer")**
>
> **7-Eleven Store #37581 – located 11870 SW 40th Street, Miami, FL 33175 (the
> "Leased Premises"); SEIF Store #37581 (the "Facility")**

Dear Mr. Brito:

    I am in receipt of your letter dated May 12, 2020, which is in response to my letter dated
March 26, 2020. Due to the unprecedented Covid-19 crisis, the negotiations relating to the
purchase contract for the sale of the Leased Premises were delayed and are ongoing. Please be
advised that SEIF will provide Dealer with the final, signed purchase contract and honor Dealer's
right of first refusal, even if the non-renewal notice date has passed. For such reasons, SEIF is
willing to extend the non-renewal notice for the Lease and Supply Agreement beyond June 12,
2020, provided that Dealer continues to operate at the Facility in accordance with the terms and
conditions of the Lease and Supply Agreement. Such extension will be effective until 45 days
from delivery of the final sales contract to the Dealer. Without rescinding the effectiveness of the
non-renewal notice of the Lease and Supply Agreement, please advise if your client would like to
continue to operate past June 12, 2020. If your client intends to vacate the Leased Premises on
June 12, 2020, please advise me so that SEIF can plan accordingly.

    We understand and appreciate that your client is anxious to know the status of the sale. We
will keep you updated as this matter progresses. A copy of the summary statement described in

**SEI Fuel Services, Inc.**
3200 Hackberry Road, Irving, TX 75063

**EXHIBIT
E**

Mr. Alejandro Brito
May 15, 2020
Page 2

Section 104(d) [15 U.S.C. Section 2804 (d)] of the Petroleum Marketing Practices Act is enclosed herewith.  Please let me know how your client would like to proceed.

Regards,

Kristen Cook
Associate General Counsel
7-Eleven, Inc. and SEI Fuel Services, Inc.

KWC/eg

cc:     Kenia Del Risco, SEI Fuel Services, Inc. (via e-mail)
        Rob Dowd, SEI Fuel Services, Inc. (via e-mail)
        Hollie Roane, 7-Eleven, Inc. (via e-mail)
        Robin Bryant, 7-Eleven, Inc. (via e-mail)
        Matt Sanders, 7-Eleven, Inc. (via e-mail)

# Revised Summary of Title I of the Petroleum Marketing Practices Act

**AGENCY: Department of Energy**

ACTION: Notice

**SUMMARY:** This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or non renewal of a franchise is given.

**SUPPLEMENTARY INFORMATION:**

Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. §§2801-2807, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the Federal Register a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under the title. The Department published this summary in the Federal Register on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised Dealer by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchise-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

## Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 2007 (the Act), 15 U.S.C §§2801-2807. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination, or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure

to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark, which is owned or controlled by a refiner and it includes secondary agreements such as leases of real property and motor fuel Supply Agreement which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 2007 (15 U.S.C. §§2801-2807). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

## I.   Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

### A.   Non-Compliance with Franchise Agreement
Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State, or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

### B.   Lack of Good Faith Efforts
Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith

efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

**C.      Mutual Agreement to Terminate the Franchise**

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

**D.      Withdrawal From the Market Area**

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. § 2802(b)(E).

**E.      Other Events Permitting a Termination**

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate you franchise agreement:

(1)      Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2)      You declare bankruptcy or a court determines that you are insolvent.

(3)      You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4)      Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered by the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5)      Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6)      Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7)      Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8)      Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9)      Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10)      Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11)      Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12)      Your conviction of any felony involving moral turpitude.

(13)      Any event that affects the franchise relationship and as a result of which termination is reasonable.

**II.      Reasons for Nonrenewal**

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

**A.      Failure to Agree on Changes or Additions To Franchise**

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

**B.      Customer Complaints**

If you supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

**C.      Unsafe or Unhealthful Operations**

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

**D.      Operation of Franchise is Uneconomical**

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

**III.     Notice Requirements for Termination or Nonrenewal**

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

**A.      How Much Notice Is Required**

In most cases, your supplier must give you notice of termination or nonrenewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier my repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

**B.      Manner and Contents of Notice**

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain: (1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action; (2) The date the termination or nonrenewal takes effect; and (3) A copy of this summary.

**IV.     Trial Franchises and Interim Franchises**

The following is a description of the special requirements that apply to trial and interim franchises.

**A.      Trial Franchises**

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

**B. Interim Franchises**

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately

after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

**V.       Your Legal Rights**

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. §§2801-2807.

