UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-22984-CV-O'SULLIVAN

[CONSENT]

MENDEZ FUEL HOLDINGS, LLC, MENDEZ FUEL
HOLDINGS 1, LLC, MENDEZ FUEL HOLDINGS 2,
LLC, and MENDEZ FUEL HOLDINGS 3 LLC,

      Plaintiffs/Counterclaim Defendants,

v.


7-ELEVEN, INC. and SEI FUEL SERVICES, INC.,

      Defendants/Counterclaim Plaintiffs,

_____/

## ORDER

THIS MATTER is before the Court on the parties' cross-motions for summary judgment. See Defendants' Motion for Partial Summary Judgment and Incorporated Memorandum of Law (DE# 71, 2/19/21); Mendez Fuel Holdings 3, LLC and Michael Mendez's Motion for Summary Judgment on Count II of the Complaint and Count V of the Second Amended Counterclaim (DE# 88, 6/14/21).

## BACKGROUND[1]

The instant action stems from a franchise relationship between the parties. On July 24, 2017, Mendez Fuel Holdings 3, LLC (hereinafter "Mendez Fuel 3") and 7-

_____

[1] Unless otherwise noted, the Court will cite to the page numbers automatically assigned by the Court's CM/ECF system appearing at the top, right-hand side of each page.

Eleven, Inc. (hereinafter "7-Eleven") entered into a Dealer Fuel Lease Agreement (DE# 74-2, 2/19/21) (hereinafter "Lease Agreement") wherein Mendez Fuel 3 would lease a gasoline station located at 11870 SW 40th Street, Miami, Florida 33175 (hereinafter "Property").

On May 1, 2017, Mendez Fuel 3 and SEI Fuel Services, Inc. (hereinafter "SEIF") entered into a Motor Fuel Supply & Security Agreement (DE# 74-3, 2/19/21) (hereinafter "Supply Agreement") wherein Mendez Fuel 3 would purchase Mobil branded gasoline and diesel fuels from SEIF.

The Lease Agreement together with the Supply Agreement formed the "Franchise Relationship" between the parties. Both the Lease Agreement and the Supply Agreement were for a term commencing on May 1, 2017 and ending on April 30, 2020. See Lease Agreement at ¶ 4; Supply Agreement at ¶ 1.

On a prior date, October 14, 2015, Michael Mendez signed a continuing guaranty covering all indebtedness incurred by Mendez Fuel 3 and owed to SEIF. See Guaranty (DE# 74-1, 2/19/21).

**A.     The Operative Pleadings**

The operative pleadings in the instant case are the Complaint and Demand for Jury Trial (DE# 1-1, 7/20/20) (hereinafter "Complaint") and the SEIF Defendants' Second Amended Counterclaims (DE# 67, 1/6/21) (hereinafter "Counterclaim").

The Complaint alleged two causes of action, only one of which remains pending before this Court: a violation of the Petroleum Marketing Practices Act (hereinafter "PMPA"), 15 U.S.C. § 2801 et seq., brought by Mendez Fuel 3 against 7-Eleven and SEIF (collectively, "SEIF Defendants").

The Counterclaim alleged the following causes of action: breach of contract (Lease Agreement) brought by 7-Eleven against Mendez Fuel 3 based on the alleged failure to pay rent, taxes and common area maintenance charges (Count I); breach of contract (Supply Agreement) brought by the SEIF Defendants against Mendez Fuel 3 based on the alleged failure to pay amounts due under the agreement (Count II); breach of contract (Lease Agreement) brought by the SEIF Defendants against Mendez Fuel 3 based on the alleged failure to allow 7-Eleven and/or authorized third parties onto the Property (Count III); breach of contract (Supply Agreement) brought by the SEIF Defendants against Mendez Fuel 3 based on the alleged failure to allow 7-Eleven and/or authorized third parties onto the Property (Count IV); declaratory judgment on the proper non-renewal of the franchise relationship effective July 13, 2020 (Count V); declaratory judgment on the proper termination of the franchise relationship effective September 11, 2020 (Count VI); declaratory judgment on the proper termination of the franchise relationship effective April 5, 2021 (Count VII); trespass against Mendez Fuel 3 (Count VIII); eviction and ejectment against Mendez Fuel 3 (Count IX) and breach of personal guaranty against Michael Mendez (Count X).

**B.      The Instant Motions**

**1.      SEIF Defendants' Motion for Summary Judgment**

On February 19, 2021, the SEIF Defendants filed the Defendants' Motion for Partial Summary Judgment and Incorporated Memorandum of Law (DE# 71, 2/19/21) (hereinafter "SEIF Defendants' Motion"). The SEIF Defendants also filed the following supporting documents: the Defendants/Counterclaim Plaintiffs 7-Eleven, Inc. and SEIF Fuel Services, Inc. Statement of Material Facts (DE# 72, 2/19/21) (hereinafter "SEIF

Defendants' SOF"), the Declaration of Kenia Del Risco in Support of Plaintiffs' Motion for Partial Summary Judgment (DE# 73, 2/19/21) ("Del Risco Decl.") and the Declaration of Robert Dowd in Support of Plaintiffs' Motion for Partial Summary Judgment (DE# 74, 2/19/21) ("Dowd Decl.").

On June 4, 2021, Mendez Fuel Holdings 3, LLC and Michael Mendez (collectively, "Mendez Fuel") filed a response in opposition to the SEIF Defendants' Motion and a response in opposition to the SEIF Defendants' SOF. See Plaintiffs/Counterclaim Defendants Mendez Fuel Holdings 3, LLC and Michael Mendez's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (DE# 85, 6/4/21) (hereinafter "Mendez Fuel's Response"); Plaintiffs' Response to Defendants/Counterclaim Plaintiffs 7-Eleven, Inc. and SEIF Fuel Services, Inc.'s Statement of Material Facts (DE# 86, 6/4/21) (hereinafter "Mendez Fuel's RSOF"). Mendez Fuel also filed the Appendix in Support of Plaintiffs/Counterclaim Defendants Mendez Fuel Holdings 3, LLC and Michael Mendez's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (DE# 87, 6/4/21).

The SEIF Defendants filed their reply on June 17, 2021. See Defendants' Reply Motion for Further Support of Its [sic] Partial Summary Judgment and Incorporated Memorandum of Law (DE# 91, 6/17/21) (hereinafter "SEIF Defendants' Reply").

### 2.    Mendez Fuel's Motion for Summary Judgment

On June 14, 2021, Mendez Fuel filed its cross-motion for summary judgment and statement of undisputed facts. See Mendez Fuel Holdings 3, LLC and Michael Mendez's Motion for Summary Judgment on Count II of the Complaint and Count V of the Second Amended Counterclaim (DE# 88, 6/14/21) (hereinafter "Mendez Fuel's

Motion"); Plaintiffs/Counterclaim Defendants Mendez Fuel Holdings 3, LLC and Michael Mendez's Statement of Undisputed Material Facts (hereinafter "Mendez Fuel's SOF"). Mendez Fuel also filed an appendix. See Appendix in Support of Plaintiffs'/Counterclaim Defendants Mendez Fuel Holdings 3, LLC and Michael Mendez's Motion for Summary Judgment on Count II of the Complaint and Count V of the Second Amended Counterclaim (DE# 90, 6/14/21).

The SEIF Defendants filed their response in opposition on August 23, 2021. See Defendants' Opposition to Plaintiffs' Motion for Summary Judgment and Incorporated Memorandum of Law (DE# 101, 8/23/21) (hereinafter "SEIF Defendants' Response"). The SEIF Defendants also filed a response to Mendez Fuel's SOF. See Defendants/Counterclaim Plaintiffs 7-Eleven, Inc. and SEIF Fuel Services, Inc.'s Response to Plaintiffs['] Statement of Material Facts (DE# 102, 8/23/21) (hereinafter "SEIF Defendants' RSOF").[2]

Mendez Fuel filed their reply on August 30, 2021. See Plaintiffs/Counterclaim Defendants Mendez Fuel Holdings 3, LLC and Michael Mendez's Reply to Defendants' Opposition to Plaintiffs' Motion for Summary Judgment on Count II of the Complaint and Count V of the Second Amended Counterclaim (hereinafter "Mendez Fuel's Reply").

This matter is ripe for adjudication.

---

[2] It is unclear why the SEIF Defendants' RSOF has 71 paragraphs when Mendez Fuel's SOF has only 68 paragraphs.

### FACTS[3]

As noted above, the parties entered into a Franchise Relationship for a term commencing on May 1, 2017 and ending on April 30, 2020. See Lease Agreement at ¶ 4; Supply Agreement at ¶ 1. Additionally, Michael Mendez signed a Guaranty on October 14, 2015. See Guaranty (DE# 74-1, 2/19/21).

**A.      Offer to Purchase the Property**

Michael Schubert is a transaction manager in the corporate real estate department of HCA Management Services. See Deposition of Michael Schubert (DE# 90-1 at 12, 6/14/21) (hereinafter "Schubert Depo.").[4] Mr. Schubert was tasked by Kendall Healthcare Group, Ltd. (hereinafter "Kendall")[5] with acquiring the Property. Id. at 13. Kendall was interested in acquiring the Property to provide additional parking in connection with the expansion of its hospital campus. Id.

At some point in 2019, Mr. Schubert conveyed an offer to 7-Eleven to purchase the Property for $8 million. See SEIF Defendants' SOF at ¶ 7; Mendez Fuel's RSOF at

--------------------

[3] The Court makes no factual findings in this Order. The facts summarized herein are not disputed and are supported by the record evidence.

[4] Each page of Mr. Schubert's deposition transcript contains four mini-pages. The Court will cite to the specific mini-page, instead of the page number automatically assigned by the Court's CM/ECF system.

[5] Kendall was a defendant in this lawsuit until it was dismissed pursuant to a voluntary dismissal on September 22, 2020. See Order on Stipulation of Voluntary Dismissal of Claim Against Defendant Kendall Healthcare Group, Ltd. (DE# 50, 9/22/20).

¶ 7.[6] Mr. Schubert determined the $8 million purchase price based on his own estimate

and work background:

> Q        How was the offer priced, the $8 million amount determined, as far
> as you know?
>
> A        In **my estimation and experience working in the area**, t**hat price
> worked for us, and it was my hope that it would get 7-Eleven's
> attention and be agreeable to sell us the property**.
>
> Q        **Were you the one that determined that price?**
>
> A        **Largely, yes. Yes.**
>
> Q        Subject to approval from folks within the leadership team
> presumably, correct?
>
> A        Correct.

Schubert Depo. at 18 (emphasis added).

Mendez Fuel's expert determined that the market value of the Property was

$1.55 million as of April 29, 2021. See Appraisal Report (DE# 90-20 at 4-45, 6/14/21).

The $8 million offer was an unsolicited offer which Mr. Schubert routinely makes

as part of his job:

> It[ was] an unsolicited offer on our part. And in my role in the company, we
> make -- routinely make unsolicited offers and offers to buy property
> around the state of Florida. And sometimes you -- it takes a while before
> the owner to get back to you while they consider it.

---

[6] The SEIF Defendants state that the offer was made at an unspecified date "through a
local real estate broker." SEIF Defendants' SOF at ¶ 7 (citing Dowd Decl. at ¶ 12).
Mendez Fuel maintains that "[o]n August 21, 2019, and on behalf of Kendall Healthcare
Group, Ltd. ('Kendall'), Michael Schubert ('Schubert'), the HCA Management Services'
Transaction Manager, directly reached out to 7-Eleven's representative, Carlo Rivera
('Rivera'), and on behalf of Kendall, made an offer of $8,000,000.00 to acquire the
Premises." Mendez Fuel's RSOF at ¶ 7. This is not a material dispute. For purposes of
the instant summary judgment motions, it only matters that the SEIF Defendants
received an offer from a third-party to purchase the property for $8 million.

Schubert Depo. at 23.

7-Eleven did not immediately respond to the $8 million offer. Schubert Depo. at 18. On March 26, 2020, Matt Sanders, 7-Eleven's Senior Director of Acquisitions, sent an email to Mr. Schubert acknowledging receipt of the September 2019 proposal to purchase the Property and asking "to restart discussions and try to move this forward." See Email dated March 26, 2020 (DE# 90-3 at 1, 6/14/21). In March or April of 2020, 7-Eleven made a counteroffer for $8.3 million. Schubert Depo. at 22. At some point, the purchase price was reduced back to $8 million.

There was no "signed purchase and sale agreement between 7-Eleven and Kendall as of May 15, 2020." Mendez Fuel's SOF at ¶ 34; SEIF Defendants' RSOF at ¶ 34. On May 17, 2020, SEIF sent an initial draft of the purchase and sale agreement. Id. at ¶ 35. "On June 9, 2020, HCA's counsel sent to [Mr.] Sanders a clean and redline copy of the purchase and sale agreement for the SEIF Defendants' review." Id. at ¶ 36. "As of June 10, 2020, there were still seven (7) pending items that were being discussed and negotiated between the parties." Mendez Fuel's SOF at ¶ 42.

On June 16, 2020, Mr. Sanders asked Mr. Schubert to place an abbreviated Letter of Intent ("LOI") on HCR's letterhead with the understanding it would not "constitut[e] a deal until a purchase agreement [was] signed . . . ." June 16, 2020 Email (DE# 90-9, 6/14/21). Mr. Sanders stated that:

> this [would] both facilitate communication with the dealer about the [right of first refusal] and also show us operating in good faith and being transparent with the dealer, who needs to work on his own plans for the future based on the best available information, and whose general cooperation [would] benefit both of us.

Id. Mr. Schubert agreed to the request. Schubert Depo. at 46.

As of July 9, 2020, SEIF and Kendall were still negotiating the terms for a potential acquisition of the Property by Kendall. Mendez Fuel's SOF at ¶ 56; SEIF Defendants' RSOF at ¶ 56. "[O]n February 2, 2021, 7-Eleven's counsel advised Kendall's counsel that 7-Eleven's resources were maxed out as they were in the middle of an acquisition for the Speedway gas station system and that they would get back to Kendall in a few months." Id. at ¶ 65.

At the time of his deposition, March 30, 2021, Mr. Schubert believed that "[t]he terms of the transaction were . . . largely agreed to" and remained "hopeful of proceeding and acquiring the [P]roperty." Schubert Depo at 53, 68.[7]

**B.   March 10, 2020 Letter: Non-Renewal of the Franchise Relationship Based on the Prospective Sale of the Property**

On March 10, 2020, SEIF sent a letter[8] to Mendez Fuel providing "formal written notice pursuant to the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 et seq., that SEIF [would] not renew the franchise with [Mendez Fuel 3] effective close of business on Friday, June 12, 2020 ('Effective Date')." March 10, 2020 Letter (DE# 74-4 at 2, 2/19/21).

---

[7] Kendall and 7-Eleven signed a contract for the sale of the Property on May 26, 2021 ("May 26, 2021 Contract"). See SEIF Defendants' Response at 2 n. 1. Mendez Fuel does not dispute the existence of this contract. Instead, Mendez Fuel argues that "the SEIF Defendants should be precluded from introducing any evidence of a sales contract with Kendall . . . since such a document was not produced in discovery until after the fact discovery deadline." Mendez Fuel's Reply at 5-6. Leaving aside the propriety of raising what is tantamount to a motion in limine in a reply brief (with no memorandum of law supporting the relief requested), the Court finds that it does not need to consider the May 26, 2021 Contract in ruling on the instant cross-motions for summary judgment.

[8] There were numerous letters and emails exchanged between the parties. The communications summarized herein are only those communications which are relevant to the parties' cross motions for summary judgment.

The March 10, 2020 Letter explained that "[p]ursuant to 15 U.S.C. §
2802(b)(3)(D)(III), SEIF [was] electing to non-renew the Supply Agreement because 7-
Eleven, the parent company of SEIF, ha[d] decided in good faith and in the normal
course of business to sell the [Property] to a bona fide third party." March 10, 2020
Letter at 2-3. The letter stated that once the sales contract was signed, a copy of the
sales contract would be provided to Mendez Fuel 3 and that Mendez Fuel 3 would have
a right of first refusal:

> As soon as the sales contract is signed, a representative at 7-Eleven will
> forward to [Mendez Fuel 3] the sales contract along with a 45-day right of
> first refusal option in accordance with the Petroleum Marketing Practices
> Act. Upon receipt of the sales contract, [Mendez Fuel 3] will have the right
> to determine, within forty-five (45) days, if it chooses to purchase the
> property upon the same terms and conditions as the third party.

Id. at 3. The letter further stated that Mendez Fuel 3 should construe the letter as a
"notice that pursuant to Section 29 of the Lease [Agreement],[9] [Mendez Fuel 3's] right
to occupy the [Property would] . . . terminate on June 12, 2020 and [Mendez Fuel 3
would have to] vacate the [Property] not later than that date." Id. at 3.

On March 16, 2020, counsel for Mendez Fuel 3 responded to the March 10, 2020
Letter. See March 16, 2020 Letter (DE# 74-5, 2/19/21). The March 16, 2020 Letter
asserted that the March 10, 2020 Letter "[was] defective and noncompliant with the
PMPA." Id. at 2. The March 16, 2020 Letter referred to communications between the
parties beginning in approximately September, 2019 "relating to renewing" the Lease
Agreement and Supply Agreement. Id. The letter stated that "[a]t no point was Mendez

---

[9] Section 29 of the Lease Agreement governs notices. It states that notices must be in
writing and sets forth the manner in which notices are to be delivered. See Lease
Agreement at ¶ 29.

Fuel advised that these agreements would not be renewed" and that "[t]o the contrary, the information supplied to Mendez Fuel by SEIF was that these agreements, consistent with the parties' course of conduct and course of dealing, would be renewed." Id. The letter also referenced Mendez Fuel 3's intent to sell the "facility" at the beginning of 2020 and Mendez Fuel 3's submission on February 18, 2020 of a written proposal to SEIF. Id. at 3. The letter concluded by stating that:

> Mendez Fuel ha[d] repeatedly requested that SEIF approve the proposed transaction. Those efforts, however, have been unavailing as SEIF has become non-responsive. Now, just a few weeks before the Supply Agreement and the Lease [Agreement] state that those agreements are set to expire, **SEIF has advised that it intends to sell the Facility to an unnamed party upon terms that are not even disclosed to Mendez Fuel given that the purported purchase and sale agreement between SEIF and this third party has not been executed. These facts do not support a finding that SEIF is selling the Facility "in good faith and in the normal course of business."** Rather, **it is evident that SEIF is simply seeking to avoid granting approval of the purchase and sale transaction proposed by Mendez Fuel**. Such conduct would clearly constitute tortious interference by SEIF.
>
> **SEIF's conduct in this regard is not compliant with the terms and the spirit of the PMPA** and is actionable. Notwithstanding, we are hopeful that SEIF will properly consider and address the Mendez Fuel transaction so that the parties may amicably proceed with the sale of the Facility by Mendez Fuel to its proposed purchaser.

Id. at 3 (emphasis added).

On March 26, 2020, the SEIF Defendants responded to the March 16, 2020 Letter. See March 26, 2020 Letter (DE# 74-6, 2/19/21). The March 26, 2020 Letter denied any representations made by a SEIF representative to Mendez Fuel 3 and further noted that "pursuant to Section 18 of the Supply Agreement," oral representations could not modify the agreements between the parties. Id. at 2-3. The March 26, 2020 Letter further stated that "[c]ontrary to [Mendez Fuel 3's] assertions, 7-Eleven's decision to sell was made in the ordinary course of business" and that "the

sales price [was] fair market value." Id. at 3. The March 26, 2020 Letter reiterated that "once a contract of sale [was] finalized with the third-party buyer, 7-Eleven [would] provide Dealer the opportunity to review the offer and purchase the property on the same terms and conditions as set forth therein." Id. at 4.

**C.     June 11, 2020 Letter: Offer to Sell the Property to Mendez Fuel 3**

On June 11, 2020, SEIF sent a letter to Mendez Fuel offering to sell the Property for $8 million. See June 11, 2020 Letter (DE# 74-9 at 2, 2/19/21) (stating that "as a sales contract has not been signed and negotiations have stalled [with the third party] due to the pandemic, 7-Eleven makes the offer to sale [sic] the property to [Mendez Fuel 3] for the purchase price of $8,000,000.00, which is the same price for which 7-Eleven is offering the property to sale [sic] for the other third party."). "This offer for the sale of the property [was] valid for thirty days or until July 13, 2020." Id. at 3. The June 11, 2020 Letter, "extend[ed Mendez Fuel 3's] right to occupy the [Property] through July 13, 2020" and further stated that "[i]f [Mendez Fuel 3 did] not exercise this option to purchase the property in writing on or before July 13, 2020, then the Supply Agreement and Lease [Agreement would] also terminate on July 13, 2020 and [Mendez Fuel 3 had to] vacate the [Property] not later than that date." Id. at 3.

On June 15, 2020, Mendez Fuel 3 sent a letter to SEIF's counsel. See June 15, 2020 Letter (DE# 74-10, 2/19/21). The letter referred to the $8 million purchase price as "simply an aspirational asking price; and . . . not a bona fide offer, much less an offer that any third party has accepted or considered" and further stated that:

> Putting aside the fact that the alleged sale price is grossly in excess of the value of the property, **there is no evidence that an offer anywhere near $8,000,000 has been made to SEIF and, thus, the purported offer being made by SEIF to Mendez Fuel simply highlights that SEIF's conduct continues to not be in good faith and in the ordinary course**

12

**of business as SEIF is obligated to do under the PMPA**.

Id. at 2-3 (emphasis added).

The following day, SEIF responded to the June 15, 2020 letter. See June 16,

2020 Letter (DE# 74-11, 2/19/21). The June 16, 2020 Letter stated that the delay was

attributable to the pandemic. Id. at 2 (stating that "[w]hile SEIF recognizes that these

negotiations are taking longer than usual due to the unprecedented Covid-19 crisis,

these delays are unavoidable"). The June 16, 2020 Letter further stated that 7-Eleven

would provide Mendez Fuel 3 with "a copy of the fully executed letter of intent

demonstrating a third party's interest in purchasing the property for $8,000,000"

provided that Mendez Fuel 3 sign "a Confidentiality and Non-Disclosure Agreement with

7-Eleven and SEIF." Id. A copy of the Confidentiality and Non-Disclosure Agreement

was enclosed. SEIF also took the position that the PMPA did not require SEIF to

provide a copy of the sales contract:

> your assertion that SEIF is required to provide your client "a contract to
> examine and determine whether to exercise its right of first refusal" is
> incorrect. Rather, **SEIF may either: (1) make a bona fide offer to your
> client; or (2) offer to your client an offer made by another.
> Accordingly, since SEIF has made a bona fide offer to sell the
> property to your client within ninety days after its § 2804 notification
> to your client was given, SEIF has complied with 15 U.S.C. §
> 2802(b)(3)(D)(III)**.

Id. at 3 (emphasis added).

**D.    Expiration of the Lease Agreement and Cessation of Fuel Deliveries**

"On July 14, 2020, 7-Eleven, through counsel, advised [Mendez Fuel 3] that its

Lease Agreement expired as of July 13, 2020 and that it was now a hold-over tenant."

Mendez Fuel's SOF at ¶ 57; SEIF Defendants' RSOF at ¶ 57.

"SEIF ceased the delivery of fuel as of July 14, 2020" and "[o]n or about July 17,

2020, MFH3 ran out of fuel." Mendez Fuel's SOF at ¶ 58; SEIF Defendants' RSOF at ¶

58. Robert Dowd, the Wholesale Fuels Market Manager for SEIF, "was aware that a

decision had [been] made by SEIF to stop all fuel deliveries to [Mendez Fuel 3]" but

"stated that he could not [say who made the decision] without divulging attorney-client

privileged communications." Id. at ¶¶ 61-62.

**E.    August 11, 2020 Letter: Termination of Franchise Relationship for Failure to Pay Rent**

On August 11, 2020, counsel for 7-Eleven sent a letter to Mendez Fuel 3 stating

that, consistent with prior correspondence, 7-Eleven considered Mendez Fuel 3 "a

holdover tenant in accordance with paragraph 27 of the Lease [Agreement] and state

law." August 11, 2020 Letter (DE# 74-12 at 2, 2/19/21). The August 11, 2020 Letter

further stated that Mendez Fuel 3 owed "an outstanding balance [of] $26,680.81 for the

past due April and May rent abatement repayments, and $16,008.49 in July Base Rent

(collectively, "Past Due Rent") . . . ." Id.

According to the August 11, 2020 Letter, this:

> failure to pay Past Due Rent [was] a separate ground for termination of the
> Lease [Agreement] in that: (1) [Mendez Fuel 3] failed to comply with
> franchise provisions which [were] reasonable and material, 15 U.S.C.
> § 2802(b)(2)(A); (b) [Mendez Fuel 3] failed to exert good faith efforts to
> carry out the provisions of the franchise, § 2802(b)(2)(B); and (c) such
> failure [was] an occurrence of an enumerated event relevant to the
> franchise relationship, § 2802(b)(2)(C) and § 2802(c)(8).

Id. at 2-3. The August 11, 2020 Letter required that Mendez Fuel 3 "surrender the

Property and surrender all of 7-Eleven's personal property in accordance with the

PMPA Franchise Agreement provisions and pursuant to the PMPA on

September 11, 2020." Id. at 3 (emphasis omitted).

14

On August 12, 2020, Kenia Del Risco, a Dealer Business Consultant for SEIF, "personally served" on Mendez Fuel 3 a copy of the August 11, 2020 Letter. <u>See</u> Del Risco Decl. at ¶¶ 1, 13; Exhibit 1 (DE# 73, 2/19/21) (photograph of August 11, 2020 Letter).

Mendez Fuel 3 states that it "was unable to pay rent as a result of the SEIF Defendants' decision to stop all fuel deliveries to [Mendez Fuel 3]." Mendez Fuel's RSOF at ¶ 23. Additionally, Mendez Fuel 3 does not dispute that it "has failed to pay for petroleum products delivered to the Property in the amount of $7,754.12." SEIF Defendants' SOF at ¶ 29; Mendez Fuel's RSOF at ¶ 29.

## STANDARD OF REVIEW

The Court, in reviewing a motion for summary judgment, is guided by the standard set forth in Federal Rule of Civil Procedure 56(a). Rule 56(a) states, in part, as follows:

> A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

The moving party bears the burden of meeting this exacting standard. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The moving party "has the initial burden of informing the district court of the basis for its motion and identifying the portions of the record that it believes demonstrate the absence of a genuine issue of material fact."

Guidry v. Comey, 692 F. App'x 975, 977 (11th Cir. 2017). The burden then shifts to the non-movant "to present specific facts showing that there remains a genuine issue for trial." Id.

The Court is required to view the evidence and all factual inferences arising therefrom in the light most favorable to the non-moving party. Batey v. Stone, 24 F.3d 1330, 1333 (11th Cir. 1994). "When evaluating cross-motions for summary judgment, the Court analyzes each individual motion on its own merits and thus views the facts on each motion in the light most favorable to the respective nonmovant." Adega v. State Farm Fire & Cas. Ins. Co., No 07-20696, 2009 WL 3387689, at *3 (S.D. Fla. Oct. 16, 2009). Summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain. Id. If the record presents factual issues, the Court must deny the motion and proceed to trial. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

Despite these presumptions in favor of the non-moving party, the Court must be mindful of the purpose of Rule 56 which is to eliminate the needless delay and expense to the parties and to the Court occasioned by an unnecessary trial. Celotex, 477 U.S. at 322-23. Consequently, the non-moving party cannot merely rest upon his bare assertions, conclusory allegations, surmises or conjectures. Id. As the Supreme Court noted in Celotex:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against the party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Id. at 322-323. Thus, the mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient. There must be evidence on which the jury could reasonably find for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).

## OVERVIEW OF THE PMPA

In the instant case, the parties agree that their Franchise Relationship is governed by the PMPA. See SEIF Defendants' SOF at ¶ 5; Mendez Fuel's RSOF at ¶ 5.

"Congress enacted the PMPA in 1978 to protect motor fuel franchisees from arbitrary or discriminatory termination or nonrenewal of their franchise agreements." LLB Convenience & Gas, Inc. v. Se. Petro Distributors, Inc., 476 F. Supp. 3d 1225, 1228 (M.D. Fla. 2020) (citing Shukla v. BP Expl. & Oil, Inc., 115 F.3d 849 (11th Cir. 1997)). Thus, "the PMPA . . . address[es] the narrow areas of franchise terminations and nonrenewals" and does not "govern every aspect of the petroleum franchise relationship." Mac's Shell Serv., Inc. v. Shell Oil Prod. Co. LLC, 559 U.S. 175, 194 (2010). To that end, "[t]he [PMPA] sets forth the circumstances under which a [franchisor] may terminate or decide not to renew a franchise and imposes certain notice requirements." Freeman v. BP Oil, Inc., Gulf Prod. Div., 855 F.2d 801, 802 (11th Cir. 1988); 15 U.S.C. § 2802(b)(2) (listing authorized grounds for the termination or non-renewal of a franchise relationship).

"The PMPA gives explicit guidelines as to how a franchisor must proceed when terminating or non-renewing a franchise." Seckler v. Star Enter., 124 F.3d 1399, 1403 (11th Cir. 1997), as clarified (Dec. 4, 1997). A franchisor may not terminate or not renew a franchise relationship "unless the franchisor does so pursuant to one of the grounds

enumerated in § 2802(b)(2) and meets the notification requirements contained in

§ 2804." <u>LLB Convenience & Gas</u>, 476 F. Supp. 3d at 1229 (citing 15 U.S.C. § 2802(a)-

(b)).

One of the authorized grounds for non-renewal under the PMPA is "a

determination made by the franchisor in good faith and in the normal course of business

. . . to sell [the] premises." 15 U.S.C. § 2802(b)(3)(D)(i)(III). Section 2802(b)(3)(D)

further requires that:

> (iii) in the case of leased marketing premises such **franchisor, during the 90-day period after notification was given** pursuant to section 2804 of this title, **either**--
>
>> (I) **made a bona fide offer to sell**, transfer, or assign to the franchisee such franchisor's interests in [the] premises; **or**
>>
>> (II) if applicable, **offered the franchisee a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises**.

15 U.S.C. § 2802(b)(3)(D)(iii) (emphasis added). A franchisor need only comply with

subsection (I) or subsection (II), not both.[10]

The PMPA also permits the termination or non-renewal of a franchise

relationship based on "event[s] which [are] relevant to the franchise relationship and as

a result of which termination of the franchise or nonrenewal of the franchise relationship

is reasonable." 15 U.S.C. § 2802(b)(2)(C). Section 2802(c) includes "a non-exhaustive

---

[10]  In the instant case, the parties agree that a franchisor need only comply with subsection (I) or subsection (II). <u>See</u> SEIF Defendants' Response at 6 ("§ 2802(b)(3)(D)(iii) does not require that both elements of subsection I and II be met"); Mendez Fuel's Reply at 8 ("[Mendez Fuel] acknowledges that § 2802(b)(3)(D)(iii) only requires a franchisor to meet either subpart (I) or subpart (II).").

list of twelve such 'events.'" <u>Clinkscales v. Chevron U.S.A., Inc.</u>, 831 F.2d 1565, 1571 n.13 (11th Cir. 1987) (citing 15 U.S.C. § 2802(c)).[11] The "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled" is one of the events enumerated in section 2802(c). <u>See</u> 15 U.S.C. § 2802(c)(8).

The Eleventh Circuit has stated that the twelve events enumerated in section 2802(c) are those "which Congress has decided that termination of a franchise agreement is reasonable." <u>Clinkscales</u>, 831 F.2d at 1573. Therefore, it is only in instances "when the franchisor bases termination **on a ground not specifically provided for in the PMPA** that 'the courts may undertake careful scrutiny of nonenumerated events to determine whether they also constitute events 'as a result of which termination or nonrenewal is reasonable.'" <u>Id.</u> (emphasis added) (quoting <u>Cantrell v. Exxon Co.</u>, 574 F. Supp. 313, 316 (M.D. Tenn. 1983)).

The PMPA authorizes a franchisee to bring a private cause of action against a franchisor who terminates or does not renew a franchise relationship in accordance with section 2802 of the PMPA. 15 U.S.C. § 2805. The franchisee bears the initial "burden of proving the termination of the franchise or the nonrenewal of the franchise relationship." <u>Id.</u> § 2805(c). The franchisor then has "the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b) or 2803 of this title, and, if applicable, that such franchisor

---

[11] Some of the cases cited in this Order predate the 1994 amendments to the PMPA. <u>See</u> PMPA Amendments of 1994, PL 103–371, October 19, 1994, 108 Stat 3484. These cases are cited in this Order either for general propositions or for their discussion of portions of the PMPA which were not affected by the 1994 amendments.

complied with the requirements of section 2802(d) of [the PMPA]." Id. "Successful

franchisees can benefit from a wide range of remedies, including compensatory and

punitive damages, reasonable attorney's fees and expert costs, and equitable relief."

Mac's Shell Serv., 559 U.S. at 179 (citing 15 U.S.C. §§ 2805(b), (d)).

The PMPA is interpreted "liberally in order to effect its remedial purpose."

Seckler, 124 F.3d at 1402.

## ANALYSIS

As noted above, the parties have filed cross-motions for summary judgment. See

SEIF Defendants' Motion; Mendez Fuel's Motion. The parties acknowledge the

existence of the Franchise Relationship and do not dispute that the Franchise

Relationship was not renewed. At issue before the Court is whether the SEIF

Defendants' non-renewal of the Franchise Relationship was proper under the PMPA.

The SEIF Defendants seek summary judgment on the following claims:

Plaintiffs' claim (Count II) for improper non-renewal of the Petroleum
Marketing Practices Act, 15 U.S.C. §§ 2801, et seq. ("PMPA") and SEIF's
Counterclaims against the Plaintiffs sounding in declaratory relief under
the PMPA (Counts V and VI) as well as state law claims of Breach of
Lease (Count I), Breach of Supply Agreement (Count II), Trespass (Count
VIII), Eviction/Ejectment (Count IX), and Breach of Personal Guaranty
(Count X).

SEIF Defendants' Motion at 2. Mendez Fuel seeks summary judgment on Count II of

the Complaint and Count V of the Counterclaim. See Mendez Fuel's Motion at 1.

The Court will address Mendez Fuel's summary judgment motion first.

**A.   Mendez Fuel's Motion for Summary Judgment**

**1.    Count II of the Complaint: Improper Non-Renewal under the PMPA**

In Count II of the Complaint, Mendez Fuel alleges that the SEIF Defendants' non-

renewal of the Franchise Relationship violated the PMPA. See Complaint at ¶¶ 48-61.

20

As noted above, "a franchisor violates the PMPA . . . when it 'fail[s] to renew' a franchise relationship for a reason not provided for in the [PMPA] or after not providing the required notice." Mac's Shell Serv., 559 U.S. at 191 (citing 15 U.S.C. § 2802).

The SEIF Defendants maintain that they did not renew the Franchise Relationship because they decided, "in good faith and in the normal course of business," to sell the Property. See SEIF Defendants' Response at 2. "Under the PMPA, a decision to sell is a proper ground for nonrenewal if certain conditions are met, including proper notice to the franchisee and a bona fide offer to sell the premises to the franchisee or an offer of the right of first refusal." Lauro v. Mobil Oil Corp., 825 F. Supp. 994, 995 (M.D. Fla. 1992) (citing 15 U.S.C. § 2802(b)(3)((D)).

Mendez Fuel argues that the SEIF Defendants did not comply with section 2802(b)(3)(D)(iii)(I) or (II) of the PMPA in the following respects: (1) the SEIF Defendants' offer to sell the Property (June 11, 2020 Letter) was not timely because it was made 93 days after the notice of non-renewal (March 10, 2020 Letter); (2) the $8 million purchase price was not a bona fide offer and (3) the SEIF Defendants did not provide Mendez Fuel 3 with a 45-day right of first refusal within 90-days of the March 10, 2020 Letter. See Mendez Fuel's Motion for Summary Judgment at 4, 8.

The Court will address these arguments below.

### a. Timeliness of the Offer to Sell

Section 2802(b)(3)(D)(iii) states that "**during the 90-day period after notification was given** pursuant to section 2804," the franchisor must:

either--

(I) [**make] a bona fide offer to sell**, **transfer, or assign to the franchisee** such franchisor's interests in such premises; or

(II) if applicable, offer[ ] the franchisee a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises.

15 U.S.C. § 2802(b)(3)(D)(iii) (emphasis added).

Mendez Fuel argues that because the SEIF Defendants' offer to sell the Property (June 11, 2020 Letter) was made 93 days after the notice of non-renewal (March 10, 2020 Letter), the SEIF Defendants failed to comply with subsection (I) of section 2802(b)(3)(D)(iii). See Mendez Fuel's Motion at 4. The SEIF Defendants maintain that their March 10, 2020 Letter extended the franchise end date from April 30, 2020 to June 12, 2020. SEIF Defendants' Response at 3.[12] "Therefore, when the June 11, 2020 offer to extend the franchise was made, it was made during the franchise term, which had already been extended to June 12, 2020." Id.[13] According to the SEIF Defendants, the "extension of the non-renewal date, coupled with the June 11, 2020 communication of the firm price of the bona fide offer, satisfied the notification requirements under the PMPA." Id.

Both parties rely on Carstarphen v. Star Enter., 1996 U.S. Dist. LEXIS 22971 (S.D. Fla. 1996) to support their positions. In Carstarphen, this Court entered a directed verdict in favor of the franchisor following a jury trial. Id. at *1. The franchise agreement in Carstarphen was set to expire on March 31, 1993. Id. at *4. The franchisor decided to sell the property and on March 2, 1993 notified the franchisee that it would extend the

---

[12] The March 10, 2020 Letter stated that "SEIF [would] not renew the franchise with [Mendez Fuel 3] **effective close of business on Friday, June 12, 2020**" and that Mendez Fuel 3's "right to occupy the [Property would] . . . **terminate on June 12, 2020**." See March 10, 2020 Letter (DE# 74-4 at 2-3, 2/19/21) (emphasis added).

[13] The June 11, 2020 Letter "extend[ed] [Mendez Fuel 3's] right to occupy the [Property] through July 13, 2020." See June 11, 2020 Letter (DE# 74-9 at 3, 2/19/21).

22

franchise agreement through May 31, 1993. Id. In a series of letters, the franchisor extended the franchise agreement multiple times, the last letter extending the franchise agreement through May 31, 1994. Id. at *4-*8. The franchisee "continuously occupied the premises, engaging in the business of selling gasoline and other products/services" until he abandoned the property on May 2, 1994. Id. at *8-*9.

The franchisor also sent three notices of termination and non-renewal, dated July 1, 1993, January 31, 1994 and May 12, 1994. Carstarphen, 1996 U.S. Dist. LEXIS 22971 at *5, *7-*8. The July 1, 1993 notice of termination and non-renewal stated that "all agreements between the parties would be terminated effective October 5, 1993, and the franchise relationship would not be renewed." Id. at *5. The letter stated that the reason for non-renewal was the franchisor's "determination in good faith and the normal course of business to sell the service station" and that it was the franchisor's "intention to make [the franchisee] a bona fide offer to sell the station and improvements." Id.

On October 26, 1993, the franchisor sent a letter offering to sell the property to the franchisee for $588,565. Carstarphen, 1996 U.S. Dist. LEXIS 22971 at *6. Prior to this letter, on September 29, 1993, the franchisor extended the franchise relationship through November 30, 1993. Id. The franchisee challenged the sale price and on March 16, 1994, the franchisor reduced the sale price by $50,000. Id. at *6, *8. The franchisee did not respond to this new offer and "abandoned the premises on May 2, 1994, notifying [the franchisor] that he would no longer operate the service station and that he was terminating the relationship between the parties." Id. at *8.

The franchisee filed suit "alleg[ing] that [the franchisor] breached the PMPA by failing to make a bona fide offer of sale within 90 days [of] serving [the franchisee] with

the first notification of termination and nonrenewal, on July 1, 1993, or by October 5, 1993, the date the termination/non-renewal was to take effect." <u>Carstarphen</u>, 1996 U.S. Dist. LEXIS 22971 at *8-*9. The parties did not dispute that the "[franchisor] did not make a bona fide offer to sell the premises until October 26, 1993," nonetheless, this Court concluded that "**this was not a material breach of the [PMPA], by virtue of the fact that on September 29, 1993, the parties agreed to extend their franchise relationship until November 30, 1993**." <u>Id.</u> at *9 (emphasis added). This Court determined that "[t]he extension acted to void the October 5, 1993 termination/non-renewal date and extend[ed] that date until November 30, 1993" and "also acted as an extension of time in which [the franchisor] could proffer its bona fide offer of sale." <u>Id.</u> The Court noted that the franchisee continued to operate the gas station past the October 5, 1993 date he alleged the franchise agreement had ended and negotiated the purchase price with the franchisor. <u>Id.</u> The Court further stated that for the franchisee:

> [t]o now argue that the entire franchise relationship was terminated as of October 5, 1993, after having continuously occupied the premises, engaging in the business of selling gasoline and other products/services under Texaco's name, negotiating the purchase price of the premises, and receiving the benefit and profits of that business relationship until the time he decided to vacate the premises, seem[ed] disingenuous.

<u>Id.</u> at *10. The Court therefore "[found] that the franchise relationship was not terminated as of October 5, 1993, . . . . [the franchisor] did not violate the PMPA by failing to make a bona fide offer on that date" and, in fact, had made two bona fide offers to the franchisee for the sale of the property. <u>Id.</u> at *10-*11.

In the instant case, the Court similarly concludes that because the March 10, 2020 Letter extended the Franchise Relationship through June 12, 2020, <u>see</u> Footnote 12, the SEIF Defendants did not violate section 2802(b)(3)(D)(iii)(I) of the PMPA when

they offered to sell the Property to Mendez Fuel on June 11, 2020, the 93rd day. It is undisputed that like the franchisee in <u>Carstarphen</u>, Mendez Fuel 3 had been in continuous possession of and operating the Property at the time the offer to sell was made. Moreover, the June 11, 2020 Letter extended the Franchise Relationship for 30 days, through July 13, 2020, the day the offer to sell the property would expire. <u>See</u> June 11, 2020 Letter (DE# 74-9 at 3, 2/19/21). Thus, the June 11, 2020 Letter allowed Mendez Fuel 3 to remain in possession of the Property and continue its operations while it considered the offer to sell.

Mendez Fuel argues that "unlike the franchisor in <u>Carstarphen</u> who extended the franchise relationship instead of making a bona fide offer to sell on the ninetieth (90th) day after providing a notice of termination and non-renewal, the SEIF Defendants failed to either extend the franchise relationship or make a bona fide offer to sell within ninety (90) days." Mendez Fuel's Motion at 7. This argument, however, ignores the fact that the March 10, 2020 Letter extended the Franchise Relationship through June 12, 2020. <u>See</u> March 10, 2020 Letter (DE# 74-4 at 2-3, 2/19/21) (stating that "SEIF [would] not renew the franchise with [Mendez Fuel 3] **effective close of business on Friday, June 12, 2020**" and that Mendez Fuel 3's "**right to occupy the [Property would] . . . terminate on June 12, 2020**.") (emphasis added). Thus, at the time the SEIF Defendants sent their June 11, 2020 offer to sell the Property, the Franchise Relationship was still in effect. The Court therefore finds that because the Franchise Relationship had not ended[14] at the time the SEIF Defendants made their offer to sell

---

[14] <u>See</u> Footnotes 12-13, <u>supra</u>.

the Property to Mendez Fuel 3 for $8 million, the SEIF Defendants have shown, as a matter of law, that they did not violate the requirements of section 2802(b)(3)(D)(iii)(I) of the PMPA.

Mendez Fuel cites three out of district cases for the proposition that the requirements of the PMPA must be strictly construed. <u>See</u> Mendez Fuel's Motion at 8 (citing <u>Mobil Oil Corp. v. Vachon</u>, 580 F. Supp. 153, 159 (D. Mass. 1983); <u>Davy v. Murphy Oil</u>, 488 F. Supp. 1013 (W.D. Mich. 1980) and <u>Blankenship v. Atlantic Richfield Co.</u>, 478 F. Supp. 1016 (D. Or. 1979)). However, <u>Carstarphen</u> itself did not strictly construe the PMPA, finding that the franchisor's failure to make an offer to sell within the statutory 90-day period "was not a material breach of the statute" because the parties had "agreed to extend their franchise relationship." 996 U.S. Dist. LEXIS 22971 at *9.

        **b.**     **Bona Fide Offer**

Mendez Fuel further argues that the SEIF Defendants did not comply with subsection (I) of section 2802(b)(3)(D)(iii) because the $8 million offer to sell the Property was not a bona fide offer under the PMPA. Mendez Fuel's Motion at 8. Notably, Mendez Fuel does not dispute that the SEIF Defendants received an $8 million offer to purchase the Property. In fact, Mendez Fuel's SOF states that: "On August 21, 2019, and on behalf of Kendall Healthcare Group, Ltd. ('Kendall'), Michael Schubert ('Schubert'), the HCA Management Services' Transaction Manager, forwarded an e-mail to 7-Eleven's representative, Carlo Rivera, pursuant to which Kendall offered $8,000,000 for the [Property]." Mendez Fuel's SOF at ¶ 4. Rather, Mendez Fuel states that "there exists no evidence in the record to demonstrate that the $8,000,000 figure

was a legitimate, bona fide offer as contemplated by the PMPA that bore relation to the fair market value of the Premises." Mendez Fuel's Motion at 8. Mendez Fuel's argument ignores the evidence it concedes existed: that "[o]n August 21, 2019, and on behalf of Kendall Healthcare Group, Ltd. ('Kendall'), Michael Schubert ('Schubert') . . . forwarded an e-mail to 7-Eleven's representative . . . pursuant to which Kendall offered $8,000,000 for the [Property]." Mendez Fuel's SOF at ¶ 4.

Mendez Fuel's reliance on Alafaya Crossing, Inc. v. Exxon Mobil Corp., No. 6:02-CV-520-ORL28DAB, 2002 WL 31475218 (M.D. Fla. May 29, 2002), Mendez Fuel's Motion at 9, is misplaced. The court in Alafaya Crossing decided a motion for preliminary injunction under the PMPA. Id. at *1. The franchisee in that case obtained her own appraisal of the property and presented to the court evidence of irregularities with the appraisal obtained by the franchisor. Id. at *4. The court stated as follows:

> Upon examination of the two appraisals submitted by the parties, and considering the methodologies employed by the appraisers and the over $200,000 difference between the appraised values, the Court finds that **[the franchisee] has raised "sufficiently serious questions" regarding whether Exxon's offer of sale at the price of $853,400 is bona fide. The Court agrees with [the franchisee] that the mandates of the Arthur Andersen-Exxon agreement, including a proscription on site inspection and reliance on telephone conversations for all research, raise serious questions as to the accuracy of any resulting appraisal values**. Additionally, the fact that Exxon refused to disclose the appraisal to [the franchisee] until ordered to do so by the court raises serious questions as to whether Exxon believed that its offer price, which was based on that appraisal, approached fair market value.

Id.

Here, Mendez Fuel has brought no such evidence to the Court's attention. To the contrary, the record evidence shows that Kendall's offer to purchase the Property was an unsolicited offer and that the $8 million purchase price was determined by Mr.

Schubert based on his background and work experience. See Schubert Depo. at 18.

The fact that Mendez Fuel's expert determined that the market value of the Property

was $1.55 million as of April 29, 2021, see Appraisal Report (DE# 90-20 at 4-45,

6/14/21), does not create a genuine issue of material fact as to whether the SEIF

Defendants' offer to sell the property to Mendez Fuel 3 for $8 million was a bona fide

offer. At least one other party (Kendall) was willing to pay that much money for the

Property.

The Court finds that the $8 million offer was a bona fide offer. Kendall's $8 million

offer is, in and of itself, evidence that the SEIF Defendants' $8 million offer to sell the

Property to Mendez Fuel 3 was a bona fide offer. The SEIF Defendants have therefore

met their burden of proof that the $8 million offer contained in the June 11, 2020 Letter

to Mendez Fuel 3 was a bona fide offer.

The Court is similarly not persuaded by Mendez Fuel's argument that the $8

million offer to sell the property was not a bona fide offer because "the SEIF Defendants

. . . fail[ed] to introduce any evidence to reflect that its alleged offer of sale included

gasoline tanks, storage units, dispensers and other equipment." Mendez Fuel's Motion

at 9. The SEIF Defendants submit the Term Sheet between Kendall and 7-Eleven which

states that "[t]he Property shall include all structures, fixtures and equipment remaining

at the site at Closing, including but not limited to the underground storage tanks and

other fuel equipment (which upon Closing, Buyer shall register in its name as required

by law)." Term Sheet (DE# 101-1 at 1, 8/23/21). The Court notes that the Term Sheet

was not available at the time of the June 11, 2020 Letter containing the SEIF

Defendants' offer to sell.

The June 11, 2020 Letter's failure to specify whether the offer to sell included gasoline tanks, storage units, dispensers and other equipment does not detract from the Court's conclusion that the SEIF Defendants' $8 million offer to Mendez Fuel was a bona fide offer, based on the circumstances of the instant case. At the outset, the Court notes that Mendez Fuel points to no provision in the PMPA that requires an offer to sale to state whether it includes these accoutrements. Moreover, the cases cited by Mendez Fuel for the proposition that an offer to sell must include gasoline tanks, storage units, dispensers and other equipment are not binding precedent. See Mendez Fuel's Motion at 9 (citing See Roberts v. Amoco Oil Co., 740 F.2d 602, 607 (8th Cir. 1984); Greco v. Mobil Oil Corp., 597 F. Supp. 468, 473 (N.D. Ill. 1984) and Lauro v. Mobil Oil Corp., 825 F. Supp. 994, 995–96 (M.D. Fla. 1992)). Moreover, at least in the case of Roberts, the Eighth Circuit stated in a later decision that it did not:

> read [its own decision in] Roberts to hold that the franchisor's failure to include in the offer existing underground fuel tanks and fuel lines is per se a violation of the PMPA's requirement that the offer be bona fide. Whether a particular offer to sell is bona fide must be decided on a case by case basis considering the offer as a whole and the purposes underlying the PMPA.

LCA Corp. v. Shell Oil Co., 916 F.2d 434, 438 (8th Cir. 1990). For these reasons, the Court concludes that the June 11, 2020 Letter did not violate the PMPA when it failed to specify whether the offer to sell included gasoline tanks, storage units, dispensers and other equipment.

Mendez Fuel also notes that "notwithstanding the express language contained in the Non-Renewal Letter, the SEIF Defendants never forwarded an executed sales contract, along with a 45-day right of first refusal to [Mendez Fuel 3]." Mendez Fuel's Motion at 9-10. Mendez Fuel points to no provision in the PMPA that requires the SEIF

29

Defendants to provide a copy of an executed sales contract. Moreover, and as Mendez Fuel acknowledges in its Reply, "§ 2802(b)(3)(D)(iii) only requires a franchisor to meet either subpart (I) **or** subpart (II)." Mendez Fuel's Reply at 8 (emphasis added). Therefore, the SEIF Defendants need only prove that they made a bona fide offer to sell under subsection (I) **or** that they provided a right of first refusal under subsection (II). The fact that the SEIF Defendants did not also provide a right of first refusal under subsection (II) after making a bona fide offer to sell under subsection (I) is of no consequence.

Mendez Fuel insists that "there was no deal in place between 7-Eleven and Kendall for the [Property]" at the time the SEIF Defendants made their offer to sell to Mendez Fuel 3 and that the SEIF Defendants purportedly lied in their June 11, 2020 Letter when they stated that 'negotiations have stalled due to the pandemic.'"[15] The fact remains uncontested that at all relevant times, Kendall was interested in purchasing the property for $8 million. See Schubert Depo at 53, 68 (Mr. Schubert believed as late as the date of his March 30, 2021 deposition that "[t]he terms of the transaction were . . . largely agreed to" and remained "hopeful of proceeding and acquiring the [P]roperty."). The SEIF Defendants have therefore shown that their $8 million offer to sell the property to Mendez Fuel 3 was a bona fide offer.

"It is settled law that a bona fide offer under the PMPA is measured by an objective market standard. To be objectively reasonable, an offer must 'approach[ ] fair market value.'" Ellis v. Mobil Oil, 969 F.2d 784, 787 (9th Cir. 1992) (quoting Slatky v.

---

[15] This point is highly contested by the parties but is not material to the Court's rulings in this Order.

Amoco Oil Co., 830 F.2d 476, 485 (3d Cir. 1987)). As the Third Circuit explained:

> The [PMPA] requires the distributor to make an offer as if it "actually" wanted to sell the property (not necessarily to the franchisee but to someone). With such a desire, however, **the distributor would set an offer price at fair market value. That, by definition, is the highest price a willing buyer would pay**, and an offer at fair market value protects the franchisee's reasonable expectation of being able to make a living with the franchise property.

Slatky, 830 F.2d at 484 (emphasis added). Thus, in the instant case, the $8 million offer was, by definition, the fair market value of the Property because that was "the highest price a willing buyer [Kendall] would pay." Id.

Mendez Fuel insists that the SEIF Defendants' $8 million offer to sell cannot be bona fide because:

> the SEIF Defendants fail to point to any internal procedural procedures, facts used by any appraisers and inferences made from such facts, or any other evidence to support their position that the $8,000,000 offer price represented the actual fair market value of the Premises. Nor can the SEIF Defendants point to such evidence because they concede that they relied on their subjective belief that $8,000,000 was the value of the Premises, which is not the appropriate legal standard.

Mendez Fuel's Reply at 7. Again, the existence of an unsolicited offer by a third-party to purchase the Property for $8 million is **objective** proof that $8 million was fair market value for the Property. The $8 million purchase price is not based on the SEIF Defendants' subjective belief of the value of the property. It was the price set by Mr. Schubert, a disinterested party, based on his "estimation and experience working in the area," Schubert Depo at 18, and was the amount of money Kendall was willing to pay for the Property.

For all of these reasons, the SEIF Defendants have shown that $8 million was a bona fide offer for the Property.

### c.    Right of First Refusal

Mendez Fuel further argues that the SEIF Defendants also did not meet the requirements of subsection (II) of section 2802(b)(3)(D)(iii) because the SEIF Defendants failed to "provide [Mendez Fuel 3] with a sales contract, along with a forty-five (45) day right of first refusal, as required under the PMPA." Mendez Fuel's Motion at 4. The SEIF Defendants appear to argue that their June 11, 2020 Letter constitutes a right of first refusal:

> **the right of first refusal was made on June 11, 2020, when SEIF offered to sell the Property to [Mendez Fuel 3] for $8,000,000**. However, on June 15, 2020, counsel for **[Mendez Fuel 3]** rejected that offer and, as such, Plaintiffs' argument that it never received a 45-day right of first refusal rings hollow.

SEIF Defendants' Response at 7 (emphasis added).

The Court agrees with Mendez Fuel that the June 11, 2020 letter was not a right of first refusal. In its own words, the June 11, 2020 Letter stated that the SEIF Defendants were making an offer to sell the property. See June 11, 2020 Letter at 2 (stating that "as a sales contract has not been signed and negotiations have stalled due to the pandemic, **7-Eleven makes the offer to sale [sic] the property to Dealer** for the purchase price of $8,000,000.00, which is the same price for which 7-Eleven is offering the property to sale [sic] for the other third party.") (emphasis added). The June 11, 2020 Letter further states that the "**offer for the sale of the property is valid for thirty days** or until July 13, 2020." Id. at 3 (emphasis added). Thus, because the offer to sell was valid only for 30 days, the SEIF Defendants cannot meet the requisite 45-day period for a right of first refusal, 15 U.S.C. § 2802(b)(3)(D)(iii)(II), irrespective of when Mr. Mendez purportedly rejected the offer made in the June 11, 2020 Letter.

32

The Court finds, as a matter of law, that the SEIF Defendants did not make a right of first refusal in accordance with 15 U.S.C. § 2802(b)(3)(D)(iii)(II).

### 2. Count V of the Counterclaim: Declaratory Judgment on the Non-Renewal of the Franchise Relationship

Mendez Fuel also seeks summary judgment on Count V of the Counterclaim which seeks a declaratory judgment on the proper non-renewal of the franchise relationship. Mendez Fuel's Motion at 4.

For the reasons stated above, the Court finds that Mendez Fuel is not entitled to summary judgment in its favor on Count V of the Counterclaim seeking a declaratory judgment on the proper non-renewal of the franchise relationship.

In sum, based on the foregoing, Mendez Fuel has not shown that it is entitled to summary judgment in its favor on Count II of the Complaint and Count V of the Counterclaim. In making this determination, the Court is cognizant that the burden of proof is on the SEIF Defendants to show that they complied with the PMPA. See Clinkscales, 831 F.2d at 1569, 1570 (finding that the district court erred when it placed the burden on the franchisee to show that the termination violated the PMPA, but nonetheless affirmed summary judgment for the franchisor because the record evidence supported that ruling); see also 15 U.S.C. § 2805(c)) (placing on the franchisor "the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b)"). For the reasons discussed in this Order, the Court finds that the SEIF Defendants have met their burden of proof and are entitled to summary judgment in their favor on Count II of the Complaint and Count V of the Counterclaim.

33

**B.    SEIF Defendants' Motion for Summary Judgment**

"To prevail on its own motion for summary judgment, [the franchisor must] demonstrate that the termination was lawful under the PMPA." Clinkscales, 831 F.2d at 1569. The SEIF Defendants do not dispute that they:

> [have] the burden to prove that the Non-Renewal Notice and Termination Notices were proper pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801, et seq. ("PMPA"), and that [Mendez Fuel 3] breached the Lease and Supply Agreements (the "Franchise Relationship"), [that the] SEIF [Defendants are] entitled to exclusive possession of the property at issue, and that [Michael] Mendez is personally liable under his guaranty.

Id. at 2-3.

**1.    PMPA Claims**

**a.    Count II of the Complaint: Improper Non-Renewal of the Franchise Relationship under the PMPA**

The SEIF Defendants argue that their non-renewal of the Franchise Relationship (the Lease Agreement and the Supply Agreement) was "in accordance with the PMPA, 15 U.S.C. § 2802(B)(3)(D), because 7-Eleven, the parent company of SEI Fuels, made a determination in good faith and in the normal course of business to sell . . . [the Property] to a bona fide third party, Kendall Healthcare Group ('KHG')." SEIF Defendants' Motion at 3.

The Court finds that the SEIF Defendants are entitled to summary judgment in their favor on Count II of the Complaint, the alleged improper non-renewal of the Franchise Agreement under the PMPA. The SEIF Defendants have met their burden of showing that their notice of non-renewal (March 10, 2020 Letter) coupled with their offer to sell the Property to Mendez Fuel 3 for $8 million (June 11, 2020 Letter) met the requirements of section 2802(b)(3)(D)(iii)(I) of the PMPA. As discussed in more detail

above, on March 10, 2020, the SEIF Defendants sent written notice of its intent not to renew the Franchise Relationship. See March 10, 2020 Letter (DE# 74-4, 2/19/21). The March 10, 2020 Letter advised Mendez Fuel that the reason for the non-renewal was "because 7-Eleven, the parent company of SEIF, [had] decided in good faith and in the normal course of business to sell the [Property] to a bona fide third party." Id. at 2. A decision to sell "made by the franchisor in good faith and in the normal course of business" is proper grounds for the non-renewal of a franchise relationship. 15 U.S.C. § 2802(b)(3)((D). The March 10, 2020 Letter further set the effective date of the non-renewal as the "close of business on Friday, June 12, 2020," thereby extending the end date of the Franchise Agreement which was set to expire on April 30, 2020. See Lease Agreement at ¶ 4; Supply Agreement at ¶ 1.

On June 11, 2020, one day prior to the June 12, 2020 expiration of the Franchise Relationship, the SEIF Defendants conveyed an offer to sell the property to Mendez Fuel 3 for $8 million. See June 11, 2020 Letter (DE# 74-9 at 2, 2/19/21). The Court finds that the fact that this offer to sell was made 93 days after the March 10, 2020 notice of non-renewal does not violate the 90-day period set forth in section 2802(b)(3)(D)(iii) of the PMPA because the offer to sell was made while the Franchise Relationship was still in place. See Discussion, supra. Briefly, the March 10, 2020 Letter extended the Franchise Relationship to June 12, 2020 and the June 11, 2020 Letter further extended the Franchise Relationship for an additional 30 days or until July 13, 2020. See June 11, 2020 Letter (DE# 74-9 at 2, 2/19/21). Thus, the offer to sell was made during the Franchise Relationship. The SEIF Defendants have shown that the $8 million offer was a bona fide offer because that was the price a third-party (Kendall) was willing to pay for

35

the Property. <u>See</u> Schubert Depo at 18.

The Court further finds that the SEIF Defendants have shown that they complied with the notice requirements of section 2804. Section 2804(a) states that:

**(a) General requirements applicable to franchisor**

Prior to termination of any franchise or nonrenewal of any franchise relationship, the franchisor shall furnish notification of such termination or such nonrenewal to the franchisee who is a party to such franchise or such franchise relationship--

(1) **in the manner described in subsection (c)**; **and**

(2) except as provided in subsection (b), **not less than 90 days prior to the date on which such termination or nonrenewal takes effect**.

15 U.S.C. § 2804(a) (emphasis added). Section 2804(c) provides that:

**(c) Manner and form of notification**

Notification under this section--

(1) shall be in writing;

(2) shall be posted by certified mail or personally delivered to the franchisee; and

(3) shall contain--

(A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor;

(B) the date on which such termination or nonrenewal takes effect; and

(C) the summary statement prepared under subsection (d).

<u>Id.</u> at § 2804(c). Subsection (d) refers to a summary prepared and published by the Secretary of Energy in the Federal Register. <u>Id.</u> at § 2804(d).

36

The Court finds that the March 10, 2020 Letter and the June 11, 2020 Letter met all of the requirements of section 2804(c). The March 10, 2020 Letter and the June 11, 2020 Letter were served by certified mail, return receipt requested. See March 10, 2020 Letter (DE# 74-4, 2/19/21); June 11, 2020 Letter (DE# 74-9, 2/19/21). Moreover, both documents indicated the SEIF Defendants' intent not to renew the Franchise Relationship, contained an effective date for the non-renewal and attached the PMPA Summary Statement prepared by the Department of Energy. Id. Accordingly, the SEIF Defendants are entitled to summary judgment in their favor on Count II of the Complaint.

### b. Count V of the Counterclaim: Declaratory Judgment on the Non-Renewal of the Franchise Relationship

In Count V of their Counterclaim, the SEIF Defendants ask the Court for a declaratory "judgment in their favor and against Mendez Fuel 3 finding that the SEIF Defendants properly terminated the Franchise Relationship on July 13, 2020" and "that Mendez Fuel 3's refusal to vacate the premises is in violation of the Supply and Lease Agreements." Counterclaim at 21.

For the reasons discussed above, the Court finds that the SEIF Defendants are entitled to summary judgment in their favor on Count V of the Counterclaim seeking a declaratory judgment on the proper non-renewal of the Franchise Relationship.

### c. Damages

The SEIF Defendants further argue that they would also be entitled to summary judgment on Count II of the Complaint and Count V of the Counterclaim because Mendez Fuel 3 cannot prove damages. See SEIF Defendants' Motion at 12-14. Mendez Fuel maintains that it does not have to prove damages at the summary judgment stage.

37

See Mendez Fuel's Response at 11-12 (asserting that damages are a question of fact).
The Court does not need to resolve this damages dispute. The Court has already found
that the SEIF Defendants are entitled to summary judgment in their favor on Count II of
the Complaint and Count V of the Counterclaim. See supra.

> ### d. Count VI of the Counterclaim: Declaratory Judgment on the Termination of the Franchise Relationship effective September 11, 2020

The SEIF Defendants argue, in the alternative,[16] that the Franchise Relationship
was properly terminated effective September 11, 2020, due to Mendez Fuel 3's failure
to pay past rent due. See SEIF Defendants' Motion at 14-16.

As noted above, on August 11, 2020, 7-Eleven sent a letter to Mendez Fuel 3
notifying Mendez Fuel 3 that its "failure to pay the Base Rent [was] a violation and
breach of the Lease [Agreement]." August 11, 2020 Letter at 2. The SEIF Defendants
note that the Lease Agreement provides that the failure to pay rent is grounds for
default and that the Supply Agreement contains a "cross-default provision
. . . [which] provides that if [Mendez Fuel 3] defaults or fails to comply with its obligations
of the Lease Agreement, it is also in default under the Supply Agreement." SEIF
Defendants' Motion at 14 (citing Lease Agreement at ¶ 26(a)(i); Supply Agreement at
¶ 8(r)). The SEIF Defendants therefore argue that "each failure to pay rent by [Mendez
Fuel 3] is a separate ground for termination of both the Lease and Supply Agreements
under the PMPA." Id. (citing Chevron U.S.A., Inc. v. Finn, 851 F.2d 1227, 1230 (9th Cir.

---

[16] The SEIF Defendants assert that "even if this Court were to find that it is unable to
rule in favor of the Defendants on the March 11, 2020, Non-Renewal Notice, the Court
may still grant judgment to SEIF on its Counterclaim for declaratory judgment that the
August 11, 2020 Termination Letter was proper as a matter of law." SEIF Defendants'
Motion at 15-16.

1988)).

The SEIF Defendants maintain that their August 11, 2020 Letter complied with the requirements of the PMPA. The SEIF Defendants note that the PMPA permits a franchisor to terminate the Franchise Relationship due to the "'failure by the franchisee to pay the franchisor in a timely manner when due all sums to which the franchise is legally entitled.'" SEIF Defendants' Motion at 14-15 (quoting 15 U.S.C. § 2802(c)(8)). The SEIF Defendants further note that the PMPA "expressly allows a franchisor to terminate a franchisee on less than 90 days' notice where it would not be reasonable for the franchisor to wait that long" and that "less than ninety days' notice was reasonable because [Mendez Fuel 3] owed April, May and July rent" and "there was no basis for [the SEIF Defendants] to continue to expose [themselves] to additional debts while [Mendez Fuel 3] continued to hold over." Id. at 15 (citing 15 U.S.C. § 2804). The SEIF Defendants further note that:

> [the August 11, 2020 Letter] was personally delivered to [Mendez Fuel 3] and was served by certified mail, return receipt requested. . . . The subject of the letter was, "NOTICE OF TERMINATION" (Bold and capitals in original) and advised [Mendez Fuel 3] that its failure to pay Past Due Rent was a separate ground for termination of the Lease in that: it failed to comply with franchise provisions which are reasonable and material, failed to exert good faith efforts to carry out the provisions of the franchise, and that such failure was an occurrence of an enumerated event relevant to the franchise relationship. The [August 11, 2020 Letter] further also provided that MF3 was required to vacate the Property by September 11, 2020 and included a copy of the DOE PMPA Summary Statement. Furthermore, since the Termination Notice cites one of the enumerated events of 15 U.S.C. §2802(b)(2)(C), [Mendez Fuel 3 was] not afforded a right to cure its default. Wisser Co. v. Mobil Oil Corp., 730 F.2d 54, 59 (2d Cir. 1984) ("the proposition that a franchisee always has the right to cure a default is obviously wrong.").

Id. at 16.

Mendez Fuel argues that summary judgment cannot be granted on Count VI of the Counterclaim because there are "genuine issues of material fact regarding the reason(s) why [Mendez Fuel 3] was unable to pay rent." Mendez Fuel's Response at 12. Mendez Fuel argues that the SEIF Defendants "resorted to self-help remedies and made the decision to cease the delivery of petroleum products, i.e., fuel, to [Mendez Fuel 3] effective July 14, 2020. This, in turn, resulted in [Mendez Fuel 3] no longer being able to pay its rent as a result of the SEIF Defendants' decision to cease all fuel deliveries to [Mendez Fuel 3]." Id. at 12. Mendez Fuel asserts that "any failure on the part of [Mendez Fuel 3] to pay rent to 7-Eleven was a direct consequence of the SEIF Defendants' own willful and deliberate conduct" in ceasing delivery of petroleum products and "[g]iven the clear causal connection, [Mendez Fuel 3] contend[s] that the August 11, 2020 Notice of Termination was improper under the PMPA and, at a minimum, is a question of fact." Id. at 13.

Assuming, arguendo, that Mendez Fuel's ability to pay rent is a proper consideration, the Court finds that Mendez Fuel's argument is not supported by the record. Mendez Fuel does not point to any record evidence showing that its failure to pay rent was a result of the SEIF Defendants' decision to stop delivering petroleum products on July 14, 2020. According to the SEIF Defendants, "[Mendez Fuel 3]'s lease term expired on July 13, 2020, at which time, pursuant to terms of the April and May rent abatement offers, all past due rent, including the deferred rent, became due and owing immediately." SEIF Defendants' Reply at 8. Mendez Fuel has shown no causal connection between its purported inability to pay rent due July 13, 2020 and the SEIF Defendants' decision not to deliver petroleum products beginning the following day, July

40

14, 2020.

The burden is on the SEIF Defendants to show that their notice of termination (August 11, 2020 Letter) for failure to pay rent was in compliance with the PMPA. O'Shea v. Amoco Oil Co., 886 F.2d 584, 597 (3d Cir. 1989) (citing 15 U.S.C. § 2805(c)). Additionally, "[i]n order for a termination to be proper under any of the subsections of section 2802(b)(2), the franchisor must comply with the notice requirement" of section 2804. Id. at 597.

The August 11, 2020 Letter states that the reason for termination was Mendez Fuel 3's failure to pay rent:

> **your failure to pay the Base Rent is a violation and breach of the Lease**. More specifically, pursuant to paragraph 26(a)(i), "Tenant's failure to timely pay Base Rent or any other payment due under the Lease, to Landlord or any authorized third party", shall be deemed an event of default under the Lease. At this time, **Mendez Fuel 3 owes Landlord an outstanding balance of $26,680.81 for the past due April and May rent abatement repayments, and $16,008.49 in July Base Rent (collectively, "Past Due Rent")**, broken down as detailed in the enclosed Account Balance attached hereto.
>
> Please take notice that **your failure to pay Past Due Rent is a separate ground for termination of the Lease** in that: (1) **you failed to comply with franchise provisions which are reasonable and material, 15 U.S.C. §2802(b)(2)(A)**; (b) **you failed to exert good faith efforts to carry out the provisions of the franchise, §2802(b)(2)(B)**; and (c) such failure is **an occurrence of an enumerated event relevant to the franchise relationship, §2802(b)(2)(C) and §2802(c)(8)**.

August 11, 2020 Letter at 2-3 (emphasis added). "It is well-established that failure to pay for rent or gasoline falls within § 2802(c)(8)." Flanigan v. Clipper Petroleum, Inc., No. 1:04-CV-2202-ODE, 2005 WL 8153817, at *6 (N.D. Ga. Nov. 16, 2005) (citing Clinkscales, 831 F.2d at 1565 and Abjo Motors, Inc. v. Shell Oil Co., 856 F. Supp. 656, 657-58 (S.D. Fla. 1994)).

The August 11, 2020 Letter also provided Mendez Fuel 3 with 30 days[17] to leave the Property. See August 11, 2020 Letter (DE# 74-12 at 3, 2/19/21) ("Please note that you are required to surrender the Property and surrender all of 7-Eleven's personal property in accordance with the PMPA Franchise Agreement provisions and pursuant to the PMPA on September 11, 2020."). The SEIF Defendants maintain that "less than ninety days' notice was reasonable because [Mendez Fuel 3] owed April, May and July rent; there was no basis for SEIF to continue to expose itself to additional debts while [Mendez Fuel 3] continued to hold over." SEIF Defendants' Motion at 15 (citing Loomis v. Gulf Oil Corp., 567 F. Supp. 591, 597 (M.D. Fla. 1983)).

In Loomis, the franchisee "developed a deficiency in payment to [the franchisor] of $56,233.52 in a period of thirty (30) to sixty (60) days." 567 F. Supp. at 598. The franchisor gave the franchisee "three days from the October 18th meeting in which to cure the deficiency and five days additional time to vacate after termination on October 21." Id. at 597. The court found that "[r]equiring [the franchisor] to continue to provide product to [the franchisee] for an additional ninety days would expose [the franchisor] to potential large additional deficiencies for the remainder of the ninety day termination period." Id. Thus, the court found that "[b]ased on this circumstance alone, it would not be reasonable to require franchisor to continue to do business with franchisee for an additional ninety days after discovery of a shortfall of this magnitude in a thirty to sixty day period." Id.

---

[17] The declaration of Kenia Del Risco attests that the August 11, 2020 Letter was "personally served" on Mendez Fuel 3 the following day, August 12, 2020. Del Risco Decl. at ¶ 13.

42

Here, Mendez Fuel had incurred a debt of $16,008.49 for "July Base Rent" alone and had an additional "outstanding balance of $26,680.81 for the past due April and May rent abatement repayments." August 11, 2020 Letter at 2. The Court finds, as a matter of law, that under the circumstances of this case, it was not unreasonable for the SEIF Defendants to provide Mendez Fuel 3 with a period of approximately 30 days to leave the Property.

Moreover, the August 11, 2020 Letter meets the notice requirements of section 2804 of the PMPA. On August 12, 2020, Kenia Del Risco, a Dealer Business Consultant for SEIF, "personally served" Mendez Fuel 3 with a copy of the August 11, 2020 Letter. See Del Risco Decl. at ¶¶ 1, 13. A photograph of the August 11, 2020 Letter is attached as "Exhibit 1" to Ms. Del Risco's declaration. See Exhibit 1 (DE# 73-1, 2/19/21). The August 11, 2020 Letter informed Mendez Fuel 3 that Mendez Fuel 3's failure to pay rent was grounds for terminating the Lease Agreement. August 11, 2020 Letter at 2-3. The August 11, 2020 Letter told Mendez Fuel 3 that it had until September 11, 2020 to surrender the Property. Id. at 3. The August 11, 2020 Letter also attached a copy of the PMPA Summary Statement prepared by the Department of Energy (DE# 74-12 at 5-10, 2/19/21).

In Count VI of their Counterclaim, the SEIF Defendants ask the Court for a declaratory "judgment in their favor and against Mendez Fuel 3 finding that the SEIF Defendants properly terminated the Franchise Relationship on September 11, 2020" and "that Mendez Fuel 3's refusal to vacate the premises is in violation of the Supply and Lease Agreements." Counterclaim at 22. For the reasons stated herein, the SEIF Defendants are entitled to summary judgment on Count VI of their Counterclaim.

### 2.     State Law Claims

The SEIF Defendants also seek summary judgment on multiple state law claims: Breach of Lease Agreement (Count I), Breach of Supply Agreement (Count II), Trespass (Count VIII), Eviction/Ejectment (Count IX), and Breach of Personal Guaranty (Count X). These state law claims are addressed below.

#### a.     Count I of the Counterclaim: Breach of Lease Agreement

Count I of the Counterclaim asserts a claim for breach of the lease agreement. It alleges that "Mendez Fuel 3 has failed to pay the full June or July 2020 rent, taxes, and [common area maintenance] charges due and owing under the Lease Agreement." Counterclaim at ¶ 46.

The elements of a breach of contract claim under Florida law are: "(1) a valid contract; (2) a material breach; and (3) damages." Friedman v. New York Life Ins. Co., 985 So. 2d 56, 58 (Fla. 4th DCA 2008). "Construction of a contract is ordinarily a question of law, and, as such, is suitable for summary judgment." Santoro v. Chevron U.S.A. Inc., No. 95-1245-CIV-T-17A, 1997 WL 728097, at *3 (M.D. Fla. Nov. 14, 1997).

The SEIF Defendants argue that they are entitled to summary judgment on Count I of the Counterclaim due to Mendez Fuel 3's failure to pay rent. See SEIF Defendants' Motion at 17 (stating that "[Mendez Fuel 3] owes 7-Eleven a total of $175,863.12 for April, May, July, September, October, November and December 2020 rent, as well as January and February 2021 rent, plus [non-sufficient funds] fees, which are offset by $15,680.11 in credit cards for a net rent due of $160,183.01.")

Mendez Fuel argues that the Court should not enter summary judgment because "the SEIF Defendants[ ] fail[ed] to perform" and:

> SEIF resorted to self-help remedies and made the decision to cease the delivery of petroleum products, i.e., fuel, to [Mendez Fuel 3] effective July 14, 2020. This, [in] turn, directly resulted in [Mendez Fuel 3] no longer being able to pay its rent as a result of the SEIF Defendants' decision to cease all fuel deliveries to [Mendez Fuel 3]. Because a question of fact exists whether the SEIF Defendants committed the first breach that directly impacted [Mendez Fuel 3]'s ability to continue to pay its debts and also whether the SEIF Defendants' material breach excused continued performance by [Mendez Fuel 3], summary judgment is inappropriate on the SEIF Defendants' breach of contract claims.

Mendez Fuel's Response at 14. The Court remains unconvinced that Mendez Fuel's purported inability to pay rent is a proper consideration. Nonetheless, and for the reasons already discussed in this Order, Mendez Fuel has presented no evidentiary support for its argument that SEIF's decision to stop delivering petroleum products to the Property on July 14, 2020 caused Mendez Fuel 3 to miss its rent payment which initially became due on July 13, 2020.

The SEIF Defendants have shown entitlement to summary judgment in their favor based on Mendez Fuel 3's breach of the Lease Agreement (Count I of the Counterclaim).

### b.    Count II of the Counterclaim: Breach of Supply Agreement

Count II of the Counterclaim asserts a claim for breach of the supply agreement. It alleges that "Mendez Fuel 3 has failed to pay the full amounts due and owing under the Supply Agreement, $10,026.91." Counterclaim at ¶ 54. The SEIF Defendants argue that "[Mendez Fuel 3] breached the Supply Agreement by failing to pay for petroleum products delivered to [Mendez Fuel 3] at the Property on July 13 and 18, 2020, which products it sold to the general public." SEIF Defendants' Motion at 18. According to the

SEIF Defendants, Mendez Fuel 3 owes a "net amount due of $7,754.12." Id.

For the reasons already stated in this Order, the SEIF Defendants have also shown entitlement to summary judgment in their favor based on Mendez Fuel 3's breach of Supply Agreement (Count II of the Counterclaim).

### c.    Count VIII of the Counterclaim: Trespass

Count VIII of the Counterclaim asserts a claim for trespass based on Mendez Fuel 3's failure to vacate the Property. Counterclaim at ¶ 96. "Under Florida law, 'trespass to real property is an injury to or use of the land of another by one having no right or authority.'" Glen v. Club Mediterranee, S.A., 450 F.3d 1251, 1254 n.1 (11th Cir. 2006) (quoting Guin v. City of Riviera Beach, 388 So. 2d 604, 606 (Fla. 4th DCA 1980)). In order to recover for a trespass to real property, "the aggrieved party must have had an ownership or possessory interest in the property at the time of the trespass." Winselmann v. Reynolds, 690 So. 2d 1325, 1327 (Fla. 3d DCA 1997). The Court may award nominal damages in instances where there are no actual damages. Daniel v. Morris, 181 So. 3d 1195, 1199 (Fla. 5th DCA 2015).

The SEIF Defendants argue that they are entitled to summary judgment because 7-Eleven withdrew its consent to allow Mendez Fuel 3 to possess the Property either as of July 14, 2020 (pursuant to the March 10, 2020 non-renewal) or September 11, 2020 (the August 11, 2020 non-renewal). SEIF Defendants' Motion at 18.

Mendez Fuel 3 argues that "genuine issues of material fact exist regarding [the] proprietary [sic] of the SEIF Defendants' non-renewal and subsequent termination of MFH3's franchise rights." Mendez Fuel's Response at 15. The Court has already determined that the March 10, 2020 non-renewal and the August 11, 2020 notice of

termination based on the failure to pay rent complied with the PMPA. See, supra. Accordingly, the Franchise Relationship was properly terminated and Mendez Fuel 3 had no legal right to remain on the Property past July 13, 2020. See June 11, 2020 Letter at 3 (conveying offer of sale and stating, "we will also agree to extend your right to occupy the Leased Premises through July 13, 2020.").

The SEIF Defendants have also shown entitlement to summary judgment in their favor based on their cause of action for trespass (Count VIII of the Counterclaim).

### d.    Count IX of the Counterclaim: Eviction/Ejectment

Count IX of the Counterclaim alleges that "7-Eleven is entitled to a warrant mandating the ejectment and eviction of Mendez Fuel 3, its agents, servants, employees, representatives and assigns, and all persons acting in concert or participation with it from the Property." Counterclaim at ¶ 105. The SEIF Defendants argue that they are entitled to summary judgment on their claim of eviction/ejectment because Mendez Fuel 3 has remained on the Property without paying rent past the termination date of the Lease Agreement. SEIF Defendants' Motion at 19.

Because the Franchise Relationship was properly non-renewed or terminated as a matter of law, the SEIF Defendants have also shown entitlement to summary judgment in their favor based on their cause of action for eviction/ejectment (Count IX of the Counterclaim).

### e.    Count X of the Counterclaim: Breach of Personal Guaranty

Count X of the Counterclaim alleges that "[Michael] Mendez is obligated and liable to SEIF for the damages asserted in Counts I-VI, together with interest and attorneys' fees." Counterclaim at ¶ 109. "A guaranty is a promise to pay some debt (or

to perform some obligation) of another on the default of the person primarily liable for payment or performance." New Holland, Inc. v. Trunk, 579 So. 2d 215, 216-17 (Fla. 5th DCA 1991). A personal guaranty is a contract under Florida law. Trafalgar Cap. Specialized Inv. Fund, FIS v. Atl. Energy Sols., Inc., No. 09-20994-CIV-JORDAN, 2010 WL 11504712, at *2 (S.D. Fla. Nov. 16, 2010). The elements of a breach of contract claim are discussed above.

The SEIF Defendants seek summary judgment on their claim of breach of personal guaranty against Michael Mendez because "[t]o date, [Mr.] Mendez has failed to promptly pay and perform all of [Mendez Fuel 3]'s liabilities owed to SEIF which failure is a material breach of the Guaranty." SEIF Defendants' Motion at 19. The SEIF Defendants further state that "SEI Fuels is entitled to summary judgment in the amount of $7,754.12 against [Mr.] Mendez, who has contractually agreed to be personally liable for such amount." Id.

Mendez Fuel raises the same defense as in its response to the breach of contract claims (Counts I and II of the Counterclaim). Mendez Fuel's Response at 16. For the reasons already stated herein, even if Mendez Fuel 3's ability to pay were a proper consideration, Mendez Fuel has not pointed to any record evidence showing that its indebtedness was due to the SEIF Defendants' decision to stop delivering fuel beginning on July 14, 2020.

The SEIF Defendants have also shown entitlement to summary judgment in their favor and against Michael Mendez for breach of personal guaranty (Count X of the Counterclaim).

**C.  Mendez Fuel's Affirmative Defenses Do Not Preclude Summary Judgment for the SEIF Defendants**

The SEIF Defendants maintain that "each of [Mendez Fuel 3] and Mendez's sixteen (16) Affirmative Defenses are . . . 'shotgun' allegations consisting solely of bare recitations of affirmative defenses without linking the assertions to any factual support, and are therefore without merit or effect." SEIF Defendants' Motion at 20-21.

Mendez Fuel asserts that "the SEIF Defendants must . . . meet their burden of showing that [Mendez Fuel 3] cannot maintain [its affirmative] defenses by a preponderance of the evidence." Mendez Fuel's Response at 18.

"At the summary judgment stage, the mere assertion of affirmative defenses on which the defendant has the burden, without supporting evidence, is insufficient to withstand the motion for summary judgment." Pedraza-Victoria v. Villa Bellini Ristorante & Lounge Inc., No. 8:18-CV-1556-T-36JSS, 2020 WL 224531, at *3 (M.D. Fla. Jan. 15, 2020). Mendez Fuel is the counterclaim defendant in this instant case. The Court finds none of Mendez Fuel's threadbare affirmative defenses preclude summary judgment for the SEIF defendants. See Counterclaim Defendants' Answer, Affirmative Defenses and Demand for Jury Trial to SEIF Defendants' Second Amended Counterclaims (DE# 68, 1/20/21). The Court notes that the sixteenth affirmative defense is a reservation of the right to assert more affirmative defenses. The eighth affirmative defense—the alleged "failure to comply with the notice requirements under the Petroleum Marketing Practices Act" —has been addressed at length by the Court in this Order. The remaining fifteen affirmative defenses fail to include any factual predicate.

In sum, regardless of which party has the initial burden on affirmative defenses, none of the affirmative defenses asserted by Mendez Fuel preclude summary judgment

for the SEIF Defendants.

## <u>CONCLUSION</u>

Based on the foregoing, it is

ORDERED AND ADJUDGED that the Defendants' Motion for Partial Summary Judgment and Incorporated Memorandum of Law (DE# 71, 2/19/21) is **GRANTED** and Mendez Fuel Holdings 3, LLC and Michael Mendez's Motion for Summary Judgment on Count II of the Complaint and Count V of the Second Amended Counterclaim (DE# 88, 6/14/21) is **DENIED**. The Complaint is hereby **DISMISSED with prejudice**[18] and the Court will enter a judgment by separate Order in favor of the SEIF Defendants on Counts I, II, V, VI, VIII, IX and X of the Counterclaim. It is further

ORDERED AND ADJUDGED that at the status conference set for **Wednesday, September 15, 2021 at 10:00 AM** on Zoom, the parties shall be prepared to discuss the damages amounts to be included in the judgment stemming from this Order. It is further

ORDERED AND ADJUDGED that the SEIF Defendants shall **promptly** file a notice with the Court indicating whether they intend to dismiss the remaining counts of

---

[18] Although this Order only addresses Count II of the two-count Complaint, Count I of the Complaint was only against Kendall who, as noted above, was dismissed from this action on September 22, 2020. <u>See</u> Footnote 5, <u>supra</u>. Therefore, the Complaint is due to be dismissed in its entirety.

the Counterclaim on which neither party moved for summary judgment: Counts III, IV

and VII.

     DONE AND ORDERED in Chambers at Miami, Florida, this **9th** day of

September, 2021.

                    _____

                    JOHN J. O'SULLIVAN
                    CHIEF UNITED STATES MAGISTRATE JUDGE