UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-22984-CV-O'SULLIVAN

[CONSENT]

MENDEZ FUEL HOLDINGS, LLC,
MENDEZ FUEL HOLDINGS 1, LLC,
MENDEZ FUEL HOLDINGS 2,
LLC, and MENDEZ FUEL HOLDINGS 3 LLC,

     Plaintiffs,

v.

7-ELEVEN, INC. and SEI FUEL SERVICES, INC.,

     Defendants/Counterclaim Plaintiffs,

v.

MENDEZ FUEL HOLDINGS 3 LLC and MICHAEL
MENDEZ,

     Counterclaim Defendants.

_____/

## **ORDER**[1]

     THIS MATTER is before the Court following supplemental briefing from the

parties.

_____

[1] In this Order, the Court will refer to 7-Eleven, Inc. as "7-Eleven" and SEI Fuel Services, Inc. as "SEIF." Collectively, these entities will be referred to as the "SEIF Defendants." The Court will refer to Mendez Fuel Holdings 3, LLC and Michael Mendez collectively as "Mendez Fuel." The Court will refer to the SEI Fuel Services, Inc. Continuing Guaranty (DE# 114-1, 10/4/21) as the "Guaranty," the Dealer Fuel Lease Agreement (DE# 114-2, 10/4/21) as the "Lease Agreement" and the Motor Fuel Supply & Security Agreement (DE# 114-3, 10/4/21) as the "Supply Agreement" or the "MFSSA."

On September 9, 2021, the Court issued an Order (DE# 108, 9/9/21) on the parties' cross-motions for summary judgment. After a status hearing on September 22, 2021, the Court directed the parties to file supplemental briefs addressing two issues: "(1) the applicability of the personal guaranty to the [L]ease [A]greement and (2) the amount of the final judgment with respect to the [S]upply [A]greement." Order (DE# 113, 9/22/21).

On October 4, 2021, the SEIF Defendants filed their memorandum of law. See SEIF Defendants' Memorandum of Law Regarding Personal Guaranty and Damages (DE# 114, 10/4/21) (hereinafter "SEIF Defendants' Memo"). Mendez Fuel filed its memorandum of law on October 12, 2021. See Plaintiff Mendez Fuel Holdings 3, LLC and Counterclaim Defendant Michael Mendez's Memorandum of Law in Opposition to the SEIF Defendants' Memorandum of Law Regarding Personal Guaranty and Damages (DE# 117, 10/12/21) (hereinafter "Mendez Fuel's Memo"). The SEIF Defendants filed a reply memorandum on October 15, 2021. See SEIF Defendants' Reply Memorandum of Law Regarding Personal Guaranty and Damages (DE# 118, 10/15/21) (hereinafter "SEIF Defendants' Reply").

## THE AGREEMENTS BETWEEN THE PARTIES[2]

### I.    The Guaranty

On October 14, 2015, Michael Mendez executed the Guaranty. The introductory paragraph of the Guaranty defined the "Guarantor" as Michael Mendez. Although the

---

[2] Some of the documents filed by the parties contain multiple sets of page numbers. To avoid confusion and unless otherwise noted, the Court will cite to the page numbers automatically assigned by the Court's CM/ECF system appearing at the top, right-hand corner of each page.

term "Customer" was not defined in the Guaranty, the parties do not dispute that the

term "Customer," as used in the Guaranty, referred to Mendez Fuel Holdings 3, LLC.

The Guaranty stated, in relevant part, as follows:

FOR VALUE RECEIVED, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned **Guarantor hereby irrevocably and unconditionally guarantees to SEI FUEL SERVICES, INC. ("SEI Fuels") the prompt payment and performance of the Guaranteed Indebtedness (hereinafter defined), subject to and upon the following terms**:

1.      **The term "Guaranteed Indebtedness", as used herein means those certain liabilities, obligations and indebtednesses, currently existing and hereafter incurred by Customer to SEI Fuels for any business location, and any and all renewals, extensions and modifications thereof, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or unmatured and whether originally contracted to or acquired by SEI Fuels**, including without limitation, any and all costs and expenses incurred in the collection or enforcement of same, including attorney[']s fees incurred by SEI Fuels.

2.      **This Agreement shall be an absolute, continuing, irrevocable, and unconditional guaranty of payment and performance** and not a guaranty of collection. **Guarantor shall remain liable on its obligations hereunder notwithstanding any fluctuation in the size of the Guaranteed Indebtedness and notwithstanding periods in which the outstanding Guaranteed Indebtedness is zero, it being understood and acknowledged as between SEI Fuels and Guarantor that SEI Fuels is relying upon the continuing nature of this Agreement as inducement to make extensions of credit to Customer from time to time, in SEI Fuels['] sole discretion, for commercial purposes**. Guarantor acknowledges and agrees that SEI Fuels['] agreement to extend credit to Customer, including the right to modify credit terms from time to time, shall be governed solely by the terms of the agreement between SEI Fuels and Customer and any modification of credit terms as between SEI Fuels and Customer shall not affect or impair the enforceability of this Agreement.

Guaranty at ¶¶ 1-2 (emphasis added).

The Guaranty contained the following setoff provision:

> 8. **SEI Fuels shall have the right to setoff and apply against this Agreement or the Guaranteed Indebtedness or both, upon notice to Guarantor, any and all sums at any time credited by or owing from SEI Fuels to Guarantor** whether or not the Guaranteed Indebtedness is then due and irrespective of whether or not SEI Fuels shall have made any demand under this Agreement. The rights and remedies of SEI Fuels hereunder are in addition to other rights and remedies (including without limitation, other rights of setoff) which SEI Fuels may have.

Guaranty at ¶ 8 (emphasis added).

Paragraph 12 of the Guaranty stated that:

> 12. **This Agreement is for the benefit of SEI Fuels and its successors and assigns**, and in the event of an assignment of the Guaranteed Indebtedness, or any part thereof, the rights and benefits hereunder, to the extent applicable to the indebtedness so assigned, may be transferred with such indebtedness. This Agreement is binding not only on Guarantor, but on Guarantor's heirs, representatives, successors and assigns.

Guaranty at ¶ 12 (emphasis added).

## II.     The Lease Agreement

On July 24, 2017, Mendez Fuel Holdings 3, LLC and 7-Eleven entered into the Lease Agreement under which Mendez Fuel Holdings 3, LLC would lease a gasoline station located at 11870 SW 40th Street, Miami, Florida 33175. The effective date of the Lease Agreement was May 1, 2017. See Lease Agreement (DE# 114-2 at 16, 10/4/21). The Lease Agreement defined the term "Landlord" as 7-Eleven, Inc., the term "Supplier" as SEIF and the term "Tenant" as Mendez Fuel Holdings 3, LLC. Id. at ¶¶ 1-2.

Paragraph 5 of the Lease Agreement was titled "RENT/ PROPERTY TAX/ SECURITY DEPOSIT." Paragraph 5(e) stated that:

> (e) Tenant shall pay the Base Rent, taxes, and all other amounts due Landlord in accordance with Landlord's payment terms then in effect, as communicated to Tenant from time to time. **Landlord hereby designates Supplier as Landlord's agent for collection of rent and other amounts owed by Tenant hereunder**, which collections may be made by Supplier

4

as set forth in the [Supply Agreement].

Lease Agreement at ¶ 5(e) (emphasis added).

The Lease Agreement also contained an attorney's fee provision. It stated as

follows:

> 28.    ATTORNEY'S FEES. [Mendez Fuel Holdings 3, LLC] hereby covenants and **agrees to pay [7-Eleven, Inc.]**, within 10 days of receipt of a statement from [7-Eleven, Inc.], **the amount [7-Eleven, Inc.] has paid or will pay** for legal fees, court costs, investigative and related expenses arising from under or relating to any default or alleged default by [Mendez Fuel Holdings 3, LLC] under this Lease, whether or not [7-Eleven, Inc.] elects to terminate the Lease and whether or not a legal proceeding is filed or an action commenced. If legal action is commenced, the prevailing party shall recover from the non-prevailing party all of its attorneys' fees and costs through all appeals. It is the intent of the parties that the provisions of this paragraph continue after the expiration or earlier termination of this Lease.

Lease Agreement at ¶ 28 (emphasis added).

## III.   The Supply Agreement

On May 1, 2017, Mendez Fuel Holdings 3, LLC and SEIF entered into the Supply

Agreement under which Mendez Fuel Holdings 3, LLC would purchase Mobil branded

gasoline and diesel fuels from SEIF. See Supply Agreement. The Supply Agreement

defined the term "Dealer" as Mendez Fuel Holdings 3, LLC.

Paragraph 4(e) of the Supply Agreement is titled "Payments." Paragraph 4(e)(3)

and (e)(4) stated:

> (3) In addition, [Mendez Fuel Holdings 3, LLC] acknowledges that **SEIF has been authorized by 7-Eleven, Inc. ("7-Eleven") to collect on behalf of 7-Eleven some or all of the amounts due from [Mendez Fuel Holdings 3, LLC] to 7-Eleven on account of [Mendez Fuel Holdings 3, LLC]'s lease or franchise agreement with 7-Eleven covering the Premises**. [Mendez Fuel Holdings 3, LLC] hereby permits SEIF to debit any such amounts directly from [Mendez Fuel Holdings 3, LLC]'s account in the manner set forth above, **in satisfaction of such obligations to 7-Eleven**. **Should SEIF elect or be directed to discontinue collecting such amounts on behalf of 7-Eleven**, then, upon reasonable notice to

5

[Mendez Fuel Holdings 3, LLC], **[Mendez Fuel Holdings 3, LLC] shall make such payments directly to 7-Eleven in the manner set forth in the applicable agreement, or otherwise as directed by 7-Eleven**.

(4) If the due date for **any payment under this Agreement** should fall on a Saturday, Sunday, or bank holiday, then [Mendez Fuel Holdings 3, LLC]'s payment to SEIF will be due the following business day. Any and all payment amounts overdue will be subject to monthly interest at an annual rate of 10% or the maximum rate permitted by law, whichever is higher. Such interest will accrue on [Mendez Fuel Holdings 3, LLC]'s total overdue balance, calculated from each applicable payment due date, and will continue to accrue until amounts owing are paid in full. **[Mendez Fuel Holdings 3, LLC] also shall be liable for any and all expenses incurred by SEIF (including attorneys' fees) in its efforts to collect amounts overdue from [Mendez Fuel Holdings 3, LLC]**.

Supply Agreement at ¶ 4(e)(3)-(4) (emphasis added).

Paragraph 9 of the Supply Agreement was titled "Rights and Remedies of SEIF."

It contained the following setoff provision:

(d) In addition, **SEIF will have the right at any time to immediately set off against Dealer's credit-card transaction receivables or incentive program payments any and all amounts owed by Dealer to SEIF under this Agreement or under any other agreement between SEIF (or an affiliate of SEIF, including 7-Eleven) and Dealer** relating to the Premises or to Dealer's indebtedness to SEIF or such affiliate, including any lease or franchise agreement between Dealer and SEIF or its affiliates (including 7-Eleven).

Supply Agreement at ¶ 9(d) (emphasis added).

The Supply Agreement also contained an attorney's fee provision. It stated that:

**In the event of any lawsuit** between SEIF and [Mendez Fuel Holdings 3, LLC] (or any arbitration proceeding pursuant to section 20 hereof) **arising out of or relating to the transactions or relationship contemplated by this Agreement** (regardless whether such action alleges breach of contract, tort, violation of a statute, or any other cause of action), **the substantially prevailing party will be entitled to recover its reasonable costs of suit and its reasonable attorneys' fees**. If a party substantially prevails on some aspects of such action but not others, the court (or arbitrator) may apportion any award of costs or attorneys' fees in such manner as it deems equitable.

Supply Agreement at ¶ 22 (emphasis added).

## ANALYSIS

As indicated above, there are two issues presently before the Court: (1) the applicability of the personal guaranty to the Lease Agreement and (2) the amount of the final judgment with respect to the breach of the Supply Agreement. See Order (DE# 113, 9/22/21). The Court will first address the amount of the final judgment for the breach of the Supply Agreement.

### I.    Damages Corresponding to the Breach of the Supply Agreement (Count II of the Counterclaim)

On January 6, 2021, the SEIF Defendants filed SEIF Defendants' Second Amended Counterclaim (DE# 67, 1/6/21) (hereinafter "Counterclaim"). In Count II of the Counterclaim, the SEIF Defendants alleged that "Mendez Fuel 3 ha[d] failed to pay the full amounts due and owing under the Supply Agreement, **$10,026.91**, which constitute[d] a breach of same, and SEIF has been damaged." Counterclaim at ¶ 54 (emphasis added).

In their motion for summary judgment, the SEIF Defendants took the position that the amount owed for the breach of the Supply Agreement was "a net amount due of $7,754.12." Defendants' Motion for Partial Summary Judgment and Incorporated Memorandum of Law (DE# 71 at 18, 2/19/21). The SEIF Defendants explained how they arrived at this $7,754.12 amount as follows:

> [Mendez Fuel Holdings 3, LLC] breached the Supply Agreement by failing to pay for petroleum products delivered to [Mendez Fuel Holdings 3, LLC] at the Property on July 13 and 18, 2020 . . . . **As of January 15, 2021, [Mendez Fuel Holdings 3, LLC] owe[d] SEI Fuels a total of $23,434.22 for petroleum products delivered to [Mendez Fuel Holdings 3, LLC] at the Property, which [was] offset by $15,680.10 in credit cards for a net amount due of $7,754.12**.

Id. (emphasis added).

In the instant supplemental filings, the SEIF Defendants argue that "the final judgment that should be awarded to SEIF under Count II of SEIF Defendants Counterclaims for [Mendez Fuel Holdings 3, LLC]'s breach of the Supply Agreement is **$22,761.14** plus attorneys' fees." SEIF Defendants' Memo at 9. This $22,761.14 amount is derived from $22,354.22 in invoices for the delivery of petroleum products in July 2020 plus $406.92 in interest.[3] See Invoices, Exhibit 4 to the SEIF Defendants' Memo (DE# 114-4, 10/4/21).

The SEIF Defendants note that paragraph 9(d) of the Supply Agreement and paragraph 8 of the Guaranty "allow SEIF to apply any offsets how it sees fit." SEIF Defendants' Memo at 9. The SEIF Defendants further state that "due to [Mendez Fuel Holdings 3, LLC]'s failure to pay under the Supply and Lease Agreements, SEIF has elected to apply the total sum of the credit card monies it is holding to the Lease Agreement, not the Supply Agreement." Id.

Mendez Fuel argues that the $22,761.14 in damages sought by the SEIF Defendants contradicts the agreement reached by the attorneys. Mendez Fuel's Memo at 9. Mendez Fuel attaches an email exchange between the attorneys. See Exhibit C to Mendez Fuel's Memo (DE# 117-3, 10/12/21). In an email dated September 17, 2021,

---

[3] The SEIF Defendant state that the applicable interest rate should be 18 percent:

> The debt owed by MFH3 under the Supply Agreement to SEIF is subject "to monthly interest at an annual rate of 10% or the maximum rate permitted by law, whichever is higher." The maximum annual rate permitted by Florida law is 18%. Accordingly, the interest owed on the Supply Agreement is $406.92.

SEIF Defendants' Memo at 9.

Mendez Fuel's counsel presented the SEIF Defendants' counsel with proposed amounts to be included in the final judgment, including $10,026.91 plus the statutory rate of interest for Count II, breach of the Supply Agreement. Id. at 2-3. In a response email dated September 20, 2021, the SEIF Defendants' counsel wrote "I think there's only one remaining dispute" (a reference to Count X) and further wrote "Agreed (and same as above re: fees)" beside the line for Count II containing the $10,026.91 figure. Id. at 1.

Mendez Fuel further states that at the September 22, 2021 status conference, Mendez Fuel's counsel "represented to the Court that the parties agreed that the Final Judgment on Count II should be $10,026.91," to which SEIF's counsel agreed. Mendez Fuel's Memo at 10. Mendez Fuel notes that the $10,026.91 figure "is the amount that SEIF alleged in its Counterclaim and referenced by the Court in the summary judgment ruling." Id. (citation omitted). Mendez Fuel further states that "SEIF's counsel represented to this Court that Mendez should personally be responsible for the entire sum of $10,026.91." Id.

Mendez Fuel did not file a transcript of the September 22, 2021 status hearing.[4] Nonetheless, the Court finds that the email exchange between counsel sufficiently establishes that counsel for the SEIF Defendants agreed to the $10,026.91 amount plus the statutory rate of interest for Count II of the Counterclaim (breach of the Supply Agreement). See Exhibit C to Mendez Fuel's Memo (DE# 117-3 at 1, 10/12/21). The

---

[4] Although no transcript was filed, a review of the recording of the hearing supports Mendez Fuel's assertion, that counsel for the SEIF Defendants agreed to the $10,026.91 amount for Count II (breach of the Supply Agreement).

Court will hold the SEIF Defendants to that agreement. The amount of the final judgment for Count II (breach of the Supply Agreement) shall be $10,026.91, plus the statutory rate of interest.

## II.     The Scope of the Guaranty

The parties also dispute the scope of the Guaranty signed by Michael Mendez on October 14, 2015. The SEIF Defendants argue that the Guaranty applies to both the Supply Agreement **and** the Lease Agreement. <u>See</u> SEIF Defendants' Memo at 1-8. Mendez Fuel takes the position that the Guaranty applies only to the Supply Agreement. <u>See</u> Mendez Fuel's Memo at 3 (stating that "Mendez agrees that the Guaranty is binding upon him to the extent that [Mendez Fuel Holdings 3, LLC] failed to comply with its obligations owed to SEIF under the express terms of the Supply Agreement. Mendez does not agree, and vehemently disputes, that he personally guaranteed any of [Mendez Fuel Holdings 3, LLC]'s obligations owed to 7-Eleven under the express terms of the Lease Agreement.").

### a.     Florida Contract Law

The Court will apply Florida law in interpreting the Guaranty.[5] "A guaranty is a promise to pay some debt . . . of another on the default of the person primarily liable for payment or performance." <u>New Holland, Inc. v. Trunk</u>, 579 So. 2d 215, 216-17 (Fla. 5th

---

[5] Although the Guaranty states that it shall be governed by Texas law, Guaranty at ¶ 13, a choice-of-law provision in a contract may be waived. <u>See</u> <u>Axa Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC</u>, 608 F. Supp. 2d 1330, 1335 (S.D. Fla. 2009) (stating that "[c]hoice of law provisions can be waived where the parties fail to raise the issue with the Court either by objection or by failing to cite to the law provided for in the choice of law provision."). Here, both parties have relied on Florida law in their summary judgment briefs and in the instant supplemental briefs. Therefore, the Court will apply Florida law.

DCA 1991). "In Florida, guaranty agreements are governed by contract law." <u>Dickerson</u>

<u>v. Cmty. W. Bank</u>, No. 8:10-CV-729-T-17AEP, 2015 WL 4879353, at *12 (M.D. Fla.

Aug. 14, 2015).

Florida law states that "[w]here the terms of a contract are clear and

unambiguous, the parties' intent must be gleaned from the four corners of the

document." <u>Crawford v. Barker</u>, 64 So. 3d 1246, 1255 (Fla. 2011). The language of a

contract "is the best evidence of the parties' intent[.]" <u>Richter v. Richter</u>, 666 So. 2d 559,

561 (Fla. 4th DCA 1995). "Where words of a contract are clear and definite, they must

be understood according to their ordinary meaning." <u>Institutional & Supermarket Equip.,</u>

<u>Inc. v. C & S Refrigeration, Inc.</u>, 609 So. 2d 66, 68 (Fla. 4th DCA 1992). "[C]ourts must

strive to interpret a contract in such a way as to give meaning to all provisions while

doing violence to none." <u>Bethany Trace Owners' Ass'n, Inc. v. Whispering Lakes I, LLC</u>,

155 So. 3d 1188, 1191 (Fla. 2d DCA 2014); <u>see</u> <u>also</u> <u>Moore v. State Farm Mut. Auto.</u>

<u>Ins. Co.</u>, 916 So. 2d 871, 877 (Fla. 2d DCA 2005) (stating that courts "will not interpret a

contract in such a way as to render provisions meaningless when there is a reasonable

interpretation that does not do so.").

"[I]t is settled law in Florida that a court may resort to the process of interpretation

only when the words used in a contract are unclear." <u>Boat Town U.S.A., Inc. v. Mercury</u>

<u>Marine Div. of Brunswick Corp.</u>, 364 So. 2d 15, 17 (Fla. 4th DCA 1978). "[C]ontractual

language is ambiguous only if it is susceptible to more than one **reasonable**

interpretation." <u>BKD Twenty-One Mgmt. Co., Inc. v. Delsordo</u>, 127 So. 3d 527, 530 (Fla.

4th DCA 2012) (emphasis in original). "A true ambiguity does not exist merely because

a contract can possibly be interpreted in more than one manner. Indeed, fanciful,

inconsistent, and absurd interpretations of plain language are always possible. It is the duty of the trial court to prevent such interpretations." Am. Med. Int'l, Inc. v. Scheller, 462 So. 2d 1, 7 (Fla. 4th DCA 1984).

"Parol evidence is inadmissible to contradict, vary, or modify terms which are unambiguously contained within a written agreement." Prime Homes, Inc. v. Pine Lake, LLC, 84 So. 3d 1147, 1152 (Fla. 4th DCA 2012). "[C]ourts are allowed to consider extrinsic evidence only when confronting an ambiguous contract provision, and they are barred from using evidence to create an ambiguity to rewrite a contractual provision[.]" J.C. Penney Co. v. Koff, 345 So. 2d 732, 735 (Fla. 4th DCA 1977).

### b.   The Court Will Not Consider Mendez Fuel's Communication Practices, Rent Invoices and Other Guaranties Signed by the Parties

At the outset, the Court notes that both parties seek to introduce extrinsic evidence. The SEIF Defendants cite to Mendez Fuel Holdings 3, LLC's communication practices: "all of [Mendez Fuel Holdings 3, LLC]'s contacts and discussions with the Franchisor were with Robert Dowd and Kenia DelRisco, both of whom are employees of SEIF, not 7-Eleven" and "all of [Mendez Fuel Holdings 3, LLC's] discussions related to the Lease Agreement for the Property and purchase of petroleum products were through SEIF and its employees." SEIF Defendants' Memo at 8.[6]  The SEIF defendants also attach a rent invoice, Exhibit 5 to SEIF Defendants' Memo (DE# 114-5, 10/4/21), and note that "pursuant to the Supply Agreement, [Mendez Fuel Holdings 3, LLC] was

---

[6]  The SEIF Defendants have not filed a declaration or affidavit establishing these facts. "[A]ttorney argument is not evidence." Lehrfield v. Liberty Mut. Fire Ins. Co., 396 F. Supp. 3d 1178, 1183 (S.D. Fla. 2019), appeal dismissed, No. 19-13027-HH, 2019 WL 6130842 (11th Cir. Oct. 21, 2019). Thus, the Court will not consider the unattested-to factual assertions made by counsel.

responsible to pay SEIF for all rent." Id. at 3.

Mendez Fuel also cites to extrinsic evidence concerning the SEIF Defendants'
recent conduct in connection with the renewal of franchise rights involving a different
gas station affiliated with Mr. Mendez. Mendez Fuel's Memo at 4-5. Mendez Fuel
attaches to its memo an executed and unexecuted guaranty agreement. See Exhibits A
and B to Mendez Fuel's Memo. Mendez Fuel seeks to rely on Exhibits A and B to show
that:

> the SEIF Defendants have recently tacitly acknowledged that [Mendez
> Fuel]'s view of the scope of the Guaranty is sound given that the SEIF
> Defendants have revised the express terms of the Guaranty that it
> requires of its dealers by expressly including 7-Eleven and the SEIF
> Defendants' affiliates and subsidiaries within the scope of the Guaranty
> and also expanded the scope of who the actual guarantor is under the
> revised Guaranty.

Mendez Fuel's Memo at 2-3.

As noted above, "courts are allowed to consider extrinsic evidence only when
confronting an ambiguous contract provision, and they are barred from using evidence
to create an ambiguity to rewrite a contractual provision[.]" J.C. Penney Co., 345 So. 2d
at 735. The language of a contract "is ambiguous only if it is susceptible to more than
one reasonable interpretation." BKD Twenty-One Mgmt. Co., Inc., 127 So. 3d at 530
(emphasis omitted). In the instant case, the parties have not argued that any of the
contract provisions are subject to more than one reasonable interpretation. Moreover,
the Court has carefully reviewed the parties' agreements and finds that there are no
ambiguities. Therefore, the Court will disregard the extrinsic evidence submitted by the
parties.

### c.     The Guaranty Does Not Apply to the Lease Agreement

#### i.     The Guaranteed Indebtedness

The Guaranty was signed by Michael Mendez for the stated benefit of SEIF. "This Agreement is for the benefit of SEI Fuels and its successors and assigns[.]" Guaranty at ¶ 12. As will be discussed below, because SEIF currently holds all rights and interests in the Guaranty, there are presently no successors or assigns of SEIF with respect to this Guaranty. There is no mention of 7-Eleven in the Guaranty and there is no reference to a parent, subsidiary or affiliate of SEIF.

Under the Guaranty, Michael Mendez "irrevocably and unconditionally guarantee[d] to SEI FUEL SERVICES, INC. . . . the prompt payment and performance of the Guaranteed Indebtedness[.]" Guaranty at 1. The term "Guaranteed Indebtedness" is defined by the Guaranty as:

> those certain liabilities, obligations and indebtednesses, currently existing and hereafter incurred by Customer **to SEI Fuels** for any business location, and any and all renewals, extensions and modifications thereof, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or unmatured and whether originally contracted to or acquired **by SEI Fuels**, including without limitation, any and all costs and expenses incurred in the collection or enforcement of same, including attorney[']s fees incurred **by SEI Fuels**.

Id. at ¶ 1 (emphasis added).

The Guaranteed Indebtedness is defined by the Guaranty in relation to SEIF. It must be a liability, obligation or indebtedness that is "currently existing" or "hereafter incurred . . . to SEI Fuels" and includes those liabilities, obligations and indebtednesses "whether direct or indirect" that were "originally contracted to or acquired by SEI Fuels . . . , including attorney[']s fees incurred by SEI Fuels." Id.

14

Thus, in order for the Lease Agreement to be covered by the Guaranty it must be a liability, obligation or indebtedness incurred to SEIF, originally contracted to SEIF or acquired by SEIF. For the reasons stated herein, the Court finds that the Lease Agreement is not covered by the Guaranty.

### ii.      The Lease Agreement

The SEIF Defendants cite to portions of the Lease Agreement to support their position that the Guaranteed Indebtedness "include[s] the monies collected by SEIF on behalf of 7-Eleven under the Lease Agreement." SEIF Defendants' Memo at 2. Mendez Fuel argues that "it is inappropriate for the SEIF Defendants to ask this Court to review the terms of the underlying Lease Agreement to determine the scope of the Guaranty." Mendez Fuel's Memo at 7.

The Court will not rely on the Lease Agreement to interpret provisions of the Guaranty.[7] Nonetheless, the Court must look to the Lease Agreement to determine whether a liability, obligation or indebtedness arising therein falls within the definition of a "Guaranteed Indebtedness" as that term is defined by the Guaranty.

### (a).      SEIF's Designation Under the Lease Agreement as the Payment Collector is Not an Assignment of Rights

The SEIF Defendants cite to the portion of the Lease Agreement which designates SEIF as 7-Eleven, Inc.'s agent for the collection of payments owed under the Lease Agreement. See SEIF Defendants' Memo at 3 (citing paragraph 5(e) of the Lease Agreement).

---

[7] The Court finds that the language of the Guaranty is clear and unambiguous and, as such, will determine "the parties' intent . . . from the four corners of the document." Crawford, 64 So. 3d at 1255.

15

Paragraph 5(e) of the Lease Agreement states that:

(e) [Mendez Fuel Holdings 3, LLC] shall pay the Base Rent, taxes, and all other amounts due [7-Eleven] in accordance with [7-Eleven]'s payment terms then in effect, as communicated to [Mendez Fuel Holdings 3, LLC] from time to time. **[7-Eleven] hereby designates [SEIF] as [7-Eleven]'s agent for collection of rent and other amounts owed by [Mendez Fuel Holdings 3, LLC] hereunder, which collections may be made by [SEIF] as set forth in the [Supply Agreement]**.

Lease Agreement at ¶ 5(e) (emphasis added).

According to the SEIF Defendants "the express terms of the Lease Agreement authorized SEIF to act as 7-Eleven's agent and assignee, and as such, SEIF is entitled to enforce its rights under the Personal Guaranty and recover the rent and taxes owed by [Mendez Fuel Holdings 3, LLC] to SEIF." SEIF Defendants' Reply at 4.

Paragraph 5(e) of the Lease Agreement clearly states that SEIF was 7-Eleven's agent for purposes of collecting payments owed under the Lease Agreement. However, in order for money owed under the Lease Agreement to be covered by the Guaranty, it must be a liability, obligation or indebtedness to SEIF. See Guaranty at ¶ 1 (defining "Guaranteed Indebtedness").

The designation of SEIF as an agent of 7-Eleven is insufficient to show that the money owed under the Lease Agreement was owed to SEIF. "[T]he scope of the agent's authority is limited to what the principal has authorized the agent to do." Stalley v. Transitional Hosps. Corp. of Tampa, 44 So. 3d 627, 630 (Fla. 2d DCA 2010). Here, 7-Eleven authorized SEIF to collect rent and other amounts due under the Lease Agreement. Lease Agreement at ¶ 5(e). This is not enough. For payments owed under the Lease Agreement to fall under the definition of "Guaranteed Indebtedness," those payments must be incurred to SEIF "whether direct[ly] or indirect[ly]" and "[whether originally contracted to or acquired by SEI[F.]" Guaranty at ¶ 1.

16

The SEIF Defendants argue that "the provisions of the Lease Agreement clearly provide that 7-Eleven ha[s] assigned all of its rights to [Mendez Fuel Holdings 3, LLC]'s payment obligations under the Lease Agreement to SEIF, and more specifically all of the debts owed by [Mendez Fuel Holdings 3, LLC] owed to 7-Eleven under the Lease Agreement." SEIF Defendants' Memo at 3-4. The problem with this argument is that the SEIF Defendants have presented no evidence of an assignment from 7-Eleven to SEIF of any rights under the Lease Agreement.

"An assignment . . . is defined as a voluntary act of transferring a right or an interest." <u>Bioscience W., Inc. v. Gulfstream Prop. & Cas. Ins. Co.</u>, 185 So. 3d 638, 641 (Fla. 2d DCA 2016). To the extent that the SEIF Defendants are relying on paragraph 5(e) of the Lease Agreement, that provision says nothing about rent or other payments owed under the Lease Agreement being assigned to SEIF. Paragraph 5(e) does not constitute an assignment of 7-Eleven, Inc.'s substantive rights under the Lease Agreement.

Paragraph 5(e) does state that "collections may be made by [SEIF] as set forth in the [Supply Agreement]." Lease Agreement at ¶ 5(e). As will be discussed at length below, paragraph 5(e)'s reference to the Supply Agreement further undermines the argument that paragraph 5(e) creates an assignment of rights from 7-Eleven to SEIF.

        **(b).**    **The Attorney's Fee Provision in the Lease Agreement Does Not Establish that Amounts Owed Under the Lease Agreement are Covered by the Guaranty**

The SEIF Defendants also cite to paragraph 28 of the Lease Agreement, which is an attorney's fee provision. SEIF Defendants' Memo at 4. Paragraph 28 states as

follows:

> 28.    ATTORNEY'S FEES. [Mendez Fuel Holdings 3, LLC] hereby covenants and **agrees to pay [7-Eleven, Inc.]**, within 10 days of receipt of a statement from [7-Eleven, Inc.], **the amount [7-Eleven, Inc.] has paid or will pay** for legal fees, court costs, investigative and related expenses arising from under or relating to any default or alleged default by [Mendez Fuel Holdings 3, LLC] under this Lease, whether or not [7-Eleven, Inc.] elects to terminate the Lease and whether or not a legal proceeding is filed or an action commenced. If legal action is commenced, the prevailing party shall recover from the non-prevailing party all of its attorneys' fees and costs through all appeals. It is the intent of the parties that the provisions of this paragraph continue after the expiration or earlier termination of this Lease.

Lease Agreement at ¶ 28 (emphasis added).

The SEIF Defendants argue that in paragraph 28, "[Mendez Fuel Holdings 3, LLC] covenanted and agreed to allow the prevailing party in a legal action to recover **all** of its attorneys' fees and costs from the non-prevailing party" and that "it is clear that the Lease Agreement contemplated SEIF ensuring that [Mendez Fuel Holdings 3, LLC] paid all debts owed to SEIF, as authorized agent of 7-Eleven, under the Lease Agreement." SEIF Defendants' Memo at 4 (emphasis in Memo).

Paragraph 28 is a garden-variety attorney's fee provision. The express language of paragraph 28 provides that Mendez Fuel Holdings 3, LLC will pay to 7-Eleven certain fees, costs and expenses arising from a default of the Lease Agreement.

If anything, paragraph 28 undercuts the SEIF Defendants' argument that "7-Eleven ha[s] assigned all of its rights to [Mendez Fuel Holdings 3, LLC]'s payment obligations under the Lease Agreement to SEIF." SEIF Defendants' Memo at 4. Paragraph 28 contemplates that 7-Eleven will be the party enforcing its rights under the Lease Agreement, including filing a lawsuit if necessary: "[Mendez Fuel Holdings 3, LLC] hereby covenants and agrees to pay [7-Eleven] . . . the amount [7-Eleven] has

18

paid or will pay for legal fees, court costs, investigative and related expenses arising from under or relating to any default or alleged default by [Mendez Fuel Holdings 3, LLC] under this Lease[.]" Lease Agreement at ¶ 28. There is no mention, in paragraph 28, of SEIF, the purported assignee.

If, as the SEIF Defendants claim, 7-Eleven has assigned all of its rights to payment obligations under the Lease Agreement to SEIF, 7-Eleven would not have standing to bring a lawsuit to recover for the non-payment of rent.

Reading the Lease Agreement as a whole, it is clear that 7-Eleven did not assign its right to receive payments under the Lease Agreement when it designated SEIF as an agent of 7-Eleven for purposes of collecting rent and other amounts due under the Lease Agreement. See Lease Agreement at ¶ 5(e). The Lease Agreement makes clear that 7-Eleven, Inc. retained all rights under the Lease Agreement, including the right to attorney's fees in the event of a default. Id. at ¶ 28.

### iii.   The Supply Agreement

The SEIF Defendants also cite to certain portions of the Supply Agreement as evidence that "the rent payments owed by [Mendez Fuel Holdings 3, LLC] to 7-Eleven were contemplated and acknowledged in the definition of guaranteed indebtedness in the Personal Guaranty." SEIF Defendants' Memo at 4. Mendez Fuel argues that the Supply Agreement is not relevant to determining the scope of the Guaranty. Mendez Fuel's Memo at 8. The Court does not need to resolve Mendez Fuel's objection because, in any event, the Supply Agreement is not helpful to the SEIF Defendants. As discussed below, the cited provisions in the Supply Agreement undermine the SEIF Defendants' argument that the payments owed under the Lease Agreement were

assigned to SEIF.

> **(a).  The Fact that the Supply Agreement Acknowledges that SEIF is Authorized by 7-Eleven to Collect Payments under the Lease Agreement Does Not Establish that Those Payments Are Liabilities, Obligations or Indebtednesses to SEIF**

The SEIF Defendants argue that "in the Supply Agreement, the parties acknowledged and intended for SEIF to be the party to whom all rent and taxes would be due under the Lease Agreement." SEIF Defendants' Memo at 4. While this is factually correct—7-Eleven designated SEIF as 7-Eleven's agent for the collection of rent and other payments due under the Lease Agreement—it does not mean that the payments owed under the Lease Agreement were liabilities, obligations or indebtednesses to SEIF.

The SEIF Defendants cite to paragraph 4(e)(3) of the Supply Agreement. However, paragraph 4(e)(3) makes clear that the amounts owed under the Lease Agreement remained due to 7-Eleven irrespective of SEIF's role as payment collector:

> (3) In addition, [Mendez Fuel Holdings 3, LLC] acknowledges that SEIF has been authorized by 7-Eleven, Inc. ("7-Eleven") to collect **on behalf of 7-Eleven** some or all of the **amounts due** . . . **to 7-Eleven** on account of [Mendez Fuel Holdings 3, LLC]'s lease or franchise agreement with 7-Eleven covering the Premises. [Mendez Fuel Holdings 3, LLC] hereby permits SEIF to debit any such amounts directly from [Mendez Fuel Holdings 3, LLC]'s account in the manner set forth above, **in satisfaction of such obligations to 7-Eleven**. Should SEIF elect or be directed to discontinue collecting such amounts on behalf of 7-Eleven, then, upon reasonable notice to [Mendez Fuel Holdings 3, LLC], [Mendez Fuel Holdings 3, LLC] shall make such payments **directly to 7-Eleven** in the manner set forth in the applicable agreement, or otherwise as **directed by 7-Eleven**.

Supply Agreement at ¶ 4(e)(3) (emphasis added).

Paragraph 4(e)(3) of the Supply Agreement undercuts the SEIF Defendants' argument that 7-Eleven assigned the amounts owed under the Lease Agreement to

SEIF because it makes clear that the amounts owed under the Lease Agreement are being collected "on behalf of 7-Eleven" and are "amounts due . . . to 7-Eleven" and any debits are "in satisfaction of such obligations to 7-Eleven." Supply Agreement at ¶ 4(e)(3).

In fact, paragraph 4(e)(3) of the Supply Agreement provides the clearest indication that SEIF's role was that of agent and not assignee. Paragraph 4(e)(3) contemplates the possibility that SEIF's role as collector of payments due under the Lease Agreement could end: "Should SEIF elect **or be directed to discontinue collecting such amounts on behalf of 7-Eleven**, then, upon reasonable notice to [Mendez Fuel Holdings 3, LLC], **[Mendez Fuel Holdings 3, LLC] shall make such payments directly to 7-Eleven** in the manner set forth in the applicable agreement, **or otherwise as directed by 7-Eleven**." Supply Agreement at ¶ 4(e)(3).

The fact that SEIF's role as payment collector could be discontinued and upon that discontinuation, Mendez Fuel Holding 3, LLC would have to make the payments owed under the Lease Agreement directly to 7-Eleven or as directed by 7-Eleven is inconsistent with 7-Eleven having assigned the amounts due under the Lease Agreement to SEIF.

"An assignment . . . is defined as a voluntary act of transferring a right or an interest." Bioscience W., Inc. v. Gulfstream Prop. & Cas. Ins. Co., 185 So. 3d 638, 641 (Fla. 2d DCA 2016). If 7-Eleven had transferred its rights to the amounts owed under the Lease Agreement, SEIF could not be "directed to discontinue collecting such amounts on behalf of 7-Eleven," as indicated in paragraph 4(e)(3) of the Supply Agreement. "Once an assignment has been made, the assignor no longer has a right to

enforce the interest because the assignee has obtained all the rights to the thing assigned;" thus "a right once assigned can no longer be enforced or transferred by any party other than the assignee (unless further assigned)." <u>Bruno v. Hartford Ins. Co. of Midwest</u>, No. 220CV910FTM38NPM, 2021 WL 229402, at *3 (M.D. Fla. Jan. 21, 2021) (citing <u>Bioscience</u>, 185 So. 3d at 640)).

As paragraph 4(e)(3) makes clear, at any time, 7-Eleven could terminate SEIF's role as payment collector, at which point, Mendez Fuel Holdings 3, LLC would have to start making payments directly to 7-Eleven or in a manner directed by 7-Eleven. Supply Agreement at ¶ 4(e)(3). Such an arrangement is incompatible with the assertion that payments owed under the Lease Agreement were liabilities, obligations or indebtednesses to SEIF.

> **(b).** **The Attorney's Fee Provisions in the Supply Agreement Do Not Establish that Amounts Owed under the Lease Agreement are Liabilities, Obligations or Indebtednesses to SEIF**

The SEIF Defendants cite to two provisions in the Supply Agreement which provide for attorney's fees, paragraph 4(e)(4) and paragraph 22. <u>See</u> SEIF Defendants' Memo at 4-5.

As previously noted, subsection (e) is titled "Payments." Paragraph 4(e)(4) states that:

> (4) If the due date **for any payment under this Agreement** should fall on a Saturday, Sunday, or bank holiday, then [Mendez Fuel Holdings 3, LLC]'s payment to SEIF will be due the following business day. Any and all payment amounts overdue will be subject to monthly interest at an annual rate of 10% or the maximum rate permitted by law, whichever is higher. Such interest will accrue on [Mendez Fuel Holdings 3, LLC]'s total overdue balance, calculated from each applicable payment due date, and will continue to accrue until amounts owing are paid in full. **[Mendez Fuel Holdings 3, LLC] also shall be liable for any and all expenses incurred by SEIF (including attorneys' fees) in its efforts to collect**

**amounts overdue from [Mendez Fuel Holdings 3, LLC]**.

Supply Agreement at ¶ 4(e)(4) (emphasis added).

It is unclear how paragraph 4(e)(4) is helpful to the SEIF Defendants since subsection (e)(4) refers to "payment under this Agreement," i.e., the Supply Agreement. Mendez Fuel does not dispute that the Guaranty applies to the Supply Agreement. See Mendez Fuel's Memo at 3 (stating that "Mendez agrees that the Guaranty is binding upon him to the extent that [Mendez Fuel Holdings 3, LLC] failed to comply with its obligations owed to SEIF under the express terms of the Supply Agreement.").

The SEIF Defendants also cite to paragraph 22 of the Supply Agreement. SEIF Defendants' Memo at 5. Paragraph 22 states that:

> **In the event of any lawsuit** between SEIF and [Mendez Fuel Holdings 3, LLC] (or any arbitration proceeding pursuant to section 20 hereof) **arising out of or relating to the transactions or relationship contemplated by this Agreement** (regardless whether such action alleges breach of contract, tort, violation of a statute, or any other cause of action), **the substantially prevailing party will be entitled to recover its reasonable costs of suit and its reasonable attorneys' fees**. If a party substantially prevails on some aspects of such action but not others, the court (or arbitrator) may apportion any award of costs or attorneys' fees in such manner as it deems equitable.

Supply Agreement at ¶ 22 (emphasis added). The SEIF Defendants do not elaborate how paragraph 22 supports their argument other than stating that "it is abundantly clear that the parties contemplated SEIF, as 7- Eleven's assignee, collecting all debt owed by [Mendez Fuel Holdings 3, LLC] to 7-Eleven; and accordingly, the debt owed under the Lease Agreement is included in the guaranteed indebtedness definition in the Personal Guaranty." SEIF Defendants' Memo at 5.

For the reasons already discussed in this Order, the SEIF Defendants have presented no evidence of SEIF being 7-Eleven's assignee and the contractual

provisions cited by the SEIF Defendants are incompatible with an assignment.

### iv.    The SEIF Defendants Have Not Shown That the Amounts Owed Under the Lease Agreement Were Owed to SEIF

The SEIF Defendants argue that the "Guaranty specifically includes all direct **and** indirect damages of SEIF, **'whether originally contract[ed] to or acquired by SEI Fuels'"** and therefore the "'[G]uaranteed [I]ndebtedness[es]' are defined in the . . . Guaranty to explicitly include the monies collected by SEIF on behalf of 7-Eleven under the Lease Agreement." SEIF Defendants' Reply at 2 (quoting Guaranty at ¶ 1) (emphasis in Reply). The SEIF Defendants further state that "the intent of the parties is clear and unambiguous in the Personal Guaranty, to include all debts owed to SEIF." Id.

The Court agrees that the intent of the Guaranty was to include all debts **owed to SEIF**. What the SEIF Defendants have not shown is that the amounts owed under the Lease Agreement were debts owed to SEIF.

As already discussed at length in this Order, the Lease Agreement authorized SEIF to collect from Mendez Fuel Holdings 3, LLC payments owed under the Lease Agreement. Lease Agreement at ¶ 5(e). However, there is nothing in the Lease Agreement assigning 7-Eleven's rights to those payments to SEIF. The Supply Agreement contemplates that SEIF's role as payment collector could be discontinued, in which case Mendez Fuel Holdings 3, LLC would have to start submitting payments due under the Lease Agreement to 7-Eleven or as directed by 7-Eleven. See Supply Agreement at ¶ 4(e)(3). The fact that SEIF could "be directed to discontinue collecting such amounts on behalf of 7-Eleven," Supply Agreement at ¶ 4(e)(3), shows that the payments due under the Lease Agreement were not debts owed to SEIF.

For these reasons, the SEIF Defendants have not shown that the amounts owed

under the Lease Agreement were "direct [or] indirect damages of SEIF." SEIF

Defendants' Reply at 2.

### d. The Applicability of the PMPA to the Parties' Franchise Relationship Does Not Mean the SEIF Defendants Should Be Treated as One Legal Entity

The SEIF Defendants argue that "SEIF and 7-Eleven are one in the same for

purposes of the Supply and Lease Agreement" because otherwise, the Petroleum

Marketing Practices Act (PMPA) would not apply. SEIF Defendants' Memo at 7-8. The

SEIF Defendants state that "in order for the relationship between [Mendez Fuel

Holdings 3, LLC], SEIF and 7-Eleven to be a franchise relationship under the PMPA (as

both parties concede it was in their respective pleadings); SEIF and 7-Eleven must be

one and the same because a franchisor must supply petroleum products under a

trademark and provide leasehold rights to the marketing premises." Id. (emphasis

omitted). In other words, because, under the arrangement in the instant case, 7-Eleven

provided the leased premises and SEIF supplied the Mobil branded petroleum products

to Mendez Fuel Holdings 3, Inc., 7-Eleven and SEIF must be considered one legal

entity for the PMPA to apply. Id. at 7.

In their Reply Memo, the SEIF Defendants incorrectly state that Mendez Fuel

does "not even address the SEIF Defendants' argument regarding the PMPA in their

opposition papers; and accordingly, this argument should be accepted by the Court."

SEIF Defendants' Reply at 1, n. 1. The SEIF Defendants are mistaken. Mendez Fuel

does address this argument, stating that:

> In Section II of their Memorandum, the SEIF Defendants make a last-ditch effort to argue that SEIF and 7-Eleven are "legally one in the same" for purposes of the Lease Agreement and Supply Agreement. [ECF 114, pp. 4-8]. In taking such position, the SEIF Defendants go through an explanation of the PMPA. The SEIF Defendants' argument is without merit

because it contradicts the language contained in their own documents, specifically the revised Guaranty wherein they expressly delineate the 2 entities and define 7-Eleven as the parent company of SEIF. The SEIF Defendants' arguments [are] also without merit because the PMPA has nothing whatsoever to do with the interpretation of the four corners of the subject Guaranty at issue.

Mendez Fuel's Memo at 2, n.1.

The Court will not disregard the separate, corporate identities of 7-Eleven and SEIF simply because the parties in the instant case agreed that the PMPA applies to the parties' franchise relationship. Michael Mendez signed the Guaranty "for the benefit of SEI Fuels and its successors and assigns."[8] Guaranty at ¶ 12. There is no mention in the Guaranty of 7-Eleven or of a parent, subsidiary or affiliate of SEIF. "The very underpinning of contract law is the desire to bring certainty to commercial transactions." Institutional & Supermarket Equip., Inc. v. C & S Refrigeration, Inc., 609 So. 2d 66, 69 (Fla. 4th DCA 1992). This concept would be upended if courts were to insert a new party to a contract based on allegations or stipulations made approximately six years after a contract has been executed.

## **CONCLUSION**

Based on the foregoing, it is

ORDERED AND ADJUDGED that the Guaranty signed by Michael Mendez applies only to the Supply Agreement and does not apply to the Lease Agreement. It is

---

[8] It cannot be argued that 7-Eleven is SEIF's successor or assign because SEIF is presently still the holder of the Guaranty. See MBlock Invs., LLC v. Bovis Lend Lease, Inc., 274 So. 3d 504, 509 (Fla. 3d DCA 2019) (stating that "Florida courts have generally defined a successor . . . as one who follows or takes the place another has left and sustains the like part or character.") (citation and internal quotation marks omitted). Bioscience W., Inc., 185 So. 3d 638, 641 (Fla. 2d DCA 2016) (defining an assignment as "a voluntary act of transferring a right or an interest.").

further

ORDERED AND ADJUDGED that the amount of the final judgment for Count II (breach of the Supply Agreement) shall be $10,026.91, plus the statutory rate of interest. It is further

ORDERED AND ADJUDGED that no later than **noon** on **Wednesday, November 3, 2021**, the parties shall submit a joint proposed final judgment on the remaining counts of the Counterclaim (Counts I, II, V, VI, VIII, IX and X) consistent with this Order and the Court's Order (DE# 108, 9/9/21) on the cross-motions for summary judgment.

DONE AND ORDERED in Chambers at Miami, Florida, this **31st** day of October, 2021.

_____
JOHN J. O'SULLIVAN
CHIEF UNITED STATES MAGISTRATE JUDGE