**VI.      Waiver of Rights and Applicable State Law**

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

Further Discussion of Title I - Definitions and Legal Remedies

**I.       Definitions**

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

**A.       Franchise**
A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

**B.       Franchise Relationship**
The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

**C.       Franchisee**
A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

**D.       Franchisor**
A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

**E.     Marketing Premises**

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

**F.     Leased Marketing Premises**

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

**G.     Fail to Renew and Nonrenewal**

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

**II.     Legal Remedies Available to Franchisee**

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

**A.     Franchisee's Right to Sue**

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

**B.     Equitable Relief**

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

**C.     Burden of Proof**

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

**D.     Damages**

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

**E.     Franchisor's Defense to Permanent Injunctive Relief**

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:

(1)     To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
(2)     To materially alter, add to, or replace such premises;
(3)     To sell such premises;
(4)     To withdraw from marketing activities in the geographic area in which such premises are located; or

(5)     That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.

Form BJC-(R)-PMPA (10-2001)

**2007 PMPA AMENDMENT**

**15 U.S.C. § 2807. Prohibition on restriction of installation of renewable fuel pumps.**

**(a)     Definition**

In this section:

(1)     Renewable fuel
The term "renewable fuel" means any fuel—

(A)     at least 85 percent of the volume of which consists of  ethanol; **or**

(B)     any mixture of biodiesel and diesel or renewable diesel (as defined in regulations adopted pursuant to section 7545(o) of Title 42 (40 CFR, part 80)), determined without regard to any use of kerosene and containing at least 20        percent biodiesel or renewable diesel.

(2)     Franchise-related document
The term "franchise-related document" means—

(A)     a franchise under this Chapter; **and**

(B)     any other contract or directive of a franchisor relating to terms or conditions of the sale of fuel by a franchisee.

**(b)     Prohibitions**

(1)     In general

No franchise-related document entered into or renewed on or after December 19, 2007, shall contain any provision allowing a franchisor to restrict the franchisee or any affiliate of the franchisee from—

(A)     installing on the marketing premises of the franchisee a renewable fuel pump or tank, except that the franchisee's franchisor may restrict the installation of a tank on leased marketing premises of such franchisor;

(B)     converting an existing tank or pump on the marketing premises of the franchisee for renewable fuel use, so long as such tank or pump and the piping connecting them are either warranted by the manufacturer or certified by a recognized standards setting organization to be suitable for use with such renewable fuel;

(C)     advertising (including through the use of signage) the sale of any renewable fuel;

(D)     selling renewable fuel in any specified area on the marketing premises of the franchisee (including any area in which a name or logo of a franchisor or any other entity appears);

(E)     purchasing renewable fuel from sources other than the franchisor if the franchisor does not offer its own renewable fuel for sale by the franchisee;

(F)     listing renewable fuel availability or prices, including on service station signs, fuel dispensers, or light poles; **or**

(G)      allowing for payment of renewable fuel with a credit card,

so long as such activities described in subparagraphs (A) through (G) do not constitute mislabeling, misbranding, willful adulteration, or other trademark violations by the franchisee.

(2)      Effect of provision

Nothing in this section shall be construed to preclude a franchisor from requiring the franchisee to obtain reasonable indemnification and insurance policies.

**(c) Exception to 3-grade requirement**

No franchise-related document that requires that 3 grades of gasoline be sold by the applicable franchisee shall prevent the franchisee from selling a renewable fuel in lieu of 1, and only 1, grade of gasoline.



Kristen Cook
Associate General Counsel
Direct Dial: (972) 828-7242
Fax: (972) 828-5012
Kristen.Cook@7-11.com

June 11, 2020

*Certified Mail, Return Receipt Requested; and*
*Via Email (mrmendez30@icloud.com)*
Mr. Michael Mendez
Mendez Fuel Holdings 3 LLC
5250 SW 76th Street
Miami, FL 33143

Re:   **Dealer Fuel Lease Agreement ("Lease") between Mendez Fuel Holdings 3
LLC, as Landlord, and 7-Eleven, Inc. ("7-Eleven"), as Tenant, effective May
1, 2017; and**

**Motor Fuel Supply and Security Agreement, as amended (the "Supply
Agreement"), effective May 1, 2017, between SEI Fuel Services, Inc. ("SEIF"),
and Mendez Fuel Holdings 3 LLC, as Dealer ("Dealer")**

**7-Eleven Store #37581 – located 11870 SW 40th Street, Miami, FL 33175 (the
"Leased Premises"); SEIF Store #37581 (the "Facility")**

Dear Mr. Mendez:

On March 10, 2020, SEIF provided you written notice pursuant to the Petroleum Marketing
Practices Act ("PMPA"), 15 U.S.C. §2801 *et seq.*, that effective close of business on Friday, June 12,
2020, 7-Eleven and SEIF would not renew the franchise with Dealer.   The Supply Agreement and
Lease expired on April 30, 2020 and the Dealer has no options to extend the Supply Agreement or
Lease.

In my prior non-renewal letter, I also notified you that pursuant to 15 U.S.C.
§2802(b)(3)(D)(III), SEIF is electing to non-renew the Supply Agreement because 7-Eleven, the
parent company of SEIF, made a determination in good faith and in the normal course of business
to sell the Facility to a bona fide third party.   At this time, 7-Eleven is under negotiations to sale
the property to a bona fide third party.   However, as a sales contract has not been signed and
negotiations have stalled due to the pandemic, 7-Eleven makes the offer to sale the property to
Dealer for the purchase price of $8,000,000.00, which is the same price for which 7-Eleven is
offering the property to sale for the other third party.

**SEI Fuel Services, Inc.**
3200 Hackberry Road, Irving, TX 75063

**EXHIBIT**
**F**

Mr. Michael Mendez
June 11, 2020
Page 2

     This offer for the sale of the property is valid for thirty days or until July 13, 2020.  If you choose to exercise this option to purchase, please respond in writing agreeing to the purchase price. The parties will then agree to negotiate other terms and conditions; however, we will not engage in such negotiations unless and until there is a firm, written commitment to the purchase price.

     During this time, we will also agree to extend your right to occupy the Leased Premises through July 13, 2020.  If you do not exercise this option to purchase the property in writing on or before July 13, 2020, then the Supply Agreement and Lease will also terminate on July 13, 2020 and you must vacate the Facility not later than that date.

     This non-renewal is without prejudice to SEIF's accrued rights.

     A copy of the summary statement described in Section 104(d) [15 U.S.C. Section 2804 (d)] of the Petroleum Marketing Practices Act is enclosed herewith.

     Regards,

     Kristen Williams Cook
     Associate General Counsel
     7-Eleven, Inc. and SEI Fuel Services, Inc.

/kwc

cc:    Kenia Del Risco, SEI Fuel Services, Inc. (via e-mail)
      Rob Dowd, SEI Fuel Services, Inc. (via e-mail)
      Matt Sanders, 7-Eleven, Inc. (via e-mail)

      Mr. Alejandro Brito (abrito@zarcolaw.com) (via e-mail)
      Zarco Einhorn Salkowski Brito

# Revised Summary of Title I of the Petroleum Marketing Practices Act

**AGENCY: Department of Energy**

ACTION: Notice

**SUMMARY:** This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or non renewal of a franchise is given.

**SUPPLEMENTARY INFORMATION:**

Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. §§2801-2807, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the Federal Register a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under the title. The Department published this summary in the Federal Register on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised Dealer by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

## Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 2007 (the Act), 15 U.S.C §§2801-2807. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination, or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure

to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark, which is owned or controlled by a refiner and it includes secondary agreements such as leases of real property and motor fuel Supply Agreement which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 2007 (15 U.S.C. §§2801-2807). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

## I.     Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

### A.     Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State, or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

### B.     Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith

efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

**C.      Mutual Agreement to Terminate the Franchise**

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

**D.      Withdrawal From the Market Area**

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. § 2802(b)(E).

**E.      Other Events Permitting a Termination**

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate you franchise agreement:

    (1)      Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

    (2)      You declare bankruptcy or a court determines that you are insolvent.

    (3)      You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

    (4)      Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered by the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

    (5)      Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

    (6)      Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

    (7)      Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

    (8)      Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

    (9)      Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

    (10)      Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

    (11)      Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

    (12)      Your conviction of any felony involving moral turpitude.

    (13)      Any event that affects the franchise relationship and as a result of which termination is reasonable.

**II.      Reasons for Nonrenewal**

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

**A.      Failure to Agree on Changes or Additions To Franchise**

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

**B.      Customer Complaints**

If you supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

**C.      Unsafe or Unhealthful Operations**

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

**D.      Operation of Franchise is Uneconomical**

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

**III.      Notice Requirements for Termination or Nonrenewal**

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

**A.      How Much Notice Is Required**

In most cases, your supplier must give you notice of termination or nonrenewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier my repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

**B.      Manner and Contents of Notice**

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain: (1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action; (2) The date the termination or nonrenewal takes effect; and (3) A copy of this summary.

**IV.      Trial Franchises and Interim Franchises**

The following is a description of the special requirements that apply to trial and interim franchises.

**A.      Trial Franchises**

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

**B. Interim Franchises**

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately

after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

## V.    Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. §§2801-2807.

## VI.    Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

Further Discussion of Title I - Definitions and Legal Remedies

## I.    Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

## A.    Franchise
A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

## B.    Franchise Relationship
The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

## C.    Franchisee
A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

## D.    Franchisor
A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

**E.      Marketing Premises**

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

**F.      Leased Marketing Premises**

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

**G.      Fail to Renew and Nonrenewal**

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

**II.      Legal Remedies Available to Franchisee**

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

**A.      Franchisee's Right to Sue**

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

**B.      Equitable Relief**

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

**C.      Burden of Proof**

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

**D.      Damages**

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

**E.      Franchisor's Defense to Permanent Injunctive Relief**

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the nonrenewal of the franchise relationship was a determination made in good faith and in the normal course of business:

(1)      To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
(2)      To materially alter, add to, or replace such premises;
(3)      To sell such premises;
(4)      To withdraw from marketing activities in the geographic area in which such premises are located; or

(5)      That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.

Form BJC-(R)-PMPA (10-2001)

**2007 PMPA AMENDMENT**

**15 U.S.C. § 2807. Prohibition on restriction of installation of renewable fuel pumps.**

**(a)      Definition**

In this section:

(1)      Renewable fuel
The term "renewable fuel" means any fuel—

(A)      at least 85 percent of the volume of which consists of ethanol; **or**

(B)      any mixture of biodiesel and diesel or renewable diesel (as defined in regulations adopted pursuant to section 7545(o) of Title 42 (40 CFR, part 80)), determined without regard to any use of kerosene and containing at least 20         percent biodiesel or renewable diesel.

(2)      Franchise-related document
The term "franchise-related document" means—

(A)      a franchise under this Chapter; **and**

(B)      any other contract or directive of a franchisor relating to terms or conditions of the sale of fuel by a franchisee.

**(b)      Prohibitions**

(1)      In general

No franchise-related document entered into or renewed on or after December 19, 2007, shall contain any provision allowing a franchisor to restrict the franchisee or any affiliate of the franchisee from—

(A)      installing on the marketing premises of the franchisee a renewable fuel pump or tank, except that the franchisee's franchisor may restrict the installation of a tank on leased marketing premises of such franchisor;

(B)      converting an existing tank or pump on the marketing premises of the franchisee for renewable fuel use, so long as such tank or pump and the piping connecting them are either warranted by the manufacturer or certified by a recognized standards setting organization to be suitable for use with such renewable fuel;

(C)      advertising (including through the use of signage) the sale of any renewable fuel;

(D)      selling renewable fuel in any specified area on the marketing premises of the franchisee (including any area in which a name or logo of a franchisor or any other entity appears);

(E)      purchasing renewable fuel from sources other than the franchisor if the franchisor does not offer its own renewable fuel for sale by the franchisee;

(F)      listing renewable fuel availability or prices, including on service station signs, fuel dispensers, or light poles; **or**

    (G)    allowing for payment of renewable fuel with a credit card,

so long as such activities described in subparagraphs (A) through (G) do not constitute mislabeling, misbranding, willful adulteration, or other trademark violations by the franchisee.

(2)    Effect of provision

Nothing in this section shall be construed to preclude a franchisor from requiring the franchisee to obtain reasonable indemnification and insurance policies.

### (c) Exception to 3-grade requirement

No franchise-related document that requires that 3 grades of gasoline be sold by the applicable franchisee shall prevent the franchisee from selling a renewable fuel in lieu of 1, and only 1, grade of gasoline.

# ZARCO EINHORN SALKOWSKI BRITO

### ATTORNEYS AT LAW

ROBERT ZARCO
ROBERT M. EINHORN
ROBERT F. SALKOWSKI*
ALEJANDRO BRITO
HIMANSHU M. PATEL
KAARI-LYNN S. GAGNON
BESHOY RIZK
MELISSA L. BERNHEIM**
COLBY CONFORTI
MICHAEL D. BRAUNSTEIN
BRENDA PHANG

*ALSO ADMITTED TO PRACTICE IN NJ
**OF COUNSEL

2 S. BISCAYNE BOULEVARD
34TH FLOOR
MIAMI, FLORIDA 33131

MIAMI
TELEPHONE (305) 374-5418
TELEFAX (305) 374-5428

WEST PALM BEACH
TELEPHONE (561) 721-2861

WWW.ZARCOLAW.COM

June 15, 2020

Via email transmission Kristen.Cook@7-11.com and US Mail

Kristen Williams Cook, Esq.
Associate General Counsel
SEI Fuel Services, Inc.
3200 Hackberry Road
Irving, TX 75063

Re:   Mendez Fuel Holdings 3, LLC

Dear Ms. Cook:

We are in receipt of your letters dated May 15, 2020 and June 11, 2020.

The continued delay by SEIF in properly addressing this matter continues to cause harm to Mendez Fuel. Although SEIF has been claiming for months that a sales contract was imminent so that Mendez Fuel could consider whether to exercise its right of first refusal, to date no such written agreement has been executed or provided to Mendez Fuel. Instead, Mendez Fuel has been asked by SEIF to simply sit idly by and agreed to extend the termination date while SEIF elects how to proceed in its interests.

Now, Mendez Fuel has been provided with an offer to purchase the property for $8,000,000, which offer is untethered to any legitimate third-party offer to purchase the property given that, as your letter readily acknowledges, no "sales contract has not been signed and negotiations have stalled due to the pandemic." The $8,000,000 figure is simply an aspirational asking price, and is not a bona fide offer, much less an offer that any third party has accepted or considered. Putting aside the fact that the alleged sale price is grossly in excess of the value of the property, there is no evidence that an offer anywhere near $8,000,000 has been made to SEIF and, thus, the purported offer being made by SEIF to Mendez Fuel simply highlights that SEIF's

EXHIBIT
G

Kristen Williams Cook, Esq.
June 15, 2020
P a g e | **2**

conduct continues to not be in good faith and in the ordinary course of business as SEIF is obligated to do under the PMPA.

We are now one day passed the date that SEIF previously claimed would serve as the termination date and: (a) Mendez Fuel has not been provided with a contract to examine and determine whether to exercise its right of first refusal, and (b) is not being afforded the opportunity to sell its rights to the Facility due to SEIF's repeated contention that it intends to sell the facility which, given the passage of time, seems remote, if not, fictional.  The non-renewal of the franchise, at this time and under these circumstances, is unlawful.  Indeed, Mendez Fuel has been notified by its prospective purchaser that as a result of SEIF's failure to consider the proposed sale and provide new leases for the facilities, it has rescinded its offer to purchase the Assets, as that term is defined in the Asset Purchase Agreement.

Accordingly, SEIF's conduct in this regard is causing actual harm and has interfered with Mendez Fuel's contractual relationships and prospective business relationships, which is actionable as a matter of law.  Moreover, as noted in my prior communications, SEIF's personnel have also made misrepresentations of material fact relating to the renewal of the franchise.

Mendez Fuel is being left with no alternative but to enforce its legal and equitable rights, all of which are expressly reserved.  If SEIF is interested in resolving this matter amicably, and without the need to engage in protracted and expensive litigation, Mendez Fuel is prepared to consider a reasonable proposal.  To be clear, the current scenario is simply unacceptable.

Very truly yours,

ALEJANDRO BRITO

AB:ap

ZARCO EINHORN SALKOWSKI BRITO



Kristen Cook
Associate General Counsel
Direct Dial: (972) 828-7242
Fax: (972) 828-5012
Kristen.Cook@7-11.com

June 16, 2020

*Via Email (abrito@zarcolaw.com)*
Mr. Alejandro Brito
Zarco Einhorn Salkowski Brito
2 S. Biscayne Boulevard
34th Floor
Miami, FL 33131

    **Re:**    **Dealer Fuel Lease Agreement ("Lease") between 7-Eleven, Inc. ("7-Eleven"), as Landlord, and Mendez Fuel Holdings 3 LLC, as Tenant, effective May 1, 2017; and**

              **Motor Fuel Supply and Security Agreement, as amended (the "Supply Agreement"), effective May 1, 2017, between SEI Fuel Services, Inc. ("SEIF"), and Mendez Fuel Holdings 3 LLC, as Dealer ("Dealer")**

              **7-Eleven Store #37581 – located 11870 SW 40th Street, Miami, FL 33175 (the "Leased Premises"); SEIF Store #37581 (the "Facility")**

Dear Mr. Brito:

    I am in receipt of your letter dated June 15, 2020, which is in response to my letters dated May 15, 2020 and June 11, 2020.

    While SEIF recognizes that these negotiations are taking longer than usual due to the unprecedented Covid-19 crisis, these delays are unavoidable.

    With respect to SEIF's offer to sell the property to your client for the purchase price of $8,000,000.00, you are incorrect that the "$8,000,000 figure is simply an aspirational asking price, and is not a bona fide offer, much less an offer that any third party has accepted or considered." Indeed, 7-Eleven is prepared to send you a copy of the fully executed letter of intent demonstrating a third party's interest in purchasing the property for $8,000,000, subject to your client entering into a Confidentiality and Non-Disclosure Agreement with 7-Eleven and SEIF. Enclosed is a Confidentiality and Non-Disclosure Agreement for your client to review and sign.

**SEI Fuel Services, Inc.**
3200 Hackberry Road, Irving, TX 75063

┌─────────────┐
│  **EXHIBIT** │
│             │
│    **H**    │
└─────────────┘

Mr. Alejandro Brito
June 16, 2020
Page 2

Upon receipt of the letter of intent, you will see that 7-Eleven's offer to sell your client the property was clearly in good faith and in the ordinary course of business.

Indeed, 15 U.S.C. §2802(b)(3)(D)(III) only provides that:

"in the case of leased marketing premises such franchisor, during the 90-day period after notification was given pursuant to section 2804 of this title, either—
      (I)      made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or
      (II)     if applicable, offered the franchisee a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises."

Simply stated, your assertion that SEIF is required to provide your client "a contract to examine and determine whether to exercise its right of first refusal" is incorrect. Rather, SEIF may either: (1) make a bona fide offer to your client; or (2) offer to your client an offer made by another. Accordingly, since SEIF has made a bona fide offer to sell the property to your client within ninety days after its §2804 notification to your client was given, SEIF has complied with 15 U.S.C. §2802(b)(3)(D)(III).

Finally, because SEIF has extended your client's right to occupy the Leased Premises through July 13, 2020, your client has suffered no actionable damages. (See, generally, *Mac's Shell Service, Inc. v. Shell Oil Products Co. LLC et al.* 130 S.Ct. 1251, "a franchisee cannot recover for constructive termination under the PMPA if the franchisor's allegedly wrongful conduct did not compel the franchisee to abandon its franchise").

We await your client's response to the previously provided offer. Without rescinding the effectiveness of the non-renewal notice of the Lease and Supply Agreement, please advise if your client would like to continue to operate past July 13, 2020. If your client intends to vacate the Leased Premises on July 13, 2020, please advise me so that 7-Eleven and SEIF can plan accordingly.

A copy of the summary statement described in Section 104(d) [15 U.S.C. Section 2804 (d)] of the Petroleum Marketing Practices Act is enclosed herewith.

Regards,

Kristen Williams Cook
Associate General Counsel
7-Eleven, Inc. and SEI Fuel Services, Inc.

Mr. Alejandro Brito
June 16, 2020
Page 2

Enclosure

cc:    Kenia Del Risco, SEI Fuel Services, Inc. (via e-mail)
       Rob Dowd, SEI Fuel Services, Inc. (via e-mail)
       Hollie Roane, 7-Eleven, Inc. (via e-mail)
       Robin Bryant, 7-Eleven, Inc. (via e-mail)
       Matt Sanders, 7-Eleven, Inc. (via e-mail)

# Revised Summary of Title I of the Petroleum Marketing Practices Act

**AGENCY: Department of Energy**

ACTION: Notice

**SUMMARY:** This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or non renewal of a franchise is given.

**SUPPLEMENTARY INFORMATION:**

Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. §§2801-2807, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel.

Section 104(d)(1) of the Act required the Secretary of Energy to publish in the Federal Register a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under the title. The Department published this summary in the Federal Register on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised Dealer by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

**Summary of Legal Rights of Motor Fuel Franchisees**

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 2007 (the Act), 15 U.S.C §§2801-2807. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination, or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure

to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark, which is owned or controlled by a refiner and it includes secondary agreements such as leases of real property and motor fuel Supply Agreement which has existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 2007 (15 U.S.C. §§2801-2807). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

## I.     Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

### A.     Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, State, or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

### B.     Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith

efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

**C.    Mutual Agreement to Terminate the Franchise**

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

**D.    Withdrawal From the Market Area**

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. § 2802(b)(E).

**E.    Other Events Permitting a Termination**

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate you franchise agreement:

(1)    Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2)    You declare bankruptcy or a court determines that you are insolvent.

(3)    You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4)    Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered by the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5)    Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6)    Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7)    Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8)    Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9)    Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10)    Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11)    Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12)    Your conviction of any felony involving moral turpitude.

(13)    Any event that affects the franchise relationship and as a result of which termination is reasonable.

**II.    Reasons for Nonrenewal**

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

**A.    Failure to Agree on Changes or Additions To Franchise**

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

**B.      Customer Complaints**

If you supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

**C.      Unsafe or Unhealthful Operations**

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

**D.      Operation of Franchise is Uneconomical**

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

**III.     Notice Requirements for Termination or Nonrenewal**

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

**A.      How Much Notice Is Required**

In most cases, your supplier must give you notice of termination or nonrenewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier my repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

**B.      Manner and Contents of Notice**

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain: (1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action; (2) The date the termination or nonrenewal takes effect; and (3) A copy of this summary.

**IV.     Trial Franchises and Interim Franchises**

The following is a description of the special requirements that apply to trial and interim franchises.

**A.      Trial Franchises**

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

**B. Interim Franchises**

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately

after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

**V.      Your Legal Rights**

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. §§2801-2807.

**VI.     Waiver of Rights and Applicable State Law**

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

Further Discussion of Title I - Definitions and Legal Remedies

**I.       Definitions**

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

**A.      Franchise**
A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

**B.      Franchise Relationship**
The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

**C.      Franchisee**
A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

**D.      Franchisor**
A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

**E.     Marketing Premises**

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

**F.     Leased Marketing Premises**

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

**G.     Fail to Renew and Nonrenewal**

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

**II.     Legal Remedies Available to Franchisee**

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

**A.     Franchisee's Right to Sue**

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

**B.     Equitable Relief**

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

**C.     Burden of Proof**

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

**D.     Damages**

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

**E.     Franchisor's Defense to Permanent Injunctive Relief**

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:

(1)     To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
(2)     To materially alter, add to, or replace such premises;
(3)     To sell such premises;
(4)     To withdraw from marketing activities in the geographic area in which such premises are located; or

(5)   That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.

Form BJC-(R)-PMPA (10-2001)

**2007 PMPA AMENDMENT**

**15 U.S.C. § 2807. Prohibition on restriction of installation of renewable fuel pumps.**

**<u>(a)      Definition</u>**

In this section:

(1)      Renewable fuel
         The term "renewable fuel" means any fuel—

        (A)      at least 85 percent of the volume of which consists of ethanol; **or**

        (B)      any mixture of biodiesel and diesel or renewable diesel (as defined in regulations adopted pursuant to section 7545(o) of Title 42 (40 CFR, part 80)), determined without regard to any use of kerosene and containing at least 20      percent biodiesel or renewable diesel.

(2)      Franchise-related document
         The term "franchise-related document" means—

        (A)      a franchise under this Chapter; **and**

        (B)      any other contract or directive of a franchisor relating to terms or conditions of the sale of fuel by a franchisee.

**<u>(b)      Prohibitions</u>**

(1)      In general

No franchise-related document entered into or renewed on or after December 19, 2007, shall contain any provision allowing a franchisor to restrict the franchisee or any affiliate of the franchisee from—

        (A)      installing on the marketing premises of the franchisee a renewable fuel pump or tank, except that the franchisee's franchisor may restrict the installation of a tank on leased marketing premises of such franchisor;

        (B)      converting an existing tank or pump on the marketing premises of the franchisee for renewable fuel use, so long as such tank or pump and the piping connecting them are either warranted by the manufacturer or certified by a recognized standards setting organization to be suitable for use with such renewable fuel;

        (C)      advertising (including through the use of signage) the sale of any renewable fuel;

        (D)      selling renewable fuel in any specified area on the marketing premises of the franchisee (including any area in which a name or logo of a franchisor or any other entity appears);

        (E)      purchasing renewable fuel from sources other than the franchisor if the franchisor does not offer its own renewable fuel for sale by the franchisee;

        (F)      listing renewable fuel availability or prices, including on service station signs, fuel dispensers, or light poles; **or**

(G)      allowing for payment of renewable fuel with a credit card,

so long as such activities described in subparagraphs (A) through (G) do not constitute mislabeling, misbranding, willful adulteration, or other trademark violations by the franchisee.

(2)      Effect of provision

Nothing in this section shall be construed to preclude a franchisor from requiring the franchisee to obtain reasonable indemnification and insurance policies.

## (c) Exception to 3-grade requirement

No franchise-related document that requires that 3 grades of gasoline be sold by the applicable franchisee shall prevent the franchisee from selling a renewable fuel in lieu of 1, and only 1, grade of gasoline.

## CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

This CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT ("Agreement"), made as of this ___ day of June, 2020 ("Effective Date"), is entered into by Mendez Fuel Holdings 3 LLC ("Recipient"), for the benefit of 7-Eleven, Inc., a Texas corporation, and SEI Fuel Services, Inc., a Texas corporation, having their principal place of business at 3200 Hackberry Road, Irving, Texas 75063 (collectively, "SEIF") and hereinafter collectively referred to as the "Parties" or as an individual reference as a "Party."

In consideration of the mutual covenants and promises herein contained, the receipt and sufficiency of which are hereby acknowledged, Recipient agrees as follows:

1.     **Confidential Information**.  SEIF will disclose and make available to Recipient certain information that is non-public, confidential and/or proprietary in nature relating to the potential sale of the real property located 11870 SW 40th Street, Miami, Florida 33175 ("Confidential Information").  By executing this Agreement, Recipient (including, without limitation, its respective officers, directors, employees, counsel, consultants, brokers or agents) acknowledges and agrees that it shall maintain the Confidential Information in confidence from the time of this Agreement and for a period of three (3) years from the Effective Date of this Agreement, and shall not, without the prior written consent of SEIF, disclose any of the Confidential Information except as permitted herein; provided, however, that there shall be no obligation on the part of Recipient to maintain in confidence any Confidential Information disclosed to it by SEIF: (i) which is generally known to the trade or the public at the time of such disclosure; (ii) which becomes generally known to the trade or the public subsequent to the time of such disclosure, but not as a result of disclosure by the other; (iii) which is legally received by Recipient from a third party without restriction; (iv) which is independently developed by Recipient; (v) which is approved for release in writing by SEIF whose Confidential Information is to be released, prior to any release; or (vi) which is demanded by a lawful order from any court or any regulatory authority empowered to issue such an order.  Recipient agrees to notify SEIF promptly of the receipt of any such order, and to promptly provide SEIF with a copy of such order.  If Recipient is required to disclose Confidential Information in response to a valid order by a court or other governmental body, as required by law, Recipient may disclose such Confidential Information only to the extent legally compelled.  SEIF will be given an opportunity to oppose any such order or to seek a protective order that protects the Confidential Information at issue before Recipient complies with any such court or governmental order provided, however, that all Parties will stipulate to any orders necessary to protect said information from public disclosure.

2.     **Disclosure to Third Parties**.  Recipient shall not disclose the Confidential Information: (i) to its respective employees, officers, directors, consultants, advisors, brokers, or counsel, except on a need-to-know basis and each employee, officer, director, consultant, advisor, broker or counsel receiving Confidential Information shall be notified of and required to abide by the terms and conditions of this Agreement; or (ii) to subcontractors, vendors, agents or the like, without the prior written consent of SEIF and unless and until a confidential disclosure agreement expressing substantially the same terms as contained in this Agreement is executed by the person receiving and before the person receives the Confidential Information, and provided further, that disclosure of the Confidential Information by such subcontractors, vendors, agents, or the like, to their respective employees, officers, directors or counsel shall be on the same terms as set forth in Section 2(i) above.  Recipient shall not disclose to any person (other than as, and to the extent, herein detailed) the fact that Confidential Information has been requested, that discussions or negotiations between the Parties are taking place or have taken place, or the status thereof.

3.     **Procedure to Protect**.  Recipient covenants that it shall use the same degree of care with SEIF's Confidential Information that it uses with its own Confidential Information of a similar type, but in any event no less than reasonable care.  Recipient agrees not to sell, license or otherwise exploit any products or services (including software in any form) which embody in whole or in part any Confidential Information.

4.   **Control of Confidential Information.**  Copies of the Confidential Information shall be made only as necessary.

5.   **Ownership.**  Nothing in this Agreement shall be construed to convey any title, copyright, ownership or other proprietary rights in the Confidential Information to Recipient.

6.   **No Expectation.**  This Agreement is not an offer, an acceptance, or a contract to negotiate or enter into any transaction, nor is it intended to require the Parties to proceed with or continue such negotiations or transactions.  Other than the duties of nondisclosure and confidentiality as provided herein, this Agreement shall not give rise to any obligation for either Party to disclose any information, including the Confidential Information.  Recipient agrees that unless and until a definitive agreement has been executed and delivered, which may or may not occur, neither Party will be under any obligation of any kind whatsoever with respect to any transaction by virtue of this Agreement or any other written or oral expression with respect to such a transaction made by any of their respective directors, officers, employees, agents or any other representatives.

7.   **Term.**  Recipient may terminate this Agreement upon thirty (30) days' prior written notice to SEIF.  Upon termination and following a request from SEIF, Recipient will promptly return all copies of the Confidential Information that is in Recipient's possession or in the possession of any of Recipient's representatives, without retaining any copies thereof (including expunging copies from any computer or other device), except to the extent Recipient may be specifically required to retain such copy as the result of a document retention policies, deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process or law or governmental proceeding. Termination of this Agreement and the return of the Confidential Information shall not affect any of the obligations of the Parties with respect to disclosure or use of the Confidential Information.

8.   **Integration and Survival.**  This Agreement expresses the entire understanding of the Parties with respect to the exchange of Confidential Information and supersedes any prior agreements with respect thereto.  This Agreement may not be amended or modified except in writing signed by both Parties. The terms hereof shall survive termination of any other arrangement between the Parties.

9.   **Injunctive Relief.**  Recipient acknowledges that any breach of this Agreement shall result in irreparable and continuing damage to SEIF and, therefore, in addition to any other remedy which may be afforded by law, any breach or threatened breach of this Agreement may be prohibited by restraining order and/or injunction or any other equitable remedies of any court.

10.   **Severability.**  Should any provision of this Agreement be finally determined to be inconsistent with or contrary to applicable law, such provision shall be deemed omitted to conform therewith without affecting any other provision or the validity of this Agreement.

11.   **Waiver.**  No failure or delay by SEIF in exercising any power or right under this Agreement shall operate as a waiver, nor does any single or partial exercise of any power or right preclude any other or further exercise, or the exercise of any other power or right.

12.   **Assignment.**  Recipient may not assign this Agreement without the prior written consent of SEIF.

13.   **Notices.**  All notices hereunder shall be in writing, and given when mailed by certified mail, postage paid, return receipt requested, delivered by hand, or sent by receipted courier service to a Party at its above-referenced address (or at such other address as a Party may designate by service upon the other in writing).

14.   **Compliance with Law.**  Recipient agrees to comply with all applicable laws and regulations, whether federal, state or local, in performance of its obligations hereunder and further

represents and warrants that its respective officers, directors, employees, agents and subcontractors hereunder shall do the same.

15.   **Choice of Law**.  THIS AGREEMENT SHALL BE DEEMED TO BE MADE UNDER AND WILL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA, EXCLUDING CHOICE OF LAW RULES.

16.   **Electronic Signatures.**  This Agreement shall not be effective unless and until the same has been executed and delivered by all parties hereto.  To facilitate the execution of this Agreement, the parties may execute and exchange counterparts of signature pages affixing their signature by means of an electronic signature tool, application, or software (e.g., DocuSign).  Each such electronic signature of a party shall be treated as an original as if personally signed by that party.

**IN WITNESS WHEREOF**, Recipient has executed this Agreement effective as of the Effective Date written above.

RECIPIENT

Mendez Fuel Holdings 3 LLC

By:_____
Print Name:_____
Title:_